Robert B. Gerard, Esq. (Nevada State Bar #005323)
Ricardo R. Ehmann, Esq. (Nevada State Bar #010576)
**GERARD & ASSOCIATES**
2840 South Jones Boulevard
Building D, Suite #4
Las Vegas, Nevada 89146
Telephone:    (702) 251-0093
Facsimile:    (702) 251-0094

Norman Blumenthal, Esq. (California State Bar #068687)
**BLUMENTHAL, NORDREHAUG & BHOWMIK**
2255 Calle Clara
La Jolla, California 92037
Telephone:    (858) 551-1223
Facsimile:    (858) 551-1232

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARY ANN SUSSEX, et al. | CASE NO.: **2: 08-cv-00773** |
| Plaintiffs, | |
| vs. | DECLARATION OF NORMAN BLUMENTHAL IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM SEEKING THE DISQUALIFICATION OF ARBITRATOR HARE IN NEVADA STATE COURT |
| TURNBERRY/MGM GRAND TOWERS, LLC, et al. | |
| Defendants. | |
| | Judge:  Miranda Du |
| | Courtroom: 4A |

DECLARATION OF NORMAN BLUMENTHAL IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM SEEKING THE DISQUALIFICATION OF ARBITRATOR HARE IN NEVADA STATE COURT   08-cv-00773

I, Norman Blumenthal, declare:

1.  I am an attorney licensed to practice in the State of California and an attorney of record for the Plaintiffs in the above entitled action.  I have personal knowledge as to the facts stated in this declaration.  If called as a witness, I could and would competently testify to the truth of the facts stated in this declaration.  I make this declaration in support of Ex parte application for a temporary restraining order and motion for preliminary and permanent injunction enjoining Defendants from seeking the disqualification of Arbitrator Hare in Nevada State Court.

2.  Attached hereto as <u>Exhibit #1</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on February 11, 2011, ordering the parties to this action to arbitrate their claims and defenses before Arbitrator Brendan M. Hare.

3.  Attached hereto as <u>Exhibit #2</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on March 2, 2010, ordering discovery to determine whether the Non-Signatories must defend against Plaintiffs' claims in arbitration.

4.  Attached hereto as <u>Exhibit #3</u> is a true and correct copy of the nunc pro tunc Order issued by Judge Roger R. Hunt on March 10, 2010, correcting errors and omissions from the previous March 2, 2010 Order.

5.  Attached hereto as <u>Exhibit #4</u> is a true and correct copy of the Defendants' Notice of Withdrawal of Motion to Determine Whether Non-Parties are Required to Appear in Arbitration and Request to Lift Stay of Arbitration, dated March 25, 2010.

6.  Attached hereto as <u>Exhibit #5</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on August 11, 2010, denying Plaintiffs' Motion for Order Requiring the AAA to Sustain Objection to the Appointment of Arbitrator Hare.

7.  Attached hereto as <u>Exhibit #6</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on February 3, 2011, reinstating his March 2, 2010 Order for discovery

to determine whether the non-signatories must defend in arbitration.

8.  Attached hereto as <u>Exhibit #7</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on September 15, 2011, denying Plaintiffs' motion to vacate the Arbitrator's Partial Award as to proceeding as a class and to reconsider the order to proceed in arbitration.

9.  Attached hereto as <u>Exhibit #8</u> is a true and correct copy of Order No. 1 issued by Arbitrator Brendan Hare on March 2, 2012, filed under seal.

10.  Attached hereto as <u>Exhibit #9</u> is a true and correct copy of the Order issued by Judge Roger R. Hunt on March 8, 2012, denying Plaintiffs' Motion to Relate Cases and Transfer Second-Filed Case to First Filed Case.

11.  Attached hereto as <u>Exhibit #10</u> is a true and correct copy of AAA's email dated March 9, 2012, agreeing to reduce the filing fee for a consolidated arbitration, filed under seal.

12.  Attached hereto as <u>Exhibit #11</u> is a true and correct copy of Order No. 2 issued by Arbitrator Brendan Hare on March 19, 2012, filed under seal.

13.  Attached hereto as <u>Exhibit #12</u> is a true and correct copy of Order No. 3 issued by Arbitrator Brendan Hare on March 21, 2012, filed under seal.

14.  Attached hereto as <u>Exhibit #13</u> is a true and correct copy of Order No. 4 issued by Arbitrator Brendan Hare on May 30, 2012, filed under seal.

15.  Attached hereto as <u>Exhibit #14</u> is a true and correct copy of Order No. 5 issued by Arbitrator Brendan Hare on June 14, 2012, filed under seal.

16.  Attached hereto as <u>Exhibit #15</u> is a true and correct copy of Order No. 6 issued by Arbitrator Brendan Hare on June 28, 2012, filed under seal.

17.  Attached hereto as <u>Exhibit #16</u> is a true and correct copy of Order No. 7 issued by Arbitrator Brendan Hare on July 10, 2012, filed under seal.

DECLARATION OF NORMAN BLUMENTHAL IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM SEEKING THE DISQUALIFICATION OF ARBITRATOR HARE IN NEVADA STATE COURT   08-cv-00773

2

18.  Attached hereto as Exhibit #17 is a true and correct copy of Order No. 8 issued by Arbitrator Brendan Hare on July 16, 2012, filed under seal.

19.  Attached hereto as Exhibit #18 is a true and correct copy of Order No. 9 issued by Arbitrator Brendan Hare on December 31, 2012, filed under seal.

20.  Attached hereto as Exhibit #19 is a true and correct copy of Respondents' letter dated January 25, 2013, to Yvonne Baglini and JonathanWeed, objecting, pursuant to Rule 17(b) of the Commercial Arbitration Rules, to the continued service of Arbitrator Hare, filed under seal.

21.  Attached hereto as Exhibit #20 is a true and correct copy of Order No. 10 issued by Arbitrator Brendan Hare on January 26, 2013, filed under seal.

22.  Attached hereto as Exhibit #21 is a true and correct copy of Order No. 11 issued by Arbitrator Brendan Hare on February 6, 2013, filed under seal.

23.  Attached hereto as Exhibit #22 is a true and correct copy of Plaintiffs' letter dated February 8, 2013 detailing the inadequacies with Respondents' challenge to the impartiality of Arbitrator Hare, filed under seal.

24.  Attached hereto as Exhibit #23 is a true and correct copy of Respondents' reply dated February 12, 2013, in response to Claimants' February 8, 2013 letter arguing Claimants' failed to address certain points in regards to Arbitrator Hare's impartiality in the case, filed under seal.

25.  Attached hereto as Exhibit #24 is a true and correct copy of the Supplemental Disclosure submitted by Arbitrator Brendan Hare on February 13, 2013, filed under seal.

26.  Attached hereto as Exhibit #25 is a true and correct copy of Respondents' reply to Jonathan Weed dated February 14, 2013, in response to Arbitrator Hare's Supplemental disclosure asking for clarification on several issues in order to frame an appropriate response to the supplemental disclosure, filed under seal.

27. Attached hereto as <u>Exhibit #26</u> is a true and correct copy of Respondents' letter dated February 22, 2013, to Yvonne Baglini and JonathanWeed, confirming their objection to the continued services of Arbitrator Hare and their request for Arbitrator Hare's disqualification in the arbitration, filed under seal.

28. Attached hereto as <u>Exhibit #27</u> is a true and correct copy of Plaintiffs' letter dated February 28, 2013, opposing disqualification of Arbitrator Hare, filed under seal.

29. Attached hereto as <u>Exhibit #28</u> is a true and correct copy of Respondents' letter dated February 28, 2013, to Yvonne Baglini and JonathanWeed, in repsonse to Claimants' arguments addressing Arbitrator Hare's disclosures, filed under seal.

30. Attached hereto as <u>Exhibit #29</u> is a true and correct copy of Yvonne Baglini's email to Counsel for all Respondents and Counsel for all Claimants, dated March 6, 2013, reaffirming Arbitrator Brendan Hare as the Arbitrator, filed under seal.

31. Attached hereto as <u>Exhibit #30</u> is a true and correct copy of Order No. 12 issued by Arbitrator Brendan Hare on March 15, 2013, filed under seal.

32. Attached hereto as <u>Exhibit #31</u> is a true and correct copy of Order No. 13 issued by Arbitrator Brendan Hare on March 18, 2013, filed under seal.

33. Attached hereto as <u>Exhibit #32</u> is a true and correct copy of Respondents' letter dated March 28, 2013, to Yvonne Baglini and JonathanWeed seeking reconsideration of the AAA's March 6, 2013 decision, which reaffirmed Brendan Hare as the arbitrator in this matter, filed under seal.

34. Attached hereto as <u>Exhibit #33</u> is a true and correct copy of Norm Blumenthal's email to Yvonne Baglini, Jonathan Weed, and Counsel for all Respondents, dated March 28, 2013, objecting to the contents of Respondents' March 28, 2013 letter, filed under seal.

35. Attached hereto as <u>Exhibit #34</u> is a true and correct copy of Yvonne Baglini's email to Counsel for all Respondents and Counsel for all Claimants, dated April 5, 2013,

1   reaffirming Arbitrator Brendan Hare as the Arbitrator, filed under seal.

2       36.  Attached hereto as Exhibit #35 is a true and correct copy of Order No. 14 issued

3   by Arbitrator Brendan Hare on April 9, 2013, filed under seal.

4       37.  Attached hereto as Exhibit #36 is a true and correct copy of the Joint Status

5   Report submitted by Counsel for all Claimants and Counsel for all Respondents to U.S.

6   District Court Judge Roger R. Hunt dated April 10, 2013.

7       38.  Attached hereto as Exhibit #37 is a true and correct copy of Defendant

8   Turnberry/MGM Grand Towers, LLC's Motion to File Exhibit A to Motion to Disqualify

9   Under Seal and Application for an Order Shortening Time and Order Shortening, dated April

10  24, 2013, filed in the District Court of Clark County Nevada.

11      I declare under penalty of perjury under the laws of the State of Nevada that the

12  foregoing is true and correct.  Executed this 26th day of April, 2013 at San Diego, California.

13

14           _/s/ Norman B. Blumenthal_

15           Norman Blumenthal, Esq.

16  K:\D\Dropbox\Pending Litigation\MGM\Sussex - class action\p-Dec-Blumenthal Support of Motion for TRO.wpd

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT #1

1 MORRIS PETERSON
Steve Morris, No. 1543
2 Email: sm@morrislawgroup.com
Akke Levin, No. 9102
3 Email: al@morrislawgroup.com
Jean-Paul Hendricks, No. 10079
4 Email: jph@morrislawgroup.com
900 Bank of America Plaza
5 300 South Fourth Street
Las Vegas, Nevada 89101
6 Telephone: (702) 474-9400
Facsimile: (702) 474-9422
7

8 WOOD, SMITH, HENNING & BERMAN LLP
Jason C. Gless, No. 8469
9 Email: jgless@wshblaw.com
7670 West Lake Mead Boulevard, Suite 250
10 Las Vegas, Nevada 89128
Telephone: (702) 222-0625
11 Facsimile: (702) 253-6225

12 Attorneys for Defendants

13 UNITED STATES DISTRICT COURT

14 DISTRICT OF NEVADA

15

16 MARY ANN SUSSEX; MITCHELL PAE;  ) Case No. 2:08-cv-00773-RLH-PAL
MALCOLM NICHOLL and SANDY       )
17 SCALISE; ERNESTO VALDEZ, SR. and   )
ERNESTO VALDEZ, JR; JOHN         )
18 HANSON and ELIZABETH HANSON,     ) **NOTICE OF THE**
                                  ) **NONSIGNATORY**
19        Plaintiffs,            ) **DEFENDANTS' ACCEPTANCE**
                                  ) **OF ARBITRATION AND THE**
20 v.                            ) **ARBITRATOR'S AUTHORITY TO**
                                  ) **DECIDE THE CLAIMS MADE BY**
21 TURNBERRY/MGM GRAND TOWERS, ) **OR AGAINST THEM**
LLC, a Nevada LLC; MGM GRAND      )
22 CONDOMINIUMS LLC, a Nevada LLC; )         **AND**
THE SIGNATURE CONDOMINIUMS,      )
23 LLC, a Nevada LLC; MGM MIRAGE, a ) **ORDER VACATING**
Delaware Corporation; TURNBERRY/ ) **DISCOVERY ORDER AND**
24 HARMON AVE., LLC, a Nevada LLC;  ) **LIFTING STAY OF**
and TURNBERRY WEST REALTY, INC., ) **ARBITRATION**
25 a Nevada Corporation,           )
                                  )
26        Defendants.            )
                                  )
27 ——————————————————————————— )

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

In response to the Court's suggestion and statement on page 3, in lines 14–18, of its Order of February 03, 2011 (Dkt. #82), a copy of which is attached as Exhibit A hereto, the Nonsignatory Defendants "choose to submit to arbitration without contesting whether they can be compelled to arbitrate . . . to avoid discovery," which the plaintiffs have initiated in complete disregard of the Court's admonition that "the discovery . . . is to be limited only to the issue of whether the Nonsignatory Defendants may be compelled to arbitrate under contract and agency principles." *Id*. at 3:25–4:2. *See, e.g.*, Plaintiffs' Amended First Request for Production of Documents to Defendant Signature Condominiums LLC, attached as Exhibit B hereto. The Nonsignatory Defendants submit to arbitration and to the Arbitrator, Brendan M. Hare, deciding the claims made by or against them in whatever manner he may choose to do so, including, as the Court pointed out, disposition by "a motion to dismiss or similar pleading based on insufficient allegations." *Id*.

By this acceptance of arbitration and relinquishment of their objection to arbitrability, the Nonsignatory Defendants request the Court to vacate its February 03, 2011, discovery order and lift the stay of arbitration imposed by the order so that this long-delayed disposition of the claims made by the plaintiffs may proceed to conclusion, as contemplated under the arbitration agreement that each claimant signed.

MORRIS PETERSON

By: _____

Steve Morris, No. 1543
Akke Levin, No. 9102
Jean-Paul Hendricks, No. 10079
300 South Fourth Street, Suite 900
Las Vegas, Nevada 89101

Attorneys for Defendants

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

2

# ORDER

IT IS SO ORDERED: The Court's Order of February 3, 2011 (Dkt. #82) is hereby vacated, and the stay of arbitration is lifted. The parties, including the Nonsignatory Defendants, shall arbitrate their claims and defenses before Arbitrator Brendan M. Hare.

Dated: _____February 11, 2011_____

ROGER L. HUNT
Chief United States District Judge

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

3

# EXHIBIT #2

1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

11  MARY ANN SUSSEX; MITCHELL PAE;                )    Case No.: 2:08-cv-00773-RLH-PAL
    MALCOLM NICHOLL and SANDY                      )
12  SCALISE; ERNESTO VALDEZ, SR. and               )        **O R D E R**
    ERNESTO VALDEZ, JR; JOHN HANSON               )
13  and ELIZABETH HANSON,                          )    (Motion for Determination of Non-
                                                   )       Arbitrability of Claims against
14                          Plaintiffs,            )       Nonsignatory Defendants–#60)
                                                   )
15              vs.                                )
                                                   )
16  TURNBERRY/MGM GRAND TOWERS,                   )
    LLC, a Nevada LLC; MGM GRAND                   )
17  CONDOMINIUMS LLC, a Nevada LLC; THE           )
    SIGNATURE CONDOMINIUMS, LLC, a                 )
18  Nevada LLC; MGM MIRAGE, a Delaware             )
    Corporation; TURNBERRY/HARMON AVE.,           )
19  LLC, a Nevada LLC; and TURNBERRY              )
    WEST REALTY, INC., a Nevada Corporation,       )
20                                                 )
                            Defendants.            )
21  _____)

22
23          Before the Court is a **Motion for Determination of Non-Arbitrability of Claims**

24  **against Nonsignatory Defendants** (#60), filed by all Defendants on October 21, 2009. The Court

25  has also considered the Opposition to the Motion (#61), filed November 5, 2009, by all Plaintiffs,

26  and Defendants' Reply (#62), filed November 19, 2009.

AO 72
(Rev. 8/82)

**BACKGROUND**

The Signature at MGM Grand ("Signature") is a luxury condominium hotel project developed and sold by Defendant Turnberry/MGM Grand Towers, LLC ("Turnberry/MGM"). Between January 2004 and October 2005, Turnberry/MGM marketed and sold Signature condominium units to Plaintiffs pursuant to Purchase and Sale Agreements ("Agreements") that contained arbitration provisions. Plaintiffs brought this lawsuit against Turnberry/MGM in addition to other nonsignatory Defendants.

On July 17, 2008, Defendants Turnberry/MGM and Turnberry/Harmon Ave., LLC ("Turnberry/Harmon"), together with two former Defendants—MGM Grand, Inc. and Turnberry Associates—moved the Court to compel arbitration (Dkt. #17). Magistrate Judge Peggy A. Leen initially denied this motion (Dkt. #43, Order). On June 16, 2009, this Court "overruled, reversed, and vacated" Judge Leen's order, sustained the moving Defendants' objection, and compelled Plaintiffs to arbitrate their claims (Dkt. #59, Order 2).

On August 31, 2009, Plaintiffs and twelve additional claimants filed a demand for arbitration with the American Arbitration Association against all the Defendants in this case—Turnberry/MGM, MGM Grand Condominiums LLC, The Signature Condominiums LLC, MGM Mirage, Turnberry/Harmon Ave., and Turnberry West Realty, Inc. (collectively "Defendants" or "respondents in arbitration"). The respondents in arbitration filed an answering statement on October 9, 2009. The parties have not yet selected an arbitrator.

Defendants now move for an order declaring that the nonsignatory defendants—MGM Grand Condominiums, LLC; The Signature Condominiums, LLC; MGM Mirage; Turnberry/Harmon Ave., LLC; and Turnberry West Realty, Inc.—are not compelled to arbitrate Plaintiffs' claims under the Agreements. For the reasons appearing below, the Court denies Defendants' Motion in part, concluding that Turnberry/Harmon must defend against Plaintiffs' claims in arbitration; stays the arbitration proceedings; and orders the discovery and supplemental briefing schedule set forth in the Conclusion below.

2

**DISCUSSION**

**I.     Jurisdiction to Decide Question of Arbitrability**

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation and internal quotation marks omitted). This is because "arbitration is a matter of contract"; an arbitrator has authority to decide a dispute only if the parties agreed that he or she has the authority to do so. *Id.* Here, neither party argues that the arbitration agreement "clearly and unmistakably provide[d]" that the arbitrator could decide issues of arbitrability. Thus the issue is properly before the Court.

**II.     Binding Nonsignatories to Arbitration under Principles of Contract or Agency Law**

Defendants argue no principles of law require the nonsignatory Defendants to defend against claims in arbitration. "[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles. Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (citations and internal quotation marks omitted). A nonsignatory may also be held to an arbitration clause as a matter of equitable estoppel, which "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Id.* (citations and internal quotation marks omitted). One subset of the equitable estoppel theory provides that a nonsignatory may be held to an arbitration clause where it "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Id.* (citations and internal quotation marks omitted).

Defendants argue none of the foregoing principles apply. The parties do not dispute that none of the nonsignatory Defendants is incorporated into the arbitration agreement by reference and that none of the nonsignatory Defendants assumed obligations under the Agreements. But the parties dispute whether the nonsignatory Defendants may be bound to

AO 72
(Rev. 8/82)

1    arbitrate by operation of estoppel, agency, and veil-piercing/alter ego principles. The Court

2    considers each of these in turn.

3         **A.    Estoppel**

4              The Court first concludes that nonsignatory Defendant Turnberry/Harmon is

5    equitably estopped from refusing to defend against Plaintiffs' claims in arbitration because it

6    joined the Motion to Compel Arbitration. Defendants correctly argue that "asking the Court to

7    compel the [P]laintiffs to arbitrate under their contract with the proper party does not make an

8    improperly named defendant a contracting party." (Mot. 6.) But Turnberry/Harmon fails to

9    acknowledge that in moving to compel arbitration, it invoked the arbitration clause and thus

10   claimed the benefits of the contract—the ability to compel Plaintiffs to pursue their claims in an

11   arbitration setting. Equitable estoppel now prevents Turnberry/Harmon from seeking to avoid the

12   "burden" of the contract—the arbitration proceeding it previously insisted on. *Comer*, 436 F.3d at

13   1101. "Restated, the doctrine of estoppel prevents a party from 'having it both ways.'" *Wash. Mut.*

14   *Fin. Group, LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004). In addition, the Federal Arbitration

15   Act incorporates a "liberal policy favoring arbitration agreements," and "as a matter of federal law,

16   any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

17   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). That policy

18   supports the conclusion the Court reaches under equitable estoppel here.

19              Plaintiffs repeatedly state that "all" and "each" of the nonsignatory Defendants

20   moved, along with the signatory Defendant Turnberry/MGM, to compel Plaintiffs to arbitrate.

21   (Opp'n 1, 2, 5.) While Plaintiffs' statement was true at the time Defendants filed the Motion to

22   Compel Arbitration, it is no longer true because two of the movants (Turnberry Associates and

23   MGM Grand, Inc.) are no longer Defendants , and three of the current nonsignatory Defendants

24   (MGM Grand Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West

25   Realty, Inc.) were not movants. (*See* Dkt. #17, Mot. to Compel Arbitration 1–2.) The Court

26   concludes that there is no basis under which the Court can conclude the other nonsignatory

Defendants "knowingly exploited" the agreement so as to be equitably estopped from refusing to arbitrate. The Court now considers the theories of agency and veil-piercing/alter ego relative to the remaining nonsignatory Defendants.

**B.    Agency and Veil-Piercing/Alter Ego**

In their Amended Complaint (which names all current Defendants), Plaintiffs allege each Defendant "acted as the agent, principal or co-participant of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein." (Dkt. #14, Am. Compl. ¶ 23.) Similarly, they allege that Defendant MGM Mirage "is the controlling entity for" Defendants MGM Grand Condominiums, LLC, The Signature Condominiums, LLC, and Turnberry/MGM. They also allege that Defendants Turnberry/Harmon and Turnberry West Realty, Inc., "are the entities that comprise the Turnberry enterprise which is a member and/or manager of Turnberry/MGM...." (*Id.* ¶ 21.) They allege MGM Mirage and Turnberry/Harmon gave "clear and precise directions ... as to how and in what way to ... victimize investors[,]" and that MGM Grand Condominiums, LLC, The Signature Condominiums, LLC, and Turnberry West Realty, Inc. "were mere agencies and instrumentalities" of MGM Mirage and Turnberry/Harmon. (*Id.*)

While Plaintiffs' allegations are generally conclusory, the Court concludes that they nonetheless place into question the relationships between Turnberry/MGM (the signatory Defendant) and the nonsignatory Defendants. As the record now stands, the Court lacks sufficient information by which to determine whether the remaining nonsignatory Defendants—MGM Grand Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West Realty, Inc.—may be compelled to participate in arbitration under ordinary contract and agency principles. *Comer*, 436 F.3d at 1101. The Court therefore stays the arbitration proceedings and orders the discovery and supplemental briefing schedule set forth below.

/

/

/

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion for Determination of Non-Arbitrability of Claims against Non-Signatory Defendants (#60) is DENIED as to Defendant Turnberry/MGM Grand Towers, LLC.

IT IS FURTHER ORDERED that the arbitration described in Defendants' Motion (#60) is STAYED until further order of the Court as follows:

The parties shall have 90 days to conduct discovery to determine whether the remaining nonsignatory Defendants—MGM Grand Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West Realty, Inc.—must defend against Plaintiffs' claims in arbitration under ordinary contract and agency principles.

The parties must file simultaneous supplemental memoranda, with accompanying affidavits, on or before June 1, 2010. The memoranda (not including attachments and exhibits) shall not exceed 30 pages. Responses shall be filed simultaneously no later than July 1, 2010. Responses shall not exceed 20 pages. Based on the supplemental memoranda and responses, the Court will resolve the issue at hand, and lift the stay on the arbitration proceedings.

Dated: March 2, 2010.

_____
**ROGER L. HUNT**
**Chief United States District Judge**

AO 72
(Rev. 8/82)

EXHIBIT #3

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

11
12
13
14
15
16
17
18
19
20
21

MARY ANN SUSSEX; MITCHELL PAE;
MALCOLM NICHOLL and SANDY
SCALISE; ERNESTO VALDEZ, SR. and
ERNESTO VALDEZ, JR; JOHN HANSON
and ELIZABETH HANSON,

          Plaintiffs,

    vs.

TURNBERRY/MGM GRAND TOWERS,
LLC, a Nevada LLC; MGM GRAND
CONDOMINIUMS LLC, a Nevada LLC; THE
SIGNATURE CONDOMINIUMS, LLC, a
Nevada LLC; MGM MIRAGE, a Delaware
Corporation; TURNBERRY/HARMON AVE.,
LLC, a Nevada LLC; and TURNBERRY
WEST REALTY, INC., a Nevada Corporation,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:08-cv-00773-RLH-PAL

**CORRECTED ORDER
NUNC PRO TUNC***

(Motion for Determination of Non-
Arbitrability of Claims against
Nonsignatory Defendants–#60)

*This Order corrects errors and omissions
that appeared on page 6, lines 5, 9, and 10
of the previous draft.*

22
23
24
25
26

       Before the Court is a **Motion for Determination of Non-Arbitrability of Claims
against Nonsignatory Defendants** (#60), filed by all Defendants on October 21, 2009. The Court
has also considered the Opposition to the Motion (#61), filed November 5, 2009, by all Plaintiffs,
and Defendants' Reply (#62), filed November 19, 2009.

AO 72
(Rev. 8/82)

1

**BACKGROUND**

The Signature at MGM Grand ("Signature") is a luxury condominium hotel project developed and sold by Defendant Turnberry/MGM Grand Towers, LLC ("Turnberry/MGM"). Between January 2004 and October 2005, Turnberry/MGM marketed and sold Signature condominium units to Plaintiffs pursuant to Purchase and Sale Agreements ("Agreements") that contained arbitration provisions. Plaintiffs brought this lawsuit against Turnberry/MGM in addition to other nonsignatory Defendants.

On July 17, 2008, Defendants Turnberry/MGM and Turnberry/Harmon Ave., LLC ("Turnberry/Harmon"), together with two former Defendants—MGM Grand, Inc. and Turnberry Associates—moved the Court to compel arbitration (Dkt. #17). Magistrate Judge Peggy A. Leen initially denied this motion (Dkt. #43, Order). On June 16, 2009, this Court "overruled, reversed, and vacated" Judge Leen's order, sustained the moving Defendants' objection, and compelled Plaintiffs to arbitrate their claims (Dkt. #59, Order 2).

On August 31, 2009, Plaintiffs and twelve additional claimants filed a demand for arbitration with the American Arbitration Association against all the Defendants in this case—Turnberry/MGM, MGM Grand Condominiums LLC, The Signature Condominiums LLC, MGM Mirage, Turnberry/Harmon Ave., and Turnberry West Realty, Inc. (collectively "Defendants" or "respondents in arbitration"). The respondents in arbitration filed an answering statement on October 9, 2009. The parties have not yet selected an arbitrator.

Defendants now move for an order declaring that the nonsignatory defendants—MGM Grand Condominiums, LLC; The Signature Condominiums, LLC; MGM Mirage; Turnberry/Harmon Ave., LLC; and Turnberry West Realty, Inc.—are not compelled to arbitrate Plaintiffs' claims under the Agreements. For the reasons appearing below, the Court denies Defendants' Motion in part, concluding that Turnberry/Harmon must defend against Plaintiffs' claims in arbitration; stays the arbitration proceedings; and orders the discovery and supplemental briefing schedule set forth in the Conclusion below.

2

**DISCUSSION**

**I.      Jurisdiction to Decide Question of Arbitrability**

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation and internal quotation marks omitted). This is because "arbitration is a matter of contract"; an arbitrator has authority to decide a dispute only if the parties agreed that he or she has the authority to do so. *Id.* Here, neither party argues that the arbitration agreement "clearly and unmistakably provide[d]" that the arbitrator could decide issues of arbitrability. Thus the issue is properly before the Court.

**II.      Binding Nonsignatories to Arbitration under Principles of Contract or Agency Law**

Defendants argue no principles of law require the nonsignatory Defendants to defend against claims in arbitration. "[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles. Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (citations and internal quotation marks omitted). A nonsignatory may also be held to an arbitration clause as a matter of equitable estoppel, which "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Id.* (citations and internal quotation marks omitted). One subset of the equitable estoppel theory provides that a nonsignatory may be held to an arbitration clause where it "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Id.* (citations and internal quotation marks omitted).

Defendants argue none of the foregoing principles apply. The parties do not dispute that none of the nonsignatory Defendants is incorporated into the arbitration agreement by reference and that none of the nonsignatory Defendants assumed obligations under the Agreements. But the parties dispute whether the nonsignatory Defendants may be bound to

AO 72
(Rev. 8/82)

1    arbitrate by operation of estoppel, agency, and veil-piercing/alter ego principles. The Court

2    considers each of these in turn.

3    **A.    Estoppel**

4         The Court first concludes that nonsignatory Defendant Turnberry/Harmon is

5    equitably estopped from refusing to defend against Plaintiffs' claims in arbitration because it

6    joined the Motion to Compel Arbitration. Defendants correctly argue that "asking the Court to

7    compel the [P]laintiffs to arbitrate under their contract with the proper party does not make an

8    improperly named defendant a contracting party." (Mot. 6.) But Turnberry/Harmon fails to

9    acknowledge that in moving to compel arbitration, it invoked the arbitration clause and thus

10   claimed the benefits of the contract—the ability to compel Plaintiffs to pursue their claims in an

11   arbitration setting. Equitable estoppel now prevents Turnberry/Harmon from seeking to avoid the

12   "burden" of the contract—the arbitration proceeding it previously insisted on. *Comer*, 436 F.3d at

13   1101. "Restated, the doctrine of estoppel prevents a party from 'having it both ways.'" *Wash. Mut.*

14   *Fin. Group, LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004). In addition, the Federal Arbitration

15   Act incorporates a "liberal policy favoring arbitration agreements," and "as a matter of federal law,

16   any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

17   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). That policy

18   supports the conclusion the Court reaches under equitable estoppel here.

19        Plaintiffs repeatedly state that "all" and "each" of the nonsignatory Defendants

20   moved, along with the signatory Defendant Turnberry/MGM, to compel Plaintiffs to arbitrate.

21   (Opp'n 1, 2, 5.) While Plaintiffs' statement was true at the time Defendants filed the Motion to

22   Compel Arbitration, it is no longer true because two of the movants (Turnberry Associates and

23   MGM Grand, Inc.) are no longer Defendants , and three of the current nonsignatory Defendants

24   (MGM Grand Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West

25   Realty, Inc.) were not movants. (*See* Dkt. #17, Mot. to Compel Arbitration 1–2.) The Court

26   concludes that there is no basis under which the Court can conclude the other nonsignatory

AO 72
(Rev. 8/82)

1    Defendants "knowingly exploited" the agreement so as to be equitably estopped from refusing to

2    arbitrate. The Court now considers the theories of agency and veil-piercing/alter ego relative to the

3    remaining nonsignatory Defendants.

4         **B.      Agency and Veil-Piercing/Alter Ego**

5              In their Amended Complaint (which names all current Defendants), Plaintiffs allege

6    each Defendant "acted as the agent, principal or co-participant of or for the other Defendants with

7    respect to the acts, violations and common course of conduct alleged herein." (Dkt. #14, Am.

8    Compl. ¶ 23.) Similarly, they allege that Defendant MGM Mirage "is the controlling entity for"

9    Defendants MGM Grand Condominiums, LLC, The Signature Condominiums, LLC, and

10   Turnberry/MGM. They also allege that Defendants Turnberry/Harmon and Turnberry West Realty,

11   Inc., "are the entities that comprise the Turnberry enterprise which is a member and/or manager of

12   Turnberry/MGM...." (*Id.* ¶ 21.) They allege MGM Mirage and Turnberry/Harmon gave "clear and

13   precise directions ... as to how and in what way to ... victimize investors[,]" and that MGM Grand

14   Condominiums, LLC, The Signature Condominiums, LLC, and Turnberry West Realty, Inc. "were

15   mere agencies and instrumentalities" of MGM Mirage and Turnberry/Harmon. (*Id.*)

16              While Plaintiffs' allegations are generally conclusory, the Court concludes that they

17   nonetheless place into question the relationships between Turnberry/MGM (the signatory

18   Defendant) and the nonsignatory Defendants. As the record now stands, the Court lacks sufficient

19   information by which to determine whether the remaining nonsignatory Defendants—MGM Grand

20   Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West Realty,

21   Inc.—may be compelled to participate in arbitration under ordinary contract and agency principles.

22   *Comer*, 436 F.3d at 1101. The Court therefore stays the arbitration proceedings and orders the

23   discovery and supplemental briefing schedule set forth below.

24   /

25   /

26   /

AO 72
(Rev. 8/82)

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion for Determination of Non-Arbitrability of Claims against Non-Signatory Defendants (#60) is DENIED as to Defendant Turnberry/Harmon Ave., LLC.

IT IS FURTHER ORDERED that the arbitration described in Defendants' Motion (#60) is STAYED until further order of the Court as follows:

The parties shall have 90 days to conduct discovery to determine whether the remaining nonsignatory Defendants—MGM Grand Condominiums LLC; The Signature Condominiums, LLC; MGM Mirage; and Turnberry West Realty, Inc.—must defend against Plaintiffs' claims in arbitration under ordinary contract and agency principles.

The parties must file simultaneous supplemental memoranda, with accompanying affidavits, on or before June 1, 2010. The memoranda (not including attachments and exhibits) shall not exceed 30 pages. Responses shall be filed simultaneously no later than July 1, 2010. Responses shall not exceed 20 pages. Based on the supplemental memoranda and responses, the Court will resolve the issue at hand, and lift the stay on the arbitration proceedings.

Dated: March 10, 2010.

_____
**ROGER L. HUNT**
**Chief United States District Judge**

AO 72
(Rev. 8/82)

# EXHIBIT #4

MORRIS PETERSON
Steve Morris, No. 1543
Email: sm@morrislawgroup.com
Akke Levin, No. 9102
Email: al@morrislawgroup.com
Jean-Paul Hendricks, No. 10079
Email: jph@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

WOOD, SMITH, HENNING & BERMAN LLP
Jason C. Gless, No. 8469
Email: jgless@wshblaw.com
7670 West Lake Mead Boulevard, Suite 250
Las Vegas, Nevada 89128
Telephone: (702) 222-0625
Facsimile: (702) 253-6225

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MARY ANN SUSSEX; MITCHELL PAE; MALCOLM NICHOLL and SANDY SCALISE; ERNESTO VALDEZ, SR. and ERNESTO VALDEZ, JR; JOHN HANSON and ELIZABETH HANSON, | Case No. 2:08-cv-00773-RLH-PAL |
| Plaintiffs, | **NOTICE OF WITHDRAWAL OF MOTION TO DETERMINE WHETHER NON-PARTIES ARE REQUIRED TO APPEAR IN ARBITRATION (# 60)** |
| v. | |
| TURNBERRY/MGM GRAND TOWERS, LLC, a Nevada LLC; MGM GRAND CONDOMINIUMS LLC, a Nevada LLC; THE SIGNATURE CONDOMINIUMS, LLC, a Nevada LLC; MGM MIRAGE, a Delaware Corporation; TURNBERRY/ HARMON AVE., LLC, a Nevada LLC; and TURNBERRY WEST REALTY, INC., a Nevada Corporation, | **AND** |
| | **REQUEST TO LIFT STAY OF ARBITRATION** |
| Defendants. | |

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1    The defendants hereby withdraw their motion for determination of

2  non-arbitrability of claims against non-signatory defendants (# 60) and request

3  that the Court lift the stay imposed in arbitration and allow this case to proceed

4  before an arbitrator to disposition.

5  **I.      INTRODUCTION**

6    The defendants who are not parties to the arbitration agreement

7  withdraw their motion for determination of non-arbitrability without prejudice to

8  or waiver of their rights to assert all defenses to plaintiffs' complaint in

9  arbitration, including that the plaintiffs have not stated a viable claim against

10  them.  All of the defendants believe that the stay ordered by the Court and the 90-

11  day period for discovery on whether non-signatories must appear in arbitration

12  will occasion great expense and disputes over the nature and scope of the

13  discovery on whether non-parties to the arbitration agreement must go along to

14  arbitration with defendant-signatory Turnberry/MGM Grand Towers LLC.

15  Discovery on arbitrability will also occasion a duplication of discovery in

16  arbitration, because the Court has already ruled that one other non-signatory

17  defendant — Turnberry/Harmon Ave, LLC — must defend against the same

18  allegations that plaintiffs have made against the other non-signatories that file this

19  Notice of Withdrawal and Request to Lift Stay.

20    Unrestricted discovery into the relationships between

21  Turnberry/MGM Grand Towers and these four non-signatory defendants on

22  allegations which, as the Court correctly pointed out, are "generally conclusory,"

23  seems to be contrary to the Supreme Court's recent holdings in *Bell Atl. Corp. v.*

24  *Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009),

25  in which conclusory allegations were deemed insufficient to warrant further

26  expenditure of the parties' and the courts' resources to continue litigating claims

27  for which, as here in respect to the non-parties, no facts have been alleged to

28

MORRIS PETERSON
ATTORNEYS AT LAW
300 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

2

1   support the conclusory claims.  Nevertheless, discovery and the adjudication of

2   claims in this case are for the arbitrator to deal with.

3   　　　　Support for this request to lift the stay is found in state court:  It has

4   been two years since Clark County District Judge Denton ordered the *KJH*

5   plaintiffs to arbitration, which, due to resistance by the plaintiffs to an arbitral

6   forum, has yet to get underway.  This case, *Sussex*, engineered by the *KJH* lawyers,

7   has been pending in this Court since June 13, 2008.  *See* Notice of Removal (# 1).[1]

8   The Court granted the motion to compel arbitration in this case last year, on

9   June 16, 2009.  *See* Order (# 59).  The Court should permit the defendants to move

10  this case to arbitration by lifting the stay so that this dispute may proceed to

11  conclusion in arbitration for resolution of all claims, as contemplated by the

12  Federal Arbitration Act, and as agreed to by the plaintiffs when they entered into

13  their purchase contract with Turnberry/MGM Grand Towers.

14  **II.       GROUNDS FOR WITHDRAWAL AND REQUEST TO LIFT STAY**

15  **Discovery on the Arbitrability of Plaintiffs' Claims Against Four Non-Signatory Defendants Further Delays the Arbitration Proceeding and Threatens to Infringe on the Merits of the Dispute.**

16

17  　　　　"The unmistakably clear congressional purpose [in enacting the

18  Federal Arbitration Act is] that the arbitration procedure, when selected by the

19  parties to a contract, be speedy and not subject to delay and obstruction in the

20  courts." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).

21  "[P]ermitting discovery on . . . the district court level and arbitration level [] is a

22  great waste of resources and frustrates the basic purpose of the Arbitration Act

23  . . . " *Hires Parts Serv., Inc. v. NCR Corp.*, 859 F. Supp. 349, 355 (N.D. Ind. 1994).  In

24  determining to what extent discovery is necessary to determine arbitrability, these

25

26

27

28  [1] The *KJH* action has been pending in state court for almost two and a half years.

MORRIS PETERSON
ATTORNEYS AT LAW
100 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

3

goals of arbitration should be considered. *O.N. Equity Sales Co. v. Emmertz*, 526 F. Supp. 2d 523, 528 (E.D. Pa. 2007).

Discovery on issues of arbitrability may not encroach on the merits of the dispute to be arbitrated. *AT&T Techs., Inc. v. Commc'ns. Workers*, 475 U.S. 643, 647 (1986). If the question of whether plaintiffs' claims against non-signatories are arbitrable is bound up with the merits of the dispute, as it seems to be here, it may be inappropriate for the Court to decide the issue. *See AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC*, 608 F. Supp. 2d 1330, 1342-43 (S.D. Fla. 2009) (recommending denial of plaintiff's request for discovery where it appeared to bear more on the merits of the litigation than on issues of arbitrability). In any event, rather than litigate for several months over whether there is a basis to send the non-signatories to arbitration to deal with plaintiffs' claims, they withdraw their motion and will deal with the claims before the arbitrator.

Here, the Court ordered that all non-signatory defendants, except for Turnberry/Harmon Ave., LLC, participate in discovery in this Court to determine whether they may be compelled to arbitrate based on agency or veil-piercing/alter ego principles. Order (# 64). Discovery under these criteria will be time consuming and expensive because the plaintiffs have not pleaded any factual circumstances that would focus the discovery. For example, they have not identified conduct and linked such conduct to specific officers or defendants of the non-parties. Instead, they speculate that "[t]he commission of this fraud and illegal sales of the Securities *could not have occurred* without the clear and precise directions from the Defendants MGM Mirage and Turnberry/Harmon Ave., LLC . . ." Compl. (# 14) ¶ 21 (emphasis added). If this were an allegation in a case in which jurisdiction lay in this Court to decide the merits, the claim/allegation would be dismissed under *Twombly* and *Iqbal*, *supra*.

In *Twombly*, the United States Supreme Court acknowledged the enormous financial burden to a defendant who has to engage in discovery based

MORRIS PETERSON
ATTORNEYS AT LAW
300 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

4

1   on a putative class action complaint that contains only "labels and conclusions"

2   without factual allegations and declined to endorse it. *Bell Atl. Corp. v. Twombly*,

3   550 U.S. 544, 555, 558-59 (2007). Building on that foundation, the Supreme Court

4   went on to declare last year that "Rule 8 . . . does not unlock the doors of

5   discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v.*

6   *Iqbal*, 129 S. Ct. 1937, 1949 (2009). If the plaintiffs have any claim against non-

7   parties, they have not made a case for discovery outside of arbitration to support

8   it. *See ACE Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 194 (S.D. Tex. 2008)

9   (considering whether non-signatory was bound to arbitration agreement based on

10  agency and alter ego, and holding that "the conclusory statement" that one party

11  was the agent for the other was insufficient "to survive a motion to dismiss").[2]

12          Based on the all-inclusive but fact-deficient allegations in the

13  complaint with respect to the non-parties, there is a clear risk that in allowing

14  discovery on arbitrability against them, the Court will intrude on the merits of the

15  principal dispute. In any event, however, discovery on arbitrability while

16  arbitration is stayed multiplies the proceedings and will occasion great expense.

17  This time and money would be better devoted to arbitration, where the plaintiffs

18  are, by contract, required to prove their claims against all parties, whether each is

19  a signatory to the Purchase and Sale Agreement in issue or not.

20          For these reasons, the defendants withdraw their pending motion

21  and request the Court to lift the stay imposed on March 2 so that arbitration may

22  proceed. The non-parties will defend there against what they believe are

23

24  ────────────────

25          [2] There is a question whether defendants MGM Mirage and The Signature
    Condominiums, LLC are even subject to the Court's jurisdiction. They were not

26  served with a copy of the summons and the amended federal class action
    complaint. They are not parties to this action simply because they were named

27  in the amended complaint. *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir.

28  1982.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

insubstantial/opportunistic claims made by the plaintiffs to *avoid* or *delay* the arbitration of their claims.


MORRIS PETERSON

By: _____
      Steve Morris, No. 1543
      Akke Levin, No. 9102
      Jean-Paul Hendricks, No. 10079
      900 Bank of America Plaza
      300 South Fourth Street
      Las Vegas, Nevada 89101


WOOD, SMITH, HENNING & BERMAN LLP
Jason C. Gless, No. 8469
7670 West Lake Mead Blvd., Suite 250
Las Vegas, Nevada 89128

Attorneys for Defendants


**IT IS SO ORDERED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: March 25, 2010**

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

6

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS PETERSON, and that the following documents were served via electronic service:

**NOTICE OF WITHDRAWAL OF MOTION TO DETERMINE WHETHER NON-PARTIES ARE REQUIRED TO APPEAR IN ARBITRATION (# 60) AND REQUEST TO LIFT STAY OF ARBITRATION**

TO:

Robert B. Gerard
Ricardo R. Ehmann
Gerard & Associates
2840 So. Jones Blvd. - Bldg. D, Suite 4
Las Vegas, Nevada 89146
rgerard@gerardlaw.com
rehmann@gerardlaw.com

Robert Fellmeth
University of San Diego Law School
5998 Alcala Park
San Diego, California 92110
cpil@sandiego.edu

Norman Blumenthal
Blumenthal & Nordrehaug
2255 Calle Clara
La Jolla, California 92037
norm@bamlawlj.com

Burton Wiand
Wiand Guerra King
3000 Bayport Drive - Suite 600
Tampa, Florida 33607
bwiand@wiandlaw.com

Attorneys for Plaintiff

DATED this 22nd day of March, 2010.

By: _Thickerson_

MORRIS PETERSON
ATTORNEYS AT LAW
300 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

7

EXHIBIT #5

1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MARY ANN SUSSEX; MITCHELL PAE; MALCOLM NICHOLL and SANDY SCALISE; ERNESTO VALDEZ, SR. and ERNESTO VALDEZ, JR.; JOHN HANSON and ELIZABETH HANSON, <br><br> Plaintiffs, <br><br> vs. <br><br> TURNBERRY/MGM GRAND TOWERS, LLC, a Nevada LLC; MGM GRAND CONDOMINIUMS LLC, a Nevada LLC; THE SIGNATURE CONDOMINIUMS, LLC a Nevada LLC; MGM MIRAGE, a Delaware Corporation; TURNBERRY/HARMON AVE., LLC. a Nevada LLC; and TURNBERRY WEST REALTY, INC., a Nevada Corporation, <br><br> Defendants. | Case No.: 2:08-cv-00773-RLH-RJJ <br><br> **O R D E R** <br><br> (Motion for Order Requiring the AAA to Sustain Objection to Appointment of Arbitrator–#68) |

Before the Court is a **Motion for Order Requiring the AAA to Sustain Objection to Appointment of Abritrator** (#68), filed by all Plaintiffs on April 19, 2010. The Court has also considered Defendants' Opposition (#69), filed May 6, 2010, and Plaintiffs' Reply (#70), filed May 17, 2010.

/

/

AO 72
(Rev. 8/82)

**BACKGROUND**

The Court directs the reader to its order (#64) issued March 10, 2010 for general background information about this case. To those facts, the Court adds the following information relevant to the Motion now before it. On June 16, 2009, this Court ordered the parties to arbitrate their case pursuant to the arbitration agreement contained in their contract. The parties agreed that the arbitration would be conducted under the rules of the American Arbitration Association ("AAA"). *See KJH & RDA Investor Group, LLC v. Eighth Judicial Dist. Court of Nevada*, 2009 WL 1455992, *2 n.3 (Nev. 2009). After referral to the AAA, the parties began the process of choosing an arbitrator in late 2009. Plaintiffs do not dispute that the AAA's Commercial Arbitration Rules and Mediation Procedures, effective June 1, 2009, govern the arbitration selection process. R-1 of the rules states, in part, "The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the [AAA] ... of a domestic dispute without specifying particular rules.... The parties, by written agreement, may vary the procedures set forth in these rules." R-1 of the AAA Commercial Arbitration Rules and Mediation Procedures ("AAA Rules"), available at http://www.adr.org/sp.asp?id=22440. R-11 of the AAA Rules provides, in part, as follows:

> (a) If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: The AAA shall send simultaneously to each party to the dispute an identical list of 10 (*unless the AAA decides that a different number is appropriate*) names of persons chosen from the National Roster....
> (b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA.... From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. *If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, ... the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.*

*Id.*

In the process of identifying the potential arbitrator of their dispute, the parties also requested various qualifications for the arbitrators: Defendants requested arbitrators with transactional experience; Plaintiffs requested arbitrators with a "background in securities matters," preferably "former U.S. Attorneys or Assistant U.S. Attorneys." (Dkt. #69, Opp'n Ex. 2, October 9, 2009 email from Weed.) After Jonathan Weed, the AAA case administrator, submitted the first list of ten candidates to the parties, Plaintiffs learned that one of the candidates was employed by the same firm as the attorney who drafted the contract at issues in the parties' dispute. Plaintiffs viewed this as a conflict of interest and as evidence that Weed never screened the arbitrators for conflicts of interest. As reflected in an email Weed wrote, Plaintiffs, Defendants, and Weed agreed that arbitrators on the initial list would be screened for conflicts, and that a new list would be compiled in which those arbitrators on the initial list with conflicts would be "replac[ed]" by arbitrators with no conflicts. (Dkt. #68, Mot. Ex. 5, Oct. 15, 2009 email from Weed.) Plaintiffs argue, plausibly, that this agreement implies Weed would produce a new list of ten arbitrators. Weed also emailed the parties, stating that the AAA "expects to provide a list of ten names without conflicts for this matter." (Dkt. #69, Opp'n Ex. 7, Nov. 17, 2009 email from Weed.) Plaintiffs also argue this agreement amounted to a modification of the AAA rules pursuant to AAA R-1(a), which states that "[t]he parties, by written agreement, may vary the procedures set forth in these rules." (Dkt. # 68, Mot. Ex. 1.)

After other discussion between the parties and Weed concerning the parties' desired qualifications of potential arbitrators (including a request that potential arbitrators disclose information about past arbitrations), Weed submitted a second list to the parties on January 29, 2010. In an accompanying letter, Weed encouraged the parties to leave as many names as possible on the list, and warned the parties that if an arbitrator could not be appointed from the list, the AAA "shall administratively appoint the arbitrator as authorized in the Rules without the submission of an additional list." (Dkt. #69, Opp'n Ex. 10a, Jan. 29, 2010 email from Weed.) The second list had a total of eight arbitrators and included only two of the arbitrators from the first

AO 72
(Rev. 8/82)

list. One of the arbitrators did not provide information regarding his past arbitrations, allegedly because of confidentiality restrictions. In his letter, Weed explained that the AAA was "providing fewer arbitrators than originally anticipated" and that it had "exercised our best efforts to provide the parties will all of the available members of the Class Action Panel meeting the requested qualifications." (*Id.*) Weed also stated that "[i]f additional arbitrators become available," the AAA would "share their information with the parties immediately" so that the parties could "consider them as part of the selection process." (*Id.*)

That same day, Plaintiffs emailed Weed and Defendants stating that they objected "to this entire process[.]" (*Id.* Ex. 11, Jan. 29, 2010 email from Norman Blumenthal.) They complained that one of the arbitrators on the second list did not disclose information as to his past arbitrations, and that the list did not include ten names. Plaintiffs alleged these circumstances were "inherently prejudicial" and indicated they would not choose an arbitrator until they had received the names of three more arbitrators who disclosed information about previous arbitrations. (*Id.*) Despite Plaintiffs' request, no other candidates were added to the list. Plaintiffs struck six of the eight candidates from the list. Defendants presumably struck the two candidates Plaintiffs preserved, because on February 26, Weed appointed Brendan Hare, who was not previously listed as a candidate on the lists, to arbitrate the parties' dispute. Plaintiffs immediately responded to the appointment in an e-mail stating, "we object to this entire selection process as being a sham and a fraud." (Dkt. # 68, Mot. Ex. 11.) Plaintiffs allege that in subsequent communications, Weed stated that Hare "was not immediately desirable for the case and was intentionally held back in case there was no agreement." (*Id.*) Plaintiffs then attempted to strike Hare, arguing they were entitled to strike Hare because the second list included less than ten arbitrators. On April 1, 2010, Plaintiffs requested that the President and Vice President of the AAA review Moss' conduct and his appointment of Hare. The following day, Defendants responded to Plaintiffs' request. On April 9, an assistant vice president of the AAA wrote back to the parties and stated that after a review of

4

1    the parties' contentions, the AAA would "not issue a further arbitrator selection list" and that it

2    had "determined that Arbitrator Hare will be reaffirmed as arbitrator" of the parties' dispute.

3         Plaintiffs filed the motion now before the Court, in which they allege that the AAA

4    violated the AAA Rules and the agreement of the parties, and request that the Court "order the

5    AAA to strike Mr. Hare as arbitrator and order the AAA to follow the AAA Rules and the

6    agreement of the parties." (Dkt. #68, Mot. 11.) For the reasons below, the Court denies Plaintiffs'

7    Motion.

8                     **DISCUSSION**

9         A court, not an arbitrator, decides questions relating to arbitration "in the kind of

10   narrow circumstance where contracting parties would likely have expected a court to have decided

11   the ... matter[.]" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002). In contrast,

12   questions "parties would likely expect that an arbitrator would decide" are to be decided by an

13   arbitrator. *Id.* at 84. Consistent with that rule, "'procedural' questions which grow out of the

14   dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator,

15   to decide." *Id.* (citation and internal quotation marks omitted; emphasis in original); *see also*

16   *Dockser v. Schwartzberg*, 433 F.3d 421, 425 (4th Cir. 2005) (holding that an issue was procedural

17   where "AAA rules, which the parties contractually agreed to employ, provide[d] specific non-

18   judicial procedures for its resolution"). However, "procedural unfairness inherent in an arbitration

19   agreement may be challenged before the arbitration. When the process to select the arbitrator is

20   fundamentally unfair, ... the arbitral forum is not an effective substitute for a judicial forum[.]"

21   *McMullen v. Meijer, Inc.*, 355 F.3d 485, 494 n.7 (6th Cir. 2004); *see also Walker v. Ryan's Family*

22   *Steak Houses, Inc.*, 400 F.3d 370, 385–86 (6th Cir. 2005); *Hooters of Am. v. Phillips*, 173 F.3d

23   933 (4th Cir. 1999).

24         Plaintiffs' motion fails because nothing they complain of renders the arbitration

25   selection process as it transpired "fundamentally unfair" within the meaning of the cases

26   addressing the issue. In those cases, the very processes through which arbitrators were chosen were

AO 72
(Rev. 8/82)

1    biased in favor of one party. *Hooters*, 173 F.3d at 938 (arbitrator selection rules provided that party

2    must select arbitrator from a list created exclusively by opposing party); *McMullen*, 355 F.3d at

3    493–94 (process provided one party with exclusive control over pool of potential arbitrators);

4    *Walker*, 400 F.3d at 386 (symbiotic financial relationship between a party and for-profit arbitration

5    organization created circumstance where the party effectively determined the pools of arbitrators).

6    Nothing Plaintiffs have alleged legitimately places into question the neutrality of the process

7    through which Hare was selected.

8         Plaintiffs allege Weed violated R-1 of the AAA Rules, which provides that "[t]he

9    parties, by written agreement, may vary the procedures set forth in these rules." Plaintiffs argue

10   that Weed violated R-1 "by (i) failing to provide a full list of 10 neutral arbitrators, (ii) failing to

11   retain on the list all 9 arbitrators without conflicts before adding others to the list, (iii) failing to

12   place additional arbitrators on the list as they became available, and (iv) failing to accept

13   Plaintiffs' strike of Mr. Hare." (Dkt. #86, Mot. 8.) Although Weed's emails of October 15, 2009

14   and November 17, 2009 certainly indicated he would provide the parties with a list of ten

15   arbitrators, Plaintiffs have not shown the parties themselves made a "written agreement" clearly

16   setting out to "vary the procedures set forth in these rules." (R-1 of AAA Rules.) Instead, although

17   Plaintiffs attempt to construe Weed's emails as such an "agreement," the facts much more strongly

18   support the conclusion that the parties were simply following the AAA Rules for arbitrator

19   selection, which provide that the AAA's selection list will include ten arbitrators "*unless the AAA*

20   *decides that a different number is appropriate*[.]" (R-11 of AAA Rules.) Weed apparently so

21   decided, and explained his decision to the parties *before* Plaintiffs struck six of the eight arbitrators

22   on the list, forcing Weed's hand to appoint Hare (which Weed did consistent with R-11(b)). Weed

23   also apparently represented that he would place those conflict-free arbitrators from the first list

24   onto the second list, and did not. To the extent this may be considered a violation of the parties'

25   alleged "agreement" as expressed in Weed's October 15 email, it, like Weed's failure to place

26   additional arbitrators on the second list as they might have become available and his failure to

6

1   accept Plaintiffs' "strike" of Hare, did not render the arbitration selection process fundamentally

2   unfair.

3           In short, the Court concludes Plaintiffs have not sufficiently shown the parties

4   actually made a written agreement varying the procedures set forth in the AAA Rules. Even if they

5   did and if Weed's emails memorialize such an agreement, Plaintiffs have not shown that anything

6   in the arbitration selection process was fundamentally unfair, or that anything about the process

7   places its neutrality or the neutrality of Mr. Hare into doubt. The Court therefore denies Plaintiffs'

8   Motion and orders that the arbitration proceed as the AAA directs.

9                                   **CONCLUSION**

10          Accordingly, and for good cause appearing,

11          IT IS HEREBY ORDERED that Plaintiffs' Motion for Order Requiring the AAA to

12  Sustain Objection to Appointment of Arbitrator (#68) is DENIED.

13          Dated: August 11, 2010.

15  _____

16  **ROGER L. HUNT**
    **Chief United States District Judge**

7

AO 72
(Rev. 8/82)

# EXHIBIT #6

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **DISTRICT OF NEVADA**

10 * * *

11

| | |
|---|---|
| MARY ANN SUSSEX; MITCHELL PAE; MALCOLM NICHOLL and SANDY SCALISE; ERNESTO VALDEZ, SR. and ERNESTO VALDEZ, JR.; JOHN HANSON and ELIZABETH HANSON, ) ) ) ) ) ) | Case No.: 2:08-cv-00773-RLH-PAL |

12

13

14
Plaintiffs,

15

vs.

16

17 TURNBERRY/MGM GRAND TOWERS, LLC
a Nevada LLC; MGM GRAND
18 CONDOMINIUMS LLC, a Nevada LLC; THE
SIGNATURE CONDOMINIUMS, LLC a
19 Nevada LLC; MGM MIRAGE, a Delaware
Corporation; TURNBERRY/HARMON AVE.,
20 LLC a Nevada LLC; and TURNBERRY WEST
REALTY, INC., a Nevada Corporation,

21
Defendants.

22

**O R D E R**

(Motion for Determination of Arbitrability
of Claims and Reinstatement of March 2,
2010 Order–#72; Counter Motion to Stay
and Permit Motion Practice on Sufficiency
of Plaintiffs' Allegations–#78)

23       Before the Court is Plaintiffs' **Motion for Determination of Arbitrability of**

24 **Claims and Reinstatement of March 2, 2010 Order** (#72), filed September 23, 2010.  The Court

25 has also considered Defendants MGM Grand Condominiums LLC, Turnberry/MGM Grand

26

1

Towers, LLC, and Turnberry West Realty, Inc.'s (the "Nonsignatory Defendants") Opposition

(#77), filed October 26, 2010, and Plaintiffs' Reply (#79), filed November 11, 2010.

The Court has also considered the Nonsignatory Defendants' **Counter Motion to Stay and Permit Motion Practice on Sufficiency of Plaintiffs' Allegations** (#78), filed October

26, 2010. The Court has also considered Plaintiffs' Opposition (#80), filed November 11, 2010,

and the Nonsignatory Defendants' Reply (#81), filed November 19, 2010.

## BACKGROUND

The Court directs the reader to its previous order (Dkt. #64, March 2, 2010) for a

more detailed recitation of the facts of this case. As part of that order, the Court ordered limited

"discovery to determine whether the remaining nonsignatory Defendants—MGM Grand

Condominiums LLC, Turnberry/MGM Grand Towers, LLC, and Turnberry West Realty,

Inc.—must defend against Plaintiffs' claims in arbitration under ordinary contract and agency

principals" because the Court did not have sufficient information to rule on the issue at that time.

The Court granted the parties 90 days in which to conduct discovery and ordered a specific

briefing schedule for supplemental memoranda. The Court also stayed the arbitration proceedings

for all of the parties to the dispute pending resolution of whether the nonsignatory parties were

required to arbitrate along with the other Defendants. *Id*. at 6.

After Plaintiffs submitted their discovery requests and upon determining that they

were overly burdensome, the Nonsignatory Defendants withdrew their Motion for Determination

of Non-Arbitrability of Claims against Nonsignatory Defendants (Dkt. #60). (Dkt. #65, Notice.)

The Nonsignatory Defendants allegedly determined that it would be more cost effective to bring

their defenses in arbitration rather than going through even limited discovery. However, as shown

in the arbitration joint status report, the Nonsignatory Defendants sought to brief the question of

whether they could be "compelled to arbitrate as alleged 'alter egos' absent specifically pleaded

facts." (Dkt. #72, Mot. Ex. 1 § 5.) While the Nonsignatory Defendants put this question in terms

of a motion to dismiss under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v.*

1   *Iqbal*, 129 S. Ct. 1937 (2009) (*id.*), the arbitrator treated it as a question of arbitrability needing to

2   be decided by this Court. (*Id.* at Ex. 2, Procedural Order No. 2.)  After the arbitrator issued his

3   order, Plaintiffs brought the instant motion seeking reinstatement of the Court's March 2, 2010

4   Order (Dkt. #64) requiring discovery into the arbitrability issue.  The Nonsignatory Defendants, on

5   the other hand, brought a counter motion seeking a stay and the opportunity to bring a motion to

6   dismiss under Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, the Court

7   grants Plaintiffs' motion and denies the Nonsignatory Defendants' motion.

8                                   **DISCUSSION**

9          The Court adopts the reasoning of its March 2, 2010 Order (Dkt. #64) *in haec verba*

10  and re-orders discovery per the schedule laid out in that Order.  The Court notes that the

11  fundamental situation has not changed since it issued the March 2 Order.  The Court does not have

12  sufficient information to determine whether the Nonsignatory Defendants are subject to the

13  arbitration clause and, therefore, whether it has jurisdiction over them to determine the merits of

14  Plaintiffs' case.  Notwithstanding this order, the Nonsignatory Defendants may cede to the

15  arbitration agreement and voluntarily choose to submit to the arbitration without contesting

16  whether they can be compelled to arbitrate, if they want to avoid discovery.  The Court presumes

17  that the Nonsignatory Defendants would then be given the opportunity to file a motion to dismiss

18  or similar pleading based on insufficient allegations in the arbitration at some point.  The Court,

19  however, cannot and will not entertain a motion to dismiss under Rule 12(b)(6) until after the

20  arbitrability issue is determined or waived.  Further, contrary to the Nonsignatory Defendants

21  protestations, the discovery stay of the Private Securities Litigation Reform Act of 1995, 15 U.S.C.

22  §§ 77a *et. seq.*, only applies during the pendency of a motion to dismiss or a motion for summary

23  judgment.  *SG Cowen Sec. Corp. V. U.S. Dist. Court for the N. Dist. of Cal.*, 189 F.3d 909, 911

24  (9th Cir. 1999).  Since the Court cannot entertain such a motion until jurisdiction is determined,

25  the discovery stay is inapplicable here.  However, the Court notes that the discovery it orders is to

26  be limited only to the issue of whether the nonsignatory defendants may be compelled to arbitrate

under contract and agency principles. This limitation shall be strictly construed and any discovery actually intended to get to the merits of Plaintiffs' claims will not be allowed.

### CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Determination of Arbitrability of Claims and Reinstatement of March 2, 2010 Order (#72) is GRANTED. As such the arbitration described in Defendants' Motion (#72) is STAYED until further order of the Court as follows:

The parties shall have 90 days from the date of this order to conduct discovery to determine whether the remaining nonsignatory Defendants—MGM Grand Condominiums LLC; The Signature Condominiums, LLC; MGM Mirage; and Turnberry West Realty, Inc.—must defend against Plaintiffs' claims in arbitration under ordinary contract and agency principles.

The parties must file simultaneous supplemental memoranda, with accompanying affidavits, on or before May 6, 2011. The memoranda (not including attachments and exhibits) shall not exceed 30 pages. Responses shall be filed simultaneously no later than June 3, 2011, and shall not exceed 20 pages. Based on the supplemental memoranda and responses, the Court will resolve the issue at hand, and lift the stay on the arbitration proceedings.

Dated: February 3, 2011.

_____
**ROGER L. HUNT**
**Chief United States District Judge**

AO 72
(Rev. 8/82)

EXHIBIT #7

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

**\* \* \***

MARY ANN SUSSEX; MITCHELL PAE;           )     Case No.: 2:08-cv-00773-RLH-PAL
MALCOLM NICHOLL and SANDY                 )
SCALISE; ERNESTO VALDEZ, SR. and          )          **O R D E R**
ERNESTO VALDEZ, JR.; JOHN HANSON          )
and ELIZABETH HANSON,                     )     (Motion to Vacate Arbitration Ruling–#85;
                                          )         Motion for Reconsideration–#86)
                    Plaintiffs,           )
                                          )
          vs.                             )
                                          )
TURNBERRY/MGM GRAND TOWERS, LLC )
a Nevada LLC; MGM GRAND                    )
CONDOMINIUMS LLC, a Nevada LLC; THE )
SIGNATURE CONDOMINIUMS, LLC a             )
Nevada LLC; MGM MIRAGE, a Delaware        )
Corporation; TURNBERRY/HARMON AVE.,       )
LLC a Nevada LLC; and TURNBERRY WEST )
REALTY, INC., a Nevada Corporation,       )
                                          )
                    Defendants.           )
_____   )

     Before the Court is Plaintiffs' **Motion to Vacate Arbitration Ruling** (#85, filed

Mar. 24, 2011). The Court has also considered Defendants' Opposition (#90, filed Apr. 28, 2011),

and Plaintiffs' Reply (#92, filed May 12, 2011).

     Also before the Court is Plaintiffs' **Motion for Reconsideration** (#86, filed Mar.

24, 2011) of the Court's order compelling arbitration. The Court has also considered Defendants'

Opposition (#89, filed Apr. 28, 2011), and Plaintiffs' Reply (#91, filed May 12, 2011).

1
2

**BACKGROUND**

The Court directs the reader to its previous order (Dkt. #64, Mar. 2, 2010) for a

3

more detailed recitation of the facts of this case. Since the parties were all either compelled to

4

arbitrate or agreed to submit to arbitration, the Arbitrator has issued an order that Plaintiffs may

5

not proceed as a class. (Dkt. #85, Norman Blumenthal Decl. Ex. 1, Partial Final Clause

6

Construction Award (the "Award")). Plaintiffs now seek to have the Court: (1) vacate the

7

arbitrator's Award, or (2) reconsider the Court's order (Dkt. #59) compelling arbitration. For the

8

reasons discussed below, the Court denies Plaintiffs' motions.

9

**DISCUSSION**

10

**I.      Motion to Vacate**

11

**A.      Legal Standard**

12

Under the Federal Arbitration Act, a district court may issue "an order vacating the

13

award upon the application of any party to the arbitration ... where the arbitrators exceeded their

14

powers." 9 U.S.C. § 10(a)(4). Arbitrators do not "exceed their powers" when they merely

15

interpret or apply the governing law incorrectly, but when the award is "completely irrational" or

16

"exhibits a 'manifest disregard of the law.'" *Kyocera Corp. v. Prudential-Bache Trade Services,*

17

*Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (*en banc*) (citing *French v. Merrill Lynch, Pierce, Fenner*

18

*& Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986) and *Todd Shipyards Corp. v. Cunard Line, Ltd.*

19

943 F.2d 1056, 1059-60 (9th Cir. 1991)). A district court's review of an arbitration award under 9

20

U.S.C. § 10 is "extremely limited," *G.C. and K.B. Inv., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th

21

Cir. 2003), and, therefore, this is "a high hurdle" to surpass, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l*

22

*Corp.*, 130 S.Ct. 1758, 1767 (2010). The purpose of this limited review is to prevent informal

23

arbitration from becoming "merely a prelude to a more cumbersome and time-consuming judicial

24

review process." *Kyocera*, 341 F.3d at 998.

25

Courts, then, may vacate an arbitration award only if (1) the award constitutes

26

"manifest disregard of the law," or (2) the award is "completely irrational." *Comedy Club, Inc. v.*

2

1   *Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009) (internal citations omitted).  To show

2   manifest disregard of the law, it is insufficient to merely show that the arbitrator misinterpreted or

3   misapplied the law.  *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th

4   Cir. 2010); *accord Health Plan of Nevada, Inc. v. Rainbow Med. LLC*, 100 P.3d 172, 178 (Nev.

5   2004).   Similarly, an award is not "irrational" merely because the arbitrator made "erroneous

6   findings of fact."  *Kyocera*, 341 F.3d at 997.  The award must be confirmed as long as the

7   arbitrator "even arguably construed or applied the contract and acted within the scope of their

8   authority."  *Barnes v. Logan*, 122 F.3d 820, 822 (9th Cir. 1997).

9               **B.     Analysis**

10              Here, Plaintiffs contest the Arbitrator's decision that Plaintiffs may not proceed in

11  the arbitration as a class.  They also argue that whether they may proceed as a class should be

12  determined by this Court.  However, the AAA rules clearly allowed the Arbitrator to determine

13  whether the agreements the parties signed permit class proceedings.  AAA Class Rules, Rule 3.

14  Thus, this decision was within the scope of the arbitrators powers provided by the agreement.  As

15  such, the Court will only address whether the arbitrator disregarded the law or entered an award

16  that was clearly irrational.

17              The Court's review of the motion and of the Arbitrator's decision shows that the

18  Arbitrator acted rationally and did not disregard the law.  A review of the Arbitrator's decision

19  shows that he thoroughly considered the issues presented and made a rational decision based on

20  the law and the facts of this case.   The Arbitrator addressed various state and federal precedents

21  and applied them within the bounds of reason.  Thus, the Court may not vacate the Arbitrator's

22  decision regardless of Plaintiffs contentions that he misinterpreted the law and got certain facts

23  wrong.  Accordingly, the Court denies Plaintiffs' motion to vacate.

24  /

25  /

26  /

# I.    Motion for Reconsideration

## A.    Legal Standard

Although they are not explicitly mentioned in the Federal Rules of Civil Procedure, motions for reconsideration may be brought under Rules 59(e) (Motion to Alter or Amend a Judgment) and 60(b) (Grounds for Relief from a Final Judgment).  These two rules generally apply to a final judgment.  Likewise, a district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient."  *City of L.A., Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (internal citation omitted); *see also* Fed. R. Civ. Pro. 54(b) ("any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment").  Thus, all district court rulings are subject to revision at any time before the entry of judgment so long as the court retains jurisdiction over a case.  *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (emphasis omitted).

A motion for reconsideration must set forth the following: (1) some valid reason why the court should revisit its prior order; and (2) facts or law of a "strongly convincing nature" in support of reversing the prior decision.  *Frasure v. United States*, 256 F.Supp.2d 1180, 1183 (D. Nev. 2003).  Reconsideration may be appropriate if a district court: (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) there has been an intervening change in controlling law.  *Nunes v. Ashcroft*, 375 F.3d 805, 807–08 (9th Cir. 2004).  The Seventh Circuit has said that "[t]o be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must, strike [the court] as wrong with the force of a five-week-old unrefrigerated dead fish."  *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).  "There may also be other, highly unusual, circumstances warranting reconsideration."  *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

/

4

1    Therefore, a motion for reconsideration is properly denied when the movant fails to

2  establish any reason justifying relief. *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985)

3  (holding that a district court properly denied a motion for reconsideration in which the plaintiff

4  presented no arguments that were not already raised in his original motion). Motions for

5  reconsideration are not the proper vehicles for rehashing old arguments, *see Merozoite v. Thorp*,

6  52 F.3d 252, 255 (9th Cir. 1995), and are "not intended to give an unhappy litigant one additional

7  chance to sway the judge." *Durkin v. Taylor*, 444 F.Supp. 879, 889 (E.D. Va. 1977).

8         **B.     Analysis**

9    Here, Plaintiffs largely bring up the same arguments that they initially presented to

10  the Court in arguing that the arbitration clause was unconscionable and unenforceable. Plaintiffs

11  do cite some new cases that were not available when they previously argued this issue.

12  Nonetheless, the Court does not find that the Nevada Supreme Court's decision in *Gonski v.*

13  *Second Judicial Dist. Court*, 245 P.3d 1164 (Nev. 2010), either changes the law or compels the

14  Court to reconsider its earlier order compelling arbitration, particularly not in light of recent

15  United States Supreme Court precedent, *see Stolt-Nielsen*, 130 S.Ct. 1758 (2010), and especially,

16  *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011). In sum, Plaintiffs arguments for this

17  Court to reconsider its prior decision are simply a rehashing of old arguments and of their motion

18  to vacate the Award, and are not strong enough to justify reconsideration. Accordingly, the Court

19  denies Plaintiffs' motion for reconsideration.

20  /

21  /

22  /

23  /

24  /

25  /

26  /

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Vacate (#85) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Reconsideration (#86) is DENIED.

Dated: September 15, 2011.

_____
**ROGER L. HUNT**
**United States District Judge**

AO 72
(Rev. 8/82)

<u>EXHIBIT #8</u>
<u>FILED UNDER SEAL</u>

EXHIBIT #9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| MARY ANN SUSSEX, et al., | ) | Case No.: 2:08-cv-00773-RLH-PAL |
| | ) | |
| Plaintiffs, | ) | **O R D E R** |
| | ) | |
| vs. | ) | (Motion to Relate Cases and Transfer–#96) |
| | ) | |
| TURNBERRY/MGM GRAND TOWERS, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is Plaintiffs' **Motion to Relate Cases and Transfer Second-Filed Case to First-Filed Case** (#96, filed **Nov. 10, 2011**) based on Local Rule 7.2-1. The Court has also considered Defendants' Opposition (#97, filed Nov. 28), and Plaintiffs' Reply (#98, filed Dec. 8).

Plaintiffs seek to relate and transfer *Abraham, et al. v. Turnberry/MGM Grand Towers, LLC, et al.*, 2:11-cv-01007-JCM-RJJ, ("*Abraham*") currently pending before the Honorable James C. Mahan to this Court and relate it to this case. Plaintiffs argue that the two cases involve the same parties, are based on similar claims, involve the same property, involve similar questions of fact and law, and that transfer and relation would likely create substantial

1

savings of judicial effort. *See* Local Rule 7-2.1. The Court finds that it has the discretion to relate and transfer *Abraham*. Nonetheless, the Court will not do so. This is nothing more than an attempt to delay proceedings begun nearly three years ago. This case has been sent to arbitration in accord with the contracts Plaintiffs signed. (*See* Dkt. #59, Order Compelling Arbitration.) Granting this motion would not create substantial savings of judicial effort. The Court will not create further delays and judicial difficulties by relating these cases and transferring *Abraham* to this Court.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Relate and Transfer (#96) is DENIED.

Dated: March 8, 2012.

**ROGER L. HUNT**
**United States District Judge**

# EXHIBIT #10
# FILED UNDER SEAL

EXHIBIT #11
FILED UNDER SEAL

<u>EXHIBIT #12</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #13</u>
<u>FILED UNDER SEAL</u>

EXHIBIT #14
FILED UNDER SEAL

<u>EXHIBIT #15</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #16</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #17</u>
<u>FILED UNDER SEAL</u>

# EXHIBIT #18
# FILED UNDER SEAL

## EXHIBIT #19
## FILED UNDER SEAL

<u>EXHIBIT #20</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #21</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #22</u>
<u>FILED UNDER SEAL</u>

# EXHIBIT #23
# FILED UNDER SEAL

# EXHIBIT #24
# FILED UNDER SEAL

# EXHIBIT #25
# FILED UNDER SEAL

<u>EXHIBIT #26</u>
<u>FILED UNDER SEAL</u>

# EXHIBIT #27
# FILED UNDER SEAL

<u>EXHIBIT #28</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #29</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #30</u>
<u>FILED UNDER SEAL</u>

<u>EXHIBIT #31</u>
<u>FILED UNDER SEAL</u>

EXHIBIT #32
FILED UNDER SEAL

<u>EXHIBIT #33</u>
<u>FILED UNDER SEAL</u>

EXHIBIT #34
FILED UNDER SEAL

<u>EXHIBIT #35</u>
<u>FILED UNDER SEAL</u>

EXHIBIT #36

1   Robert B. Gerard, Esq.
    Nevada State Bar #005323
2   Ricardo R. Ehmann, Esq.
    Nevada State Bar #010576
3   **GERARD & ASSOCIATES**
    2840 South Jones Boulevard
4   Building D, Suite #4
    Las Vegas, Nevada 89146
5   Telephone:     (702) 251-0093
    Facsimile:     (702) 251-0094
6
7   Norman Blumenthal, Esq.
    California State Bar # 068687
8   **BLUMENTHAL NORDREHAUG & BHOWMIK**
    2255 Calle Clara
9   La Jolla, California 92037
    Telephone:     (858) 551-1223
10  Facsimile:     (858) 551-1232
11
12  *Attorneys for Plaintiffs*
13              **UNITED STATES DISTRICT COURT**
14                **DISTRICT OF NEVADA**
15  MARY ANN SUSSEX, et al,
16          Plaintiffs,                    CASE NO.:    2:08-cv-00773-MMD-PAL
17          vs.                            **JOINT STATUS REPORT**
18  TURNBERRY/MGM GRAND TOWERS,
    LLC et al.,
19
20           Defendants.
21
22          Pursuant to this Court's Minute Order dated April 3, 2013, Plaintiffs John Hanson,
23  Elizabeth Hanson,  Malcolm Nicholl, Sandy Scalise, Mitchell Pae, Ernesto Valdez, Sr., Ernesto
24  Valdez Jr., and Mary Ann Sussex (collectively, "Plaintiffs"), and Defendants Turnberry/MGM
25  Grand Towers, LLC, MGM Grand Condominiums, LLC, MGM Mirage, Signature
26  Condominiums, LLC, Turnberry West Realty Inc., and Turnberry/Harmon Ave., LLC
27  (collectively, "Defendants"), state as follows:
28

1.     Status of this action, including any pending motions or other matters which require the attention of this Court.

ANSWER:

*Plaintiffs' position:*  The matter is proceeding in Arbitration.  The Arbitrator has ordered the consolidation of all claims and is currently considering additional motions, including scheduling orders for discovery and trial plan.  These motions are under consideration.  Plaintiffs have requested a trial date in August 2013.

*Defendants' position*: The matter is proceeding in Arbitration.  Defendants are objecting to consolidation and joinder of claims and parties before a single arbitrator and may present one or both of these subjects to the Court in the future, before arbitration on the merits gets underway.  Presently, however, there are no pending motions that require the attention of the Court.

2.     Action required to be taken by this Court.

ANSWER:     No action is required or requested of the Court at this time.

3.     Attach copies of any pending motions, responses and replies and/or any other matters requiring the court's attention not previously attached to the notice of removal.

ANSWER:     Not applicable.


DATED this 10th day of April, 2013.

By:   /s/  Ricardo Ehmann            .
Robert B. Gerard, Esq.
Nevada State Bar #005323
Ricardo R. Ehmann, Esq.
Nevada State Bar #010576
**GERARD & ASSOCIATES**
2840 South Jones Boulevard
Building D, Suite #4
Las Vegas, Nevada 89146
Telephone:   (702) 251-0093
Facsimile:   (702) 251-0094

By:   /s/ Akke Levin            .
Steve Morris, Esq.
Nevada State Bar No. 1543
Akke Levin, Esq.
Nevada State Bar No. 9102
Jean-Paul Hendricks, Esq.
Nevada State Bar No. 10079
**MORRIS LAW GROUP**
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

**BLUMENTHAL NORDREHAUG &
BHOWMIK**

Norman Blumenthal, Esq.
California State Bar No. 068687
2255 Calle Clara
La Jolla, California
Telephone:     (858) 551-1223
Facsimile:     (858) 551-1232

**WIAND GUERRA KING**

Burton W. Wiand, Esq.
Florida State Bar No. 407690
5505 W. Gray St.
Tampa, FL 33609
Telephone: (813) 347-5101
Facsimile: (813) 347-5151

*Attorneys for Plaintiffs*

**WOOD, SMITH, HENNING &
BERMAN LLP**

Jason C. Gless, Esq.
Nevada State Bar No. 8469
7670 West Lake Mead Blvd., Suite 250
Las Vegas, Nevada 89128

*Attorneys for Defendants*

EXHIBIT #37

Electronically Filed
04/24/2013 09:32:30 AM

**MSRC**
MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Email: sm@morrislawgroup.com
Akke Levin, Bar No. 9102
Email: al@morrislawgroup.com
Jean-Paul Hendricks, Bar No. 10079
Email: jph@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

Attorneys for Defendant
Turnberry/MGM Grand Towers LLC

CLERK OF THE COURT

DEPARTMENT XIII
NOTICE OF HEARING
DATE 5/6/13 TIME 9:00 Am
APPROVED BY M

DISTRICT COURT

CLARK COUNTY, NEVADA

| | |
|---|---|
| KJH & RDA INVESTOR GROUP, LLC; 37TH FLOOR INVESTOR GROUP, LLC; MICHAEL ANDERSON; MATTHEW ANDERSON; CHARLES and FERNE AVILA; MICHAEL GALASSO; ANDRES ALOS; CHARLES CROOKS; LAURA CROOKS; SAMPAL FAMILY REVOCABLE LIVING TRUST; FOUAD FEGHALI; BASSILIOS PETRAKIS; DANIEL REICH; NATALIE REICH; JOSE SANCHEZ; LINDA CORBRIDGE; RONALD D. PERKINS; AND MARTHA VIAS, et al, <br><br> Plaintiffs, <br><br> v. <br><br> TURNBERRY/MGM GRAND TOWERS, LLC; and DOES 1 through 100, Inclusive, <br><br> Defendants. | CASE NO: A547024 <br> DEPT NO: XIII <br><br> CONSOLIDATED WITH: <br> A565873    A574558 <br> A569825    A577034 <br> A573280    A581851 <br><br> **TURNBERRY/MGM GRAND TOWERS, LLC'S MOTION TO FILE EXHIBIT A TO MOTION TO DISQUALIFY UNDER SEAL** <br><br> **AND** <br><br> **APPLICATION FOR AN ORDER SHORTENING TIME AND ORDER SHORTENING TIME** |

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

RECEIVED
APR 2 3 2013
DISTRICT COURT DEPT #13

Turnberry/MGM Grand Towers, LLC ("Turnberry/MGM") moves the Court for an order sealing Exhibit A to Turnberry/MGM's concurrently filed Motion For an Order to Remove Brendan Hare as Arbitrator For His Failure to Make Required Disclosures Under NRS 38.227 ("Motion to Disqualify"). This Motion to Seal is based on the Declaration of Akke Levin, EDCR 2.26, the attached exhibit, the papers and pleadings on file, and the points and authorities that follow.

MORRIS LAW GROUP

By: _____
Steve Morris, Bar No. 1543
Akke Levin, Bar No. 9102
Jean-Paul Hendricks, Bar No. 10079
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

Attorneys for Defendant
Turnberry/MGM Grand Towers LLC

### DECLARATION OF AKKE LEVIN
### IN SUPPORT OF MOTION TO SEAL AND APPLICATION FOR
### ORDER SHORTENING TIME

I, Akke Levin, declare as follows:

1.      I am an attorney with Morris Law Group. I have personal knowledge of the facts stated in this declaration except those matters stated upon information and belief and as to those matters, I believe them to be true. I would be competent to testify to them if called upon to do so.

2.      Attached as Exhibit A to this Motion to Seal is a true copy of a sample Condominium Unit Purchase and Sale Agreement ("PSA") that contains the arbitration agreement (section 24.10), under which this Court directed the plaintiffs herein to arbitration before the American Arbitration

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

1   Association (the "AAA").  The arbitration agreement provides that "[a]ll

2   arbitration proceedings shall be confidential." PSA, Ex. A.

3        3.      Pursuant to and in compliance with the confidentiality

4   provision of the arbitration agreement, Turnberry/MGM seeks to file

5   under seal a series of confidential letter briefs and related correspondence

6   to and from the AAA and selected, confidential, exhibits thereto.

7   Specifically, the Composite Exhibit A to the Motion to Disqualify that is

8   submitted for sealing consists of the following:

9        a.      **Exhibit 1**: A true copy of the January 18, 2013, letter from

10  Steve Morris to AAA arbitration manager Jonathan Weed.

11       b.      **Exhibit 2**: A true copy of the January 25, 2013, letter from

12  Steve Morris and Akke Levin to AAA president India Johnson, manager

13  Jonathan Weed, and AAA Director Yvonne Baglini.  Excerpts from the

14  October 24, 25, and 26, 2013, hearing transcripts are attached thereto as

15  Exhibits J, K, and L, respectively.

16       c.      **Exhibit 3**: A true copy of the January 28, 2013, letter from

17  Jonathan Weed to counsel involved in the pending arbitration.

18       d.      **Exhibit 4**: A true copy of the February 12, 2013, letter

19  from Steve Morris and Akke Levin to manager Jonathan Weed and

20  Director Yvonne Baglini.

21       e.      **Exhibit 5**: A true copy of the February 14, 2013, letter

22  from manager Jonathan Weed to arbitration counsel.

23       f.      **Exhibit 6**: A true copy of the February 14, 2013, letter

24  from Steve Morris to manager Jonathan Weed.

25       g.      **Exhibit 7**: A true copy of the February 19, 2013, email

26  from manager Jonathan Weed to arbitration counsel.

27

28

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

h.   **Exhibit 8**: A true copy of the February 22, 2013, letter from Steve Morris and Akke Levin to Director Yvonne Baglini and manager Jonathan Weed.

i.   **Exhibit 9**: A true copy of the February 28, 2013, letter from Steve Morris to Director Yvonne Baglini and manager Jonathan Weed.

j.   **Exhibit 10**: A true copy of the March 28, 2013, letter of attorney Yvette Ostolaza to Director Yvonne Baglini and manager Jonathan Weed.

4.   Pursuant to EDCR 2.26, good cause exists to shorten the time to decide the Motion to Seal. As set forth in my declaration in support of the application for an order shortening time for hearing of the concurrently submitted Motion to Disqualify, we expect the AAA to imminently set a hearing before the challenged arbitrator on May 13 or 14, 2014. The Motion to Disqualify asks for an expedited hearing before the anticipated May 13 or 14, 2013, hearing date to avoid any further orders by the challenged arbitrator on threshold procedural and party issues. To provide the Court with a complete record in support of the Motion to Disqualify, the Motion to Seal should be heard and decided at the same time or before the Motion to Disqualify is heard and decided.

5.   Although the Motion to Seal is submitted on an *ex parte* basis, a copy of the Motion is concurrently served via electronic mail to plaintiffs' counsel.

I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.

Executed on April 23, 2013.

Akke Levin

Page 4 of 8

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

### ORDER SHORTENING TIME

Upon application of counsel, and good cause appearing,

IT IS HEREBY ORDERED:

1.    The motion to shorten time is granted; the hearing shall be on _May 6, 2013_ at _9' u a_.m.

2.    IT IS FURTHER ORDERED that any opposition to the Motion to Seal shall be filed and served on _____; any reply shall be filed and served on _____.

Dated: ___April 23___, 2013.

_____
MARK R. DENTON
DISTRICT COURT JUDGE

### POINTS AND AUTHORITIES

## I.    INTRODUCTION

Turnberry/MGM's Motion to Disqualify is supported, in part, by a record of proceedings before the American Arbitration Association ("AAA") that under the parties' arbitration agreement is confidential. Exhibit A to the Motion is a series of confidential letter briefs and related correspondence to and from the AAA which, among other things, discuss the procedural proceedings before the challenged arbitrator and attach portions of a transcript of a three-day hearing on procedural issues conducted by him in Las Vegas.  Based on the confidential nature of the papers, the broad confidentiality provision in the arbitration agreement, the parties' expectation of privacy and confidentiality of the proceedings before the AAA, and the limited relevancy of these papers to the Motion to Disqualify, Turnberry/MGM seeks an order sealing Exhibit A, with the

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

1  exception of those documents that are available to the public, which are
2  independent exhibits.

## II.    ARGUMENT

### A.    Sealing Exhibit A is Justified to Comply with the Broad Confidentiality Provision of the Arbitration Agreement and the Parties' Expectation of Privacy and Confidentiality.

The Nevada Rules for Sealing and Redacting Court Records ("SRCR") provide that the Court may order court files and records sealed for a compelling privacy interest or other compelling circumstance that outweighs the public's interest to have access to court records. SRCR 3.4, (h). Here, the arbitration agreement between Turnberry/MGM and the purchasers provides, without limitation, that "*[a]ll* arbitration proceedings *shall* be confidential." PSA, Exhibit A hereto, at 9, § 24.10 (emphasis added). Even if the arbitration agreement does not specifically provide for confidentiality, there is a "presumption of privacy and confidentiality" in AAA arbitrations other than class arbitrations. *See* Rule 9, Supplementary Rules for Class Arbitrations (providing that the "presumption of privacy and confidentiality in arbitration proceedings shall not apply in class arbitrations"); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1776 (2010) (pointing to confidentiality as one of the differences between bilateral and class arbitrations before the AAA). It is also the AAA's policy to respect the confidentiality of the arbitration proceedings: None of the pleadings, letters, orders, or other filings made in arbitration cases pending before the AAA can be accessed by the public.

Turnberry/MGM requests that the Court authorize sealing of the letters to the AAA and the exhibits attached thereto, except those that are not confidential, to comply with the confidentiality provision in section 24.10 of the PSA and to respect the parties' expectations of privacy and confidentiality. The letters were submitted to the AAA on a confidential

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

basis without notice to the arbitrator. They describe comments and
conduct by the arbitrator, reveal content of confidential arbitration
proceedings held before the arbitrator, and attach, among other things,
portions of transcripts of these confidential hearings. *See, e.g.*, January 25,
2013, Letter, Exhibit A, Tab 2 and exhibits J, K, and L thereto. It would be
harmful to the parties' interests and contrary to their agreement if the
papers were publicized in connection with proceedings on the principal
Motion to Disqualify the arbitrator. *See In re Wal-Mart Wage and Hour
Employment Practices Litigation*, 2011 WL 4809046, *6 (D. Nev. Oct. 11, 2011)
(recognizing that the arbitrator's request for sealed filings could "exacerbate
his allegedly already existing bias").

   The content of these papers is not relevant to the Motion to
Disqualify other than to establish to the Court that Turnberry/MGM
exhausted its administrative remedies before the AAA prior to coming to
the Court for relief, which the plaintiffs cannot dispute.

## III. CONCLUSION

   For the reasons stated above, Turnberry/MGM requests that
the Court issue an order sealing the correspondence record submitted as
Exhibit A to Turnberry/MGM's Motion to Disqualify.

MORRIS LAW GROUP

By: _____
  Steve Morris, Bar No. 1543
  Akke Levin, Bar No. 9102
  Jean-Paul Hendricks, Bar No. 10079
  900 Bank of America Plaza
  300 South Fourth Street
  Las Vegas, Nevada 89101

Attorneys for Defendant
Turnberry/MGM Grand Towers LLC

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

**CERTIFICATE OF SERVICE**

Pursuant to Nev. R. Civ. P.5(b)(2)(D) and E.D.C.R. 8.05, I certify that I am an employee of MORRIS LAW GROUP and that on the date below, I cause the following document(s) to be served via the Court's Odyssey E-Filing System: **TURNBERRY/MGM GRAND TOWERS, LLC'S MOTION TO FILE EXHIBIT A TO MOTION TO DISQUALIFY UNDER SEAL.** The date and time of the electronic proof of service is in place of the date and place of deposit in the mail

Attorneys for Plaintiffs

Robert B. Gerard
Ricardo R. Ehrmann
Gerard & Associates
2840 South Jones Boulevard
Building D, Suite #4
Las Vegas, Nevada 89146

Norman Blumenthal
Blumenthal & Nordrehaug
2255 Calle Clara
La Jolla, California 92037

DATED this 24th day of April, 2013.

By: _____

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

# EXHIBIT A

# EXHIBIT A



**THE RESIDENCES**
MGM GRAND•LAS VEGAS
A CONDOMINIUM HOTEL BY *Turnberry*

Sales Associate:_____
Date: _____

## CONDOMINIUM UNIT PURCHASE AND SALE AGREEMENT
### THE RESIDENCES AT MGM GRAND - TOWER A

WARNING: THE CALIFORNIA DEPARTMENT OF REAL ESTATE HAS NOT INSPECTED, EXAMINED, OR QUALIFIED THIS OFFERING.

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENTS REQUIRED BY NEVADA REVISED STATUTES CHAPTER 116 (THE "ACT"), TO BE FURNISHED BY SELLER TO BUYER.

In consideration of the terms and conditions hereafter set forth in this Condominium Unit Purchase and Sale Agreement (this "Agreement"), Turnberry/MGM Grand Towers, LLC, a Nevada limited liability company ("Seller"), whose address is 3799 Las Vegas Boulevard South, Las Vegas, Nevada 89109, agrees to sell and the buyer or buyers named below ("Buyer") agrees to purchase unit number _____ (the "Unit") in The Residences at MGM Grand - Tower A (the "Condominium"), located generally at the northeast portion of the MGM Grand Hotel/Casino complex, east of Audrie Street, Las Vegas, Nevada. The Unit and Condominium are described in greater detail in the proposed Declaration of Covenants, Conditions and Restrictions and Reservation of Easements of the Condominium (the "Declaration") included in the Public Offering Statement and documents attached thereto (collectively, the "Governing Documents"). All capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Declaration.

Buyer:_____

Residence Address:_____

City:_____State:_____Zip:_____

Country:_____ Social Security No(s)./Tax ID No.:_____

Home Telephone:_____ Office Telephone: _____

Cellular Telephone: _____ Facsimile Number: _____

E-Mail Address:_____

NAME, ADDRESS AND TELEPHONE NUMBER WHERE ALL BUYER'S NOTICES ARE TO BE MAILED OR FAXED, IF DIFFERENT:

Name (c/o):_____

Street Address:_____

City:_____ State:_____

Country:_____ Zip Code:_____

Telephone:_____ Facsimile:_____

Estimated Closing Date: _____

1. **PURCHASE AND SALE.** Buyer agrees to buy, and Seller agrees to sell, the Unit on the terms and conditions contained in this Agreement.

The purchase price (the "Purchase Price") for the Unit is $_____, payable in United States Dollars as follows:

| PAYMENT | DUE DATE | AMOUNT |
|---|---|---|
| First Deposit | Upon execution of this Agreement | $_____ |
| Second Deposit | _____ | $_____ |
| Third Deposit | _____ | $_____ |
| Fourth Deposit | _____ | $_____ |
| Balance | At Closing (as defined below) | $_____ |
| Purchase Price | | $_____ |

1

Buyer's Initials

Seller's Initials

2. BROKERAGE. Other than real estate brokers that Seller has acknowledged in writing, Buyer represents that there are no other real estate brokers involved in this transaction, except _____. address: _____
phone: _____, and Buyer covenants to defend, indemnify and hold Seller and Seller's broker harmless against all claims of real estate brokers or salesmen due to acts of Buyer or Buyer's representatives, and Buyer shall be liable for Seller's costs, including attorneys' fees and damages, which arise by virtue of such claims as set forth in this paragraph. This paragraph shall survive Closing of the transaction contemplated hereby (the "Closing").

3. EXHIBITS AND ADDENDA. Any exhibits, attachments and/or addenda identified in Exhibit "A" (collectively "Addenda") attached hereto shall constitute a part of this Agreement and are incorporated herein by reference.

4. STANDARD PROVISIONS. It is acknowledged and agreed by the parties hereto that this Agreement is comprised of and does include the content and provisions of the first page, plus "Standard Provisions" consisting of Paragraphs 4 through 48, inclusive. A copy of the Standard Provisions has been received, read, approved and accepted by Buyer and the content and provisions are incorporated herein as a part hereof as if set forth herein. The Standard Provisions shall bear no addition, deletion or other modifications or, should any appear thereon, they shall be invalid and of no force or effect. Any additions, deletions or other modifications to this Agreement shall be solely made by notation upon the first two (2) pages of this Agreement or by formally executed riders or addenda hereto. Prior receipt, approval, acceptance, inclusion and the binding validity of the "Standard Provisions" are fully and freely acknowledged by the parties hereto.

5. SALE CONTINGENT ON ACQUISITION OF LAND. Seller's obligation hereunder to sell the Unit to Buyer is contingent upon Seller's acquisition of the real property on which the Condominium will be constructed from MGM Grand Hotel, LLC, a Nevada limited liability company. In the event Seller is unable to purchase the land prior to the recordation of the final subdivision map for The Residences at MGM Grand - Tower A, Buyer and Seller shall be released from their obligations hereunder, and Seller shall return all deposits made to Buyer, together with interest earned thereon, if any.

6. DEPOSITS. Deposits may be made by personal check (subject to clearance), cashier's check (subject to clearance) or wire transfer of federal funds. All payments must be made in United States funds and all checks must be payable on a bank located in the United States. Seller is not obligated to accept any deposit which Buyer fails to pay on time, and if Seller agrees to accept such deposit on a later date, Buyer will pay a late funding charge equal to the greater of eighteen percent (18%) or the applicable highest lawful rate per annum of all funds due Seller from the date due until the date received and cleared by Seller. Failure to pay any deposit is a default hereunder which shall enable Seller at its option, to terminate this Agreement.

7. TERMS OF CLOSING. The balance due at Closing must be paid by cashier's check (subject to clearance), or wire transfer of federal funds. Said payment must be made in United States funds and all cashier's checks must be payable on a bank located in the United States.

Buyer understands that Buyer will be obligated to pay all cash at Closing under this Agreement, and that Buyer's obligations under this Agreement to purchase the Unit will not depend on Buyer obtaining a loan secured by deed of trust from any lender or any conditions imposed by such lender. Buyer will be solely responsible for making Buyer's own financial arrangements to enable Buyer to pay Seller for the Unit. The fact that Seller may arrange for the availability of loans secured by deeds of trust for purchasers of units will not in any way affect this obligation. Seller agrees, however, to cooperate with any lender and to coordinate Closing with it, but only if the lender meets Seller's Closing schedule and pays the proceeds of its loan secured by deed of trust at Closing. In the event that the lender does not pay Seller these proceeds at Closing, Buyer will not be allowed to take possession of the Unit until Seller actually receives cleared funds.

Although Seller does not have to do so, if Seller agrees to delay Closing upon Buyer's request, or until the lender is ready to close, or to wait for full or partial funding from lender until after Closing, Buyer agrees to pay Seller a late funding charge equal to interest at eighteen percent (18%) of all sums due Seller which have not been paid to Seller (and which have not then cleared) from the date Seller originally scheduled Closing to the date of actual payment (and clearance). This late funding charge may be estimated and charged by Seller at Closing. Seller's estimate will be adjusted after Closing based on actual funding and clearance dates upon either Seller or Buyer's written request. Without limiting the generality of Paragraph 29 of this Agreement, the foregoing sentence will continue to be effective after Closing.

8. SELLER'S FINANCING. Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium. Buyer agrees that any lender advancing funds to Seller for Seller's use in connection with the Condominium will have a prior deed of trust on the Unit and the Condominium until Closing. At that time, Seller may use all the proceeds of Buyer's purchase which are necessary to release the Unit from the then applicable encumbrances for the purpose of obtaining those releases. Neither this Agreement, nor Buyer's payment of the deposits, will give Buyer any lien or claim against the Unit or the Condominium. Without limiting the generality of the foregoing, until the Closing, Buyer's rights under this Agreement are subordinate to all deeds of trust and other encumbrances (and all modifications made to those deeds of trust and other encumbrances) that secure the advancement of acquisition, development and/or construction funds, whether made or recorded before or after the Effective Date (as defined in Paragraph 47 of this Agreement).

9. CONSTRUCTION. Buyer acknowledges that Seller shall be obligated only to provide or complete those systems, services or amenities, including roads, sewers, water, gas or electric service or recreational amenities that are set forth, and by this reference hereby incorporated, in the Property Report. The effective date of the Property Report is March 30, 2004. The following provisions will apply if in accordance with this Agreement the

2

construction, furnishing and landscaping of the Unit and of the Condominium in which the Unit is located are not substantially complete on the Effective Date (if the Unit is substantially completed on the Effective Date, Buyer hereby acknowledges having inspected and approved it, and Buyer is buying the Unit "AS IS" except as indicated on any Addenda):

    9.1  Construction. Seller agrees to construct the Unit in substantial conformance with the plans and specifications on file in Seller's office ("Seller's Plans and Specifications"), which Buyer can inspect upon reasonable notice, and, where applicable, similar to an existing model of the Unit. Buyer acknowledges and agrees that Seller's Plans and Specifications for the Unit and Condominium are available for inspection at the sales office. Buyer understands that the Unit may be the reverse or mirror image of the floor plan of any model or that shown on Seller's Plans and Specifications, Seller's sales brochures or other materials. Buyer understands and agrees any existing model may contain items or special features which are not included in Buyer's purchase, such as furnishing and decorations, accessories, window treatments, carpeting and flooring, wall treatments and paint, fixtures and special lighting effects, and extra appliances. Buyer understands and agrees that the Purchase Price only includes the construction of the Unit pursuant to Seller's Plans and Specifications and the standard items specified in Seller's sales brochures and those items or additions in any Addenda. Buyer acknowledges and agrees that there are various methods for calculating the square footage of a Unit and that, depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Seller reserves the right, without liability to Buyer, (i) to make any modifications, changes or omissions to the Unit, Shared Components or the Common Elements (x) as long as they do not substantially and adversely affect Buyer, or (y) if they are recommended or required by any governmental authority, and (ii) to substitute materials, equipment, cabinets, fixtures, appliance, and/or bathroom floor coverings with items of similar or greater quality. Buyer understands materials used in the construction such as wood, paint, tile, marble, and the like, are subject to shading, the gradation of which may vary from samples, models or color charts, and from piece to piece, and Seller will not be liable for such variation. Furthermore, Seller hereby disclaims any liability for chips and scuffs in kitchen cabinets, vanities and tubs occurring after Closing. Seller will have complete discretion in "finishing details" of the Condominium including, but not limited to, the exterior of the buildings, landscaping, amenities, and beautification of the Condominium. Buyer further agrees and understands that trees and landscaping which are located on portions of the Condominium may be removed to permit construction. Seller does not guarantee the survival of any trees or landscaping which are left or planted on any portion of the Condominium.

    Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate ongoing "in the field" construction needs. These changes and adjustments are essential in order to permit all components of the units and the building to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer understands and agrees that changes in the dimensions of rooms, balconies and terraces and in the location of telephones, electric, cable television and other utility outlets, windows, doors, walls, partitions, lighting fixtures, electric panel boxes and the general layout of the Unit are subject to changes made by Seller in its sole discretion. Buyer acknowledges and agrees that it is to his benefit to allow Seller to make such changes to the Unit and the Condominium.

    9.2  Deviations from Plans and Specifications. Buyer fully understands and agrees that the Seller's Plans and Specifications for the Condominium and the Unit describe "proposed improvements" to be "constructed," and that the realities of construction are such that the final building and improvements will, in all likelihood, contain variations and deviations from the Seller's Plans and Specifications.

    9.3  Deviations from Seller's Sales Materials/Models. Buyer acknowledges and agrees that the Unit may differ from the models and floorplans shown to Buyer, as well as Seller's sales brochures or other materials ("*Seller's Sales Materials*"). Buyer understands that changes to the Unit rendering the Unit different from the models, floorplans, and Seller's Sales Materials may be made for a variety of reasons, including, but not limited to: (i) requirements or recommendations by governmental authorities; (ii) availability of materials, appliances, fixtures, floor coverings, decorations or other items originally included in the models or Seller's Sales Materials; (iii) subsequent quality enhancements or improvements to the Unit; and (iv) "in the field" changes and adjustments necessary to permit all components of the units and the building to be integrated into a well functioning and aesthetically pleasing product. Seller reserves the right to make such changes, modifications or omissions to the Unit, provided that such changes do not substantially and adversely affect Buyer. All substituted materials, appliances, fixtures, floor coverings, decorations or other items will be of similar or greater quality to the items shown in the models, floorplan and Seller's Sales Materials.

    9.4  Extras and Options. Buyer recognizes that Seller is not obligated to agree to provide extras or options.

    9.5  Completion Date. Seller anticipates the Unit will be substantially completed by the Estimated Closing Date set forth on Page 1 of this Agreement, but Buyer understands and agrees that Seller cannot guarantee completion by such Estimated Closing Date. Seller will not be liable for any delays and Seller will not have to make, provide or compensate Buyer for any accommodations or costs as a result of any delays, and any delays will not permit Buyer to cancel, amend, or diminish any of Buyer's obligations. In the event Seller is unable to obtain executed purchase and sale agreements for fifty percent (50%) of the units in the Condominium within 180 days from the date of the first purchase and sale agreement of a unit in the Condominium, Seller may terminate this Agreement and refund all of Buyer's Deposits, in which case both parties shall be relieved of all obligations hereunder. The ability of Seller to terminate this Agreement for inability to obtain a sufficient number of executed purchase and sale agreements is a condition for the benefit of Seller only, which condition Seller may waive in its sole and absolute discretion.

    9.6  Interference with Construction. Prior to the Closing, Buyer will not enter into or upon the Unit or the Condominium or interfere with the progress of construction or with workmen, and Buyer will not cause such entry or interference by others. Seller shall not be liable for any injury resulting from Buyer's breach of this Paragraph 9.6. Notwithstanding anything herein to the contrary, Buyer may enter the Unit with Seller's

3

representative for the purpose of making one pre-Closing inspection and preparation of a "punchlist" of items of workmanship or materials (only within the boundaries of the Unit itself) which Seller may agree to correct within a reasonable time subsequent to Closing. Said pre-Closing inspection shall be made by appointment with Seller's representative prior to Closing, and shall be scheduled on the date and at the time set by Seller. Both Buyer and Seller's representative shall sign the punchlist which is prepared at said pre-Closing inspection. Seller shall only be required to correct those items of workmanship and materials which should be corrected in order to conform construction of the Unit to the Seller's Plans and Specifications within a reasonable time after Closing. Notwithstanding the preparation of a punchlist, Seller's obligation to correct any items will not be grounds for deferring the Closing, nor imposing any condition on Closing, and there shall be no postponement of Closing, holdbacks of Closing funds, or escrow of sums due to punchlist items.

9.7    Completion. The issuance of a temporary, partial or permanent certificate of occupancy for the Condominium, the floor where the Unit is located or the Unit, whichever occurs first, will conclusively establish completion of the Unit. If some minor items are not finished at Closing, Buyer will not hold back any funds or object to a final non-escrow Closing. The Shared Components and other portions of the Condominium need not then have certificates of occupancy, nor be so completed.

9.8    Insulation. Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Units, the following insulation:

| Type | R-Value | Location |
|------|---------|----------|
| 6" Batt Insulation | R-19 | Exterior Wall |
| Lt. Wt. Ins. Conc. System | R-30 (average) | Roof Deck |
| 4" EPS Board Topping Slab | R-11 | Ceilings below air conditioned mechanical space above |
| 3-½" Batt Insulation | R-11 | Sound Wall |

This R-Value information is based solely on the information given by the appropriate manufacturers (based on the thicknesses listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors. All insulation information is subject to Seller's general right to make changes in Seller's Plans and Specifications.

9.9    Impact Noise Insulation; Noise Disclaimer. In the event Buyer desires to install tile or hard surface flooring finishes in the Unit, Buyer must obtain the approval of the Hotel Unit Owner and make such improvements in accordance with the Declaration and any rules or regulations adopted by the Hotel Unit Owner. Buyer must install noise insulation along with the installation of any internal hard surface flooring finishes. Owner acknowledges and agrees that sound transmission in a high-rise building is very difficult to control and that noise from adjoining Units and/or mechanical equipment can often be heard in other Units. Seller makes no representation or warranty as to the level of sound transmission between Units, and Buyer waives and expressly releases any such warranty and claims for loss or damages resulting from sound transmission.

10.    CLOSING. The Closing shall take place only upon the completion of the Unit as defined in Paragraph 9.7 of this Agreement, the recordation of a final subdivision map for the Condominium, and the recordation of the Declaration. Seller shall provide notice to Buyer, which notice shall set forth the time, date and place of Closing (the "Closing Date"). The Closing Date specified in the aforementioned notice shall be set by Seller and shall not be less than five (5) business days from the date of such notice. In the event Buyer requests an extension of the Closing Date, no such extension shall be effective unless given in writing by Seller, which extension Seller has no obligation to give. The Closing Date shall be the date utilized for calculation of all prorations and adjustments required by this Agreement.

Notwithstanding the foregoing, Seller may and is authorized to postpone the Closing for any reason and Buyer agrees to close on the date Seller specifies in its notice of postponement. A change of time or place of Closing only (one not involving a change of date) shall not require any additional notice period. Any notice of Closing, postponement or rescheduling requested or desired by Seller may be given orally, by telephone, telegraph, facsimile, mail or other means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the telephone or facsimile number specified on Page 1 of this Agreement, unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be deemed effective on the date given or mailed. An affidavit of one of Seller's employees or agents that notice was given to Buyer will be conclusive for purposes of proving that notice was in fact given.

If Buyer fails to receive any notice because Buyer failed to advise Seller of any change of address or telephone or facsimile number, or because Buyer failed to pick up a letter when Buyer had been advised of an attempted delivery, Buyer will not be relieved of Buyer's obligation to proceed with Closing on the Closing Date unless Seller agrees in writing to postpone the Closing Date. Buyer understands that Seller is not required to reschedule or to permit a delay in Closing.

In the event Buyer fails to close this transaction on the Closing Date for any reason other than for a delay desired, requested or caused by Seller (including Buyer's failure to obtain or procure any document or instrument required at Closing), Buyer shall further be required to pay to Seller, at the time of Closing, a sum equal to the greater of eighteen percent (18%) or the applicable highest lawful rate per annum calculated on a daily basis on the outstanding balance of the Purchase Price, from the Closing Date through and including the date of the actual Closing; provided, however, that at the sole option of Seller, the provisions of Paragraph 17 of this Agreement relating to default shall be considered paramount and shall prevail over the provisions of this Paragraph 10. The

4

acceptance by Buyer of the deed of conveyance shall be conclusive that Seller has performed all its obligations under this Agreement.

11. **DEED: TITLE TO UNIT.** Seller and Buyer agree that Buyer is purchasing the Unit subject to those items more particularly set forth in this Paragraph 11, and that title to the Unit which Buyer will acquire according to the terms and conditions of this Agreement will be good, marketable and insurable, and subject to the following "Permitted Exceptions." Seller will convey title to the Unit by grant, bargain and sale deed subject only to (i) real estate taxes, and any other taxes and assessments imposed by other taxing authorities for the year of the Closing and subsequent years; (ii) conditions, covenants, restrictions, agreements, limitations, reservations, declarations, dedications, and easements of record; (iii) existing zoning ordinances, publicly dedicated rights-of-way, easements and other matters of public record, including, but not limited to, utility agreements of record, and any other restrictions upon the use of the property or other requirements by governmental authorities having jurisdiction; (iv) any state of facts which an accurate survey of the Unit and the Condominium would disclose; (v) any loan secured by deed of trust executed by Buyer encumbering the Unit or such other title exceptions created by or on behalf of Buyer; (vi) the Governing Documents, including, but not limited to, the Declaration, Bylaws and Articles of Incorporation and Rules and Regulations of The Residences - Tower A and any amendments to the foregoing; (vii) the standard printed exceptions contained in an ALTA owner's residential policy of title insurance; (viii) all other laws, ordinances and rules and regulations of all governmental agencies; (ix) pending governmental liens for public improvements as of Closing (Seller will be responsible for certified governmental liens for public improvements as of Closing; provided, however, that to the extent that such certified liens are payable in installments, Seller shall only be responsible for those installments due prior to Closing, and Buyer hereby assumes all installments coming due after Closing); and (x) any other matters not listed above provided that affirmative title insurance is given to cover any such matters. Seller hereby reserves the right to grant any and all easements over, upon, under and across the Condominium and the Condominium Property (including the Unit) which may be necessary or desirable in order to furnish utility services or other services to the Units or the Annexable Area, or any portion thereof and Buyer's title shall be subject to any such easements. The foregoing exceptions set forth in this Paragraph 11 shall hereinafter be referred to as the "Permitted Exceptions."

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (not to exceed ninety (90) days) to correct any defects in title. If Seller cannot, after making reasonable efforts (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments), or elects not to, correct the title defects, Buyer will have two (2) options:

      a)      Buyer can accept title in the condition Seller offers it (with defects) and pay the Purchase Price for the Unit, waiving any right Buyer may have against Seller because of the defects in title; or

      b)      Buyer can cancel this Agreement and receive a full refund of Buyer's deposit, whereupon both Seller and Buyer shall be relieved of all obligations under this Agreement.

Notwithstanding the foregoing, Seller agrees that if Seller conveys title to the Unit to Buyer, any deed of trust, mortgage, judgment, option or contract to sell or a trust agreement not created by or on behalf of Buyer, affecting the Condominium or affecting more than one unit offered for sale in the Condominium, except for any lien or other encumbrance arising as the result of the imposition of any tax assessment by any public authority, will be released upon Closing.

12. **CLOSING DOCUMENTS AND COSTS; PRORATIONS.** At Closing, Buyer will be responsible for paying the real property transfer tax on the grant, bargain and sale deed and the premium for issuance of an ALTA owner's residential policy of title insurance for the Unit in the amount of the Purchase Price, which policy shall be subject to the Permitted Exceptions. Buyer shall also pay to Seller the cost of endorsements to the policy of title insurance which are not part of the Purchase Price. Escrow fees will be divided evenly between Seller and Buyer. The Purchase Price shall be subject to adjustment by Closing costs, charged to Buyer, if any, prorations, Hotel Shared Costs and maintenance assessments for the Condominium Association (as defined in Paragraph 22 herein) required at Closing. Buyer shall also pay to the Seller or the Hotel Unit Owner a capital contribution in accordance with Paragraph 22 of this Agreement. In addition to the capital contribution, at Closing Buyer shall be obligated to prepay the next month's charge for the Hotel Shared Cost and the maintenance assessment of the Condominium Association. Buyer shall reimburse Seller for any utility deposits or hook-up fees which Seller may have advanced prior to Closing for the Unit. Seller's acknowledgment that it is prepared to deliver title to the Unit subject only to the Permitted Exceptions set forth in Paragraph 11 of this Agreement shall be conclusive that title is good, marketable and/or insurable. Taxes, insurance premiums, Hotel Shared Costs, Condominium Association maintenance assessments, government assessments and other proratable items shall be prorated as of Closing. If Closing occurs in a year in which taxes on the Condominium are assessed in a single tax bill on the Condominium as a whole rather than on a unit-by-unit basis, Buyer will pay to Seller, Buyer's prorata share of taxes and Seller will pay the taxes for that year. If Closing occurs in a year in which taxes are assessed on an individual unit basis, Buyer will, upon presentation of the tax bill to Seller, be reimbursed for Seller's prorata share of taxes, based upon the maximum discount available. Any costs incurred in connection with Buyer obtaining a loan secured by deed of trust on the Unit and the fees, points, prepayments, expenses and loan secured by deed of trust title policy of and relating to such loan secured by deed of trust shall be paid by Buyer and each party shall bear the costs of its own attorney's fees, if any.

13. **BILL OF SALE.** Buyer shall receive at Closing a bill of sale for any appliances, furnishings, personal property and equipment in the Unit.

14. **PARKING.** Parking will be by valet only and parking spaces will not be assigned to a particular Unit. One valet parking space for each Unit will be available in the underground parking structure located in the

5

Condominium or within another parking facility located near the Condominium. Any spaces in addition to the one valet parking space available to each Residential Unit will be available on a "first-come" basis.

15. **WARRANTY AND DISCLAIMER.** Specimen copies of all manufacturers' warranties which will be delivered to Buyer at Closing and which are not expressly warranted by Seller have been made readily available for Buyer's review in the "Warranties Binder" located in the sales office and Buyer acknowledges disclosure of such warranties and the location thereof by Seller. Buyer to the extent permitted by law, is purchasing the Unit "AS IS" and should undertake whatever inspections of the Unit, Common Elements and Shared Components. Buyer so desires in order to assure Buyer as to the quality and condition of the buildings and improvements.

**EXCEPT FOR THE WARRANTIES CONTAINED IN THE DEED OF CONVEYANCE AND ANY WRITTEN WARRANTIES DELIVERED AT CLOSING, NO WARRANTIES, EXPRESS OR IMPLIED, REPRESENTATIONS, UNDERSTANDINGS, GUARANTIES OR PROMISES INCLUDING THE WARRANTIES SET FORTH IN THE ACT HAVE BEEN MADE TO OR RELIED UPON BY BUYER IN MAKING THE DETERMINATION TO EXECUTE AND CLOSE PURSUANT TO THIS AGREEMENT AND, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL WARRANTIES, INCLUDING IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND HABITABILITY, AND ALL WARRANTIES IMPOSED BY STATUTE (EXCEPT TO THE EXTENT THEY CANNOT BE DISCLAIMED) ARE DISCLAIMED.**

As to implied warranties which cannot be disclaimed either in whole or in part, incidental and consequential damages are disclaimed and Seller shall have no responsibility for any incidental or consequential damages, including, but not limited to, any claims for personal injury, property damage or emotional distress. No warranties or guaranties are given as to consumer products as defined in 15 U.S.C. Section 2301, et seq. (Magnuson-Moss Warranty Act). Seller has not given and Buyer has not relied on or bargained for any such warranties. Buyer hereby agrees to execute an addendum to this Agreement limiting the statute of limitations for certain warranties contained in the Act. This Paragraph 15 shall survive Closing.

16. **ESCROW OF DEPOSITS.**

16.1 **Escrow of Deposits.** Seller has established an escrow account with Nevada Title Company (the "Escrow Agent"), with offices located at 2500 N. Buffalo Drive, Suite 150, Las Vegas, Nevada, 89128 and all escrowed deposits shall be held and disbursed pursuant to and in accordance with the terms of this Agreement, the Act, and the escrow instructions (the "Escrow Instructions"). In the absence of Escrow Instructions, this Agreement shall act as the escrow instructions for the Escrow Agent. Seller and Buyer hereby agree to be bound by the terms, conditions, provisions and agreements of said Escrow Instructions, *provided, however,* that in the event this Agreement conflicts with the Escrow Instructions the terms and provisions of this Agreement shall supersede and control. Buyer may obtain a receipt for any and all escrow deposits from the Escrow Agent upon request. Seller may change escrow agents. In this Agreement, reference to deposits will be considered to automatically include all interest actually earned, if any, on the deposits so that the party who/which becomes entitled to receive the deposits will also receive any interest earned thereon; *provided, however,* that in the event the Closing occurs, Seller shall be entitled to all interest, if any, earned on the deposits and that Buyer will not be entitled to a credit against the Purchase Price for any interest earned. Interest on deposits will be governed by the following: (i) no interest will be deemed earned on deposits unless it actually accrues and is paid by the applicable bank or other institution; and (ii) Seller is not required to place (or cause to be placed) deposits in an account which bears interest at all or any particular rate. Buyer recognizes that if Seller uses all or any portion of the deposits in construction, or if all or any portion of the deposits are retained in non-interest bearing accounts, no interest will be earned or deemed to be earned (even if Seller indirectly benefits from any such use or retention). If Seller does place the deposits in an interest bearing account, Seller may select the kind of account (low-yielding or otherwise) in its sole discretion.

16.2 **Bonding of Deposits.** Notwithstanding Paragraph 16.1 of this Agreement, in lieu of placing the deposits in escrow, Seller may furnish a bond executed by Seller as principal and by a corporation qualified under the laws of Nevada as surety, payable to the State of Nevada, and conditioned upon the performance of Seller's duties concerning the purchase of the Unit. Such bond shall be in a principal sum equal to the amount of the deposits.

16.3 **Refund of Deposits.** In the event Buyer elects to terminate this Agreement in accordance with Paragraphs 17.2 or 42 of this Agreement, as applicable, all deposits or other property paid by the Buyer shall be refunded without penalty or obligation within twenty (20) days of the receipt of the notice of termination by the Seller.

17. **DEFAULT.**

17.1 **Buyer's Default.** Should Buyer fail to do any and all acts and execute any and all instruments necessary on the designated Closing Date or should Buyer fail to perform any covenant, promise or obligation required to be performed hereunder, Seller, at its option may terminate this Agreement and retain, or if not then paid by Buyer, Buyer will pay to Seller, all of Buyer's deposits then made or which would have been made or required had Buyer not defaulted, and all interest which was, or would have been, earned on them, as liquidated and agreed upon damages (the "Liquidated Damages Amount"); the parties hereto agree and acknowledge that actual damages resulting from a default or breach by Buyer are extremely difficult to estimate and that the Liquidated Damages Amount is a reasonable, good faith estimate of the actual damages incurred by Seller in connection with the removal of the Unit from the market and shall not constitute a penalty. Upon payment or retention of the Liquidated Damages Amount, all parties hereto shall be released from obligations hereunder. Notwithstanding the foregoing and with the exception of Buyer's failure to timely pay a deposit or close on the Closing Date, Seller shall give Buyer written notice of Buyer's default or breach of this Agreement and give Buyer

6

the opportunity to correct the default or breach within twenty (20) days from the receipt of such notice. The Escrow Agent, upon being notified of Buyer's failure to correct the default or breach, shall pay Buyer's deposits and interest thereon to Seller and the Escrow Agent shall be under no obligation to make any independent investigation or confirmation of the alleged default. In the event that Buyer fails to timely pay a deposit or close on the Closing Date, Seller shall have the option of terminating this Agreement without prior notice to Buyer.

17.2    Seller's Default.  In the event Seller shall fail to materially perform any of its obligations hereunder, Buyer shall give Seller written notice specifying such default and if Seller, within thirty (30) days subsequent to receipt of said notice, fails to take such action which would cure the default within a reasonable time after notice, and if Buyer has performed all of Buyer's obligations under this Agreement, Buyer may terminate this Agreement and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination, whereupon all parties hereto shall be released from their obligations hereunder.

17.3    Subdivision Map.  Notwithstanding the foregoing, Buyer acknowledges that (i) Seller has disclosed to Buyer that a final subdivision map for The Residences at MGM Grand - Tower A has not yet been approved and recorded, and (ii) Buyer has reviewed the most recent version of the subdivision map prepared by Seller (the "Provisional Subdivision Map").  In the event that the approved and recorded final subdivision map for The Residences at MGM Grand - Tower A differs materially and adversely from the Provisional Subdivision Map, Buyer may terminate this Agreement and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination within ten (10) days of the recordation of the final subdivision map for The Residences - Tower A, whereupon all parties hereto shall be released from their obligations hereunder.

18.    GOVERNING DOCUMENTS.  Buyer hereby acknowledges receipt of copies of those instruments and documents listed on Exhibit "A" attached hereto and Buyer shall execute a receipt in the form of Exhibit "A" hereto. Buyer agrees to comply with the Governing Documents and that occupancy of the Unit shall at all times be subject to the provisions of the Governing Documents.  Seller has delivered to Buyer a full set of the Governing Documents.  Seller reserves the right, in its sole discretion, to amend any of the Governing Documents, provided that a copy of such amendment is transmitted to the Buyer.  Notwithstanding anything to the contrary contained herein, upon recordation of the Governing Documents, Seller shall only have the right to amend the Governing Documents in accordance with Nevada law.  Buyer may rescind this Agreement if an amendment is so substantial in nature as to render title to the Unit unmarketable.  If this Agreement is cancelled for any reason, Buyer will return to Seller all of the Governing Documents delivered to Buyer in the same condition received, reasonable wear and tear excepted, or Buyer shall pay to Seller $100.00 if Buyer fails to return same to Seller.

19.    NON-ASSIGNABILITY.  Buyer shall not, and has no right to, assign, sell or transfer Buyer's interest in this Agreement without Seller's prior written consent, which consent may be arbitrarily or unreasonably withheld, in Seller's sole discretion.  If Buyer is a corporation, other business entity, trustee or nominee, a transfer of any equitable, beneficial, legal or principal interest in or to Buyer will constitute an assignment of the Agreement requiring Seller's consent.  Seller's consent may be conditioned in any manner it desires, in its sole discretion.  The fact that the Seller refuses to give its consent to an assignment shall not give rise to any claim for any damages against Seller.  Seller may freely assign, transfer or sell any or all of its rights and obligations under this Agreement. Notwithstanding anything to the contrary contained herein, Buyer, without Seller's consent, shall be entitled to assign Buyer's right, title and interest in this Agreement to a corporation, partnership or trust, of which Buyer owns and controls a majority of the voting and controlling interests.  Notwithstanding the assignment set forth herein, nothing shall relieve Buyer of its obligations hereunder.  In the event of such an assignment by Buyer, Buyer may not transfer any equity, beneficial or principal interest in the corporation, partnership or trust to which Buyer has assigned this Agreement without Seller's prior written consent, which consent may be withheld or conditioned by Seller in any manner Seller desires in Seller's sole discretion.

This Agreement is binding upon the Buyer's heirs and legal representatives.  If Buyer has received Seller's consent to assign, transfer or sell Buyer's interest in this Agreement, this Agreement shall be binding upon such assignee, transferee or purchaser.  If Buyer is a corporation or other business entity, this Agreement shall be binding upon Buyer's successors in interest.

20.    GOVERNING LAW.  The Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.  Venue for any action, litigation or proceeding arising out of or concerning this Agreement shall be in Clark County, Nevada, and the parties expressly waive their right to venue elsewhere.  **The following sentence will supersede and take precedence over anything else in this Agreement which is in conflict with it: If any provisions serve to limit or qualify Seller's substantial completion obligation as stated in this Agreement, or Buyer's remedies in the event that such obligation is breached, and such limitations or qualifications are not permitted if the exemption of this sale from the Interstate Land Sales Full Disclosure Act pursuant to 15 U.S.C., Section 1702(a)(2) is to apply, or this Agreement is to otherwise be fully enforceable, than all those provisions are hereby stricken and made null and void as if never a part of this Agreement.  For purposes of this paragraph only, the words "this Agreement" include in their meaning the Condominium Documents.**

21.    NOTICES.  Notices to either party shall be given by certified mail, postage prepaid and return receipt requested, hand delivery or a nationally recognized overnight courier.  All notices shall be sent to the addresses of the parties set forth on the first page of this Agreement.  Either party may change its address for notice by giving notice to the other as provided herein.  All notices shall be deemed and considered given upon mailing. Notwithstanding the foregoing, any notice by Seller of Closing, Closing extension, postponement or rescheduling pursuant to Paragraph 10 of this Agreement may be given orally, by telephone, telegram, facsimile or other means of

communication and an affidavit from Seller, its agents or employees, shall be conclusive of the fact that such notice was given to Buyer. Such form of notice shall be deemed effective when given.

22. MAINTENANCE AND OPERATION COSTS. As those areas typically designated as common elements in a condominium are designated as Shared Components to be owned and maintained by the Hotel Unit Owner, Buyer understands and agrees that Buyer must pay its allocated share of the Hotel Shared Costs for maintenance and operation of the Shared Components, as well as related expenses, from and after the Closing Date. Though a large portion of the expenses paid by Buyer will be attributable to the maintenance and operation of the Shared Components, Buyer understands and agrees that Buyer must also pay an assessment to the association (the "Condominium Association"), for maintenance of Common Elements, and any other expenses incident to the operation of the Condominium Association from and after the Closing Date. A capital contribution equal to three (3) months of Hotel Shared Costs shall be paid at Closing as designated by Seller.    In addition, a capital contribution equal to three (3) months of Condominium Association assessments and shall be paid at Closing as designated by Seller to Seller or to the Condominium Association. These contributions shall be determined at the time of Closing, will not be credited against regular Condominium Association assessments or Hotel Shared Costs, and may be used for any expenses that Seller or the Hotel Unit Owner incurs in maintaining the Shared Components or Common Elements, or providing services and subsidies in relation to the Shared Components or Common Elements. Such expenses may also be used to pay any deficits or other sums Seller may be required to advance to the Condominium Association and the Hotel Unit Owner. Buyer agrees to be bound by all the Governing Documents, including, but not limited to, the Declaration, as they may be amended from time to time.

23. ADDITIONAL DISCLOSURES AND ACKNOWLEDGEMENTS.

23.1    No Representations Regarding Certain Economic Benefits.    BUYER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES, AGENTS, BROKERS OR SALES AGENTS HAVE REPRESENTED OR OFFERED THE UNIT AS AN INVESTMENT OPPORTUNITY FOR APPRECIATION OF VALUE OR AS A MEANS OF OBTAINING INCOME FROM THE RENTAL THEREOF. BUYER FURTHER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES, AGENTS, BROKERS OR SALES AGENTS HAVE MADE ANY REPRESENTATIONS AS TO RENTAL OR OTHER INCOME FROM THE UNIT OR AS TO ANY OTHER ECONOMIC BENEFIT, INCLUDING POSSIBLE ADVANTAGES FROM THE OWNERSHIP OF THE UNIT UNDER FEDERAL OR STATE TAX LAWS, TO BE DERIVED FROM THE PURCHASE OF THE UNIT.

_____
BUYER'S INITIALS

23.2    Disclaimer of Express or Implied Warranties. Seller hereby disclaims any and all and each and every express or implied warranties, whether established by statutory, common, case law or otherwise, as to the design, construction, continuation of any particular view (it being understood and agreed that construction on any adjacent properties may obstruct such view), sound and/or odor transmission, and the existence and/or development of molds, mildew, toxins or fungi, furnishing and equipping of the Condominium.

24. MISCELLANEOUS.

24.1    Time is of the Essence. Time is of the essence in this Agreement with respect to Buyer's obligations hereunder.

24.2    No Rights in Unit. Buyer acknowledges that Buyer acquires no right, title, interest or lien rights in the Unit prior to the conveyance of the title and Buyer agrees not to file in the public records this Agreement, any claim, memorandum or notice (including a lis pendens) concerning any dispute with Seller relative to the subject matter of this Agreement. Any such recording shall be a default hereunder.

24.3    No Recordation. This Agreement shall not be recorded in any public records without the prior written consent of Seller, which consent may be arbitrarily or unreasonably withheld, in Seller's sole discretion. The recording of this Agreement, without Seller's prior written consent, shall be a default hereunder.

24.4    Liens. If, at the time of Closing, any deed of trust or lien encumbers the Unit, Seller may use Buyer's Closing funds to obtain a release of same at Closing.

24.5    Right to Litigate Taxes. Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit or underlying lands for prior years and the year of conveyance.

24.6    Construction. It is Seller's and Buyer's mutual desire and intention that all provisions of the Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement in its entirety unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety, and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part or parts shall be unenforceable and considered null and void in order that the mutual paramount goal that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights, remedies and powers, or waiving or limiting any of Buyer's rights, remedies or powers or Seller's obligations, results in a final determination (after giving effect to the above judicial

8

modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposit, such offending rights, powers, limitations and/or waivers shall be struck, cancelled and rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement, unless the specific purpose of that language is to grant a right of cancellation.

24.7    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument which may be sufficiently evidenced by one such counterpart.

24.8    Pronouns. All pronouns and variations thereof shall be construed so as to refer to the masculine, feminine, neuter, singular or plural form thereof, as the identity of the person or persons or the situation may require.

24.9    Headings. The titles of sections and subsections contained in this Agreement are inserted for convenience of reference only, and are not to be given any legal effect and should not affect the construction or the interpretation of this Agreement.

24.10    Arbitration. The parties agree to submit to arbitration any dispute related to this Agreement (including, but not limited to, any dispute related to the interpretation or enforceability of this Agreement) and agree that the arbitration process shall be the exclusive means for resolving disputes which the parties cannot resolve. The laws of the State of Nevada shall apply to this Agreement. Any arbitration hereunder shall be conducted under the Dispute Resolution Rules of the American Arbitration Association ("AAA") as modified herein. Arbitration proceedings shall take place in Las Vegas, Nevada before a single arbitrator who shall be a lawyer. The prevailing party shall be reimbursed for all expenses of arbitration, including arbitration fees and attorneys' fees and costs. All arbitration proceedings shall be confidential. Neither party shall disclose any information about the evidence produced by the other party in the arbitration proceedings, except in the course of judicial, regulatory, or arbitration proceeding, or as may be demanded by government authority. Before making any disclosure permitted by the preceding sentence, a party shall give the other party reasonable advance written notice of the intended disclosure and an opportunity to prevent disclosure. In connection with any arbitration provisions hereunder, each party shall have the right to take the deposition of two (2) individuals and any expert witness retained by the other party. Additional discovery may be had only where the arbitrator so orders, upon a showing of substantial need. Only evidence that is directly relevant to the issues may be obtained in discovery. Each party bears the burden of persuasion of any claim or counterclaim raised by that party. The arbitration provisions of this Agreement shall not prevent any party from obtaining injunctive relief from a court of competent jurisdiction to enforce the obligations for which such party may obtain provisional relief pending a decision on the merits by the arbitrator. Each of the parties hereby consents to the jurisdiction of Nevada courts for such purpose. The arbitrator shall have authority to award any remedy or relief that a court of the State of Nevada could grant in conformity to applicable law except that the arbitrator shall have no authority to award punitive damages. Any arbitration award shall be accompanied by a written statement containing a summary of the issues in controversy, a description of the award and an explanation of the reasons for the award. The arbitrator's award shall be final and judgment may be entered upon such award by any court.

25.    **ADJUSTMENTS WITH THE CONDOMINIUM ASSOCIATION.** Buyer understands that Seller may have to advance money to the Condominium Association to permit it to pay for certain of its initial expenses. Seller is entitled to be reimbursed by the Condominium Association for all of its sums advanced by Seller. The Condominium Association may reimburse Seller out of assessments paid by Buyer and other unit owners as those assessments are collected at a later date, or by way of a credit against any obligations Seller may have to pay the Condominium Association, at Seller's election.

26.    **BUDGETS.** Buyer understands that the estimated operating budget as to the costs associated with the operation and maintenance of the Shared Components and Condominium Association (collectively, the "Budgets") contained in the Governing Documents provide only an estimate of what it will cost to operate and maintain the Shared Components and the Condominium Association during the period of time stated in the Budgets. The Budgets, themselves, however, are not guaranteed. Seller may make changes in the Budgets at any time to cover increases or decreases in actual expenses or in estimates. Reserves are expected to be collected annually with respect to the Shared Components, however, it is intended that the Seller, as the sole Owner upon the formation of the Condominium, will elect not to provide reserves for the initial year of the Condominium. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves for the Condominium.

27.    **LIABILITY FOR CASUALTY LOSS.** If the Unit is damaged by fire or other casualty after the Effective Date, but prior to the Closing of the Unit, then Seller shall be financially responsible for the loss. If, however, such damage occurs after the Closing of any unit in the Condominium, then the Hotel Unit Owner or the Condominium Association, as applicable, shall have the right to decide whether or not to repair the unit. After the Closing, neither the Hotel Unit Owner, Condominium Association nor the Seller shall be financially responsible to Buyer for the loss of any property lying within the boundaries of the Unit, including, but not limited to, personal property of Buyer.

In the event Seller, the Hotel Unit Owner or the Condominium Association decides to repair damage occurring prior to Closing, then the Seller, the Hotel Unit Owner and/or the Condominium Association shall have a reasonable time to complete repairs. Any such repair work will be judged by the same standards used to evaluate new construction. In the event of the foregoing, the Buyer shall not have any right to reduction in the Purchase Price nor have any claim against the Seller, the Hotel Unit Owner nor the Condominium Association, and Buyer agrees to accept the Unit on the Closing Date (provided the repairs are finished by the Closing Date). Any monies that Seller, the Hotel Unit Owner or Condominium Association receive in settlement for any damages (insurance, etc.) will belong to the Seller, the Hotel Unit Owner or Condominium Association, as the case may be. If Seller, the Hotel

Unit Owner or the Condominium Association decides not to repair the damage, then, and in that event, this Agreement shall be cancelled and all deposits shall be returned to the Buyer, and the parties shall be relieved of all further obligations hereunder. Notwithstanding anything to the contrary contained hereinabove, in the event that the Unit is damaged by casualty prior to Closing, Seller may elect not to repair, and to terminate this Agreement.

28. SELLER'S USE OF THE CONDOMINIUM. As long as Seller or an affiliate of Seller owns a unit or units in the Condominium or has any ownership in the Hotel Unit, it and its agents can keep offices and model units within the Condominium. Sales people employed by Seller or outside brokers can show these units, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell or lease units or develop and manage the Condominium, but Seller's use of the Condominium shall be appropriate in Seller's opinion and cannot unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This Paragraph 28 shall survive and continue to be effective after Closing.

29. SURVIVAL. The provisions and disclaimers in this Agreement which are intended to have effect after Closing shall survive (continue to be effective after) Closing and delivery of the grant bargain sale deed to Buyer.

30. JOINT AND SEVERAL OBLIGATIONS. If more than one person signs this Agreement as Buyer, each person shall be liable for full performance of all Buyer's duties and obligations hereunder. Seller may enforce this Agreement against each of the Buyers as individuals or together.

31. WAIVER. Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

32. NO REPRESENTATIONS. No broker, salesperson, or other person has been authorized to give any information or make any representations other than those contained in writing within the offering materials provided by Seller, and if given or made, such information or representations must not be relied upon as having been authorized by Seller. By executing this Agreement, Buyer acknowledges that no representations have been or are made concerning the economic benefits to be derived from the rental or resale of the Unit.

33. RADON GAS. Buyer is advised that radon gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Additional information regarding radon and radon testing may be obtained from your county public health unit. Nothing contained herein shall be deemed to be a representation or warranty by Seller as to the existence or non-existence of radon gas in or about the Unit or Condominium.

34. SOIL TEST REPORTS. Seller has advised Buyer that the following soil test reports have been prepared: Geotechnical Site Assessment - prepared December 9, 2002. Within five (5) days after signing this Agreement, Buyer may make a written request for a copy of soil report(s) conducted on the property on which the Condominium is located. Seller shall provide, without cost, a copy of each report requested not later than five (5) days after the request is received by Seller. In accordance with Nevada Revised Statutes ("NRS") Section 113.135, Buyer hereby waives Buyer's right to rescind this Agreement for the Unit within twenty (20) days after the receipt of all soil test reports as provided in NRS Section 113.135(3).

35. RECORDING OF GOVERNING DOCUMENTS. Buyer herein specifically grants authority to the Seller to file and place among the Office of the Recorder of Clark County, Nevada, all documents and papers required to be filed by the Nevada Revised Statutes in order to legally create and maintain existence of the Condominium.

36. INDUCEMENT. Buyer acknowledges that the primary inducements for Buyer to purchase under this Agreement are the Unit itself, and not the recreational amenities and other Shared Components and Common Elements.

37. LOCAL AGENT. Buyer shall deliver to Seller, within thirty (30) days of the Effective Date, an executed designation of an individual qualified to accept service of process in the State of Nevada, which designation shall be irrevocable during the period this Agreement remains in effect and for such time thereafter as is necessary to effectuate service of process upon Buyer or such designated local agent concerning any action, litigation or proceeding arising out of or concerning this Agreement. Buyer may appoint a substitute or successor local agent by notifying Seller of same in accordance with the notice provisions hereunder. If Buyer fails to deliver such designation, Buyer shall be deemed to have appointed the Secretary of State, State of Nevada, as Buyer's agent for such purposes.

38. CERTIFICATION. Buyer hereby certifies, under penalties of perjury, that the taxpayer's identification number (social security number or federal employer identification number) as set forth on Page 1 of this Agreement is correct, and understands that failure to provide the correct taxpayer's identification number, as required by law, may subject Buyer to civil or criminal penalties.

39. ATTORNEY'S FEES. In any action, litigation or proceeding arising out of or concerning a default of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its costs and reasonable attorneys' fees, through the appellate level.

40. INTERPRETATION. Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable.

Buyer's Initials _____                                                      Seller's Initials _____

41. **BUYER'S INSPECTION.** Buyer acknowledges that, prior to Closing, Buyer will have an opportunity to inspect the Unit, subject to the restrictions and limitations set forth in Paragraph 9.6.   Buyer further acknowledges that, prior to the execution of this Agreement, Buyer has had ample opportunity to inspect the Governing Documents.

42. **CANCELLATION RIGHT OF BUYER.** In the event that the Unit is not substantially complete as of the Effective Date and Buyer has not inspected the Unit, Buyer may, by written notice to Seller, cancel this Agreement until midnight of the seventh (7th) calendar day following the Effective Date.

43. **CONSTRUCTION BY BUYER'S AGENTS.** Buyer agrees not to hire or employ any contractors, subcontractors or any other persons, firms or corporations, to do any work in or on the Unit while said Unit is under construction, until after Closing and title and possession of the Unit has been transferred to the Buyer. Buyer agrees that it, its contractors, subcontractors or any other persons hired to work on the Unit shall abide by the Governing Documents. Buyer shall be responsible for any damage to the Condominium caused by Buyer, its contractors, subcontractors or any other persons hired to work on the Unit.

44. **SELLER'S CONTROL OF CONDOMINIUM ASSOCIATION.** Buyer acknowledges that the Seller will appoint officers and directors of the Condominium Association, and of necessity will be acting on behalf of the Condominium Association in dealings and transactions with Seller. Buyer expressly waives all objections to such dealings and transactions and hereby ratifies, approves and confirms the same. Buyer further understands and acknowledges that the Condominium Association's role in the governance of the Condominium will be minimal, as those items typically considered common elements in other condominium projects are designated as Shared Components and owned entirely by the Hotel Unit Owner.

45. **SURROUNDING PROPERTY.** Buyer acknowledges that Buyer has made due inquiry from sources other than Seller regarding the property surrounding The Residences at MGM Grand – Tower A. Seller makes no representations or warranties with respect to the property surrounding The Residences at MGM Grand -- Tower A and the uses to which such property is being used or may be used in the future and any interference which such uses may present to the views and/or other uses of the Condominium. Buyer understands and agrees that, for some time in the future, Buyer may be disturbed by noise, commotion and other effects of nearby construction activity and impeded in using portions of the property on which the Condominium sits during this activity.   Buyer further understands and agrees that the Condominium is located adjacent to a hotel/casino and that noise, lights and odors common to commercial activities, as well as construction activities, may exist on or near the Condominium site, at any time and from time to time. New hotel/casino developments may be constructed and existing hotel/casinos may undergo reconstruction from time to time, and such work may cause periods of extra noise, earth vibration and dust, as well as reconfiguration of landscaping, parking and other developments.

46. **LEGAL DOCUMENTS.** This Agreement and other Governing Documents, purchase documents, all disclosure materials and brochure materials are important legal documents and if not understood, Buyers should seek legal advice.

47. **EFFECTIVE DATE.** The "Effective Date" of this Agreement shall be the latest date as indicated below on which a party has executed this Agreement. Notwithstanding the foregoing, this Agreement shall not be binding upon Seller until executed by an authorized representative of Turnberry/MGM Grand Towers, LLC, a Nevada limited liability company.

48. **ENTIRE AGREEMENT.** This Agreement is wholly integrated and shall supersede any and all previous and current understandings and agreements between the Buyer and Seller, and this Agreement represents the entire agreement between the Buyer and Seller. No modification of this Agreement shall be valid unless in writing and signed by both Buyer and Seller. Any modification not in compliance herewith shall be null and void and of no force or effect. Brochures and advertising representations and illustrations constitute general concepts only, and are subject to change and modification at Seller's sole discretion.

IN THE EVENT THAT THE UNIT IS NOT SUBSTANTIALLY COMPLETE AS OF THE EFFECTIVE DATE AND BUYER HAS NOT INSPECTED THE UNIT, YOU HAVE THE OPTION TO CANCEL THIS AGREEMENT BY NOTICE TO SELLER UNTIL MIDNIGHT ON THE SEVENTH (7th) CALENDAR DAY FOLLOWING THE EFFECTIVE DATE OF THIS AGREEMENT.

11

Buyer's Initials                                                                                     Seller's Initials

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year set forth below.

SELLER:

WITNESS: _____

(as to Seller)

Turnberry/MGM Grand Towers, LLC,
a Nevada limited liability company

By:  Turnberry/Harmon Ave., LLC,
     a Nevada limited liability company

    By:_____
       Name:_____
       Title: _____

WITNESSES:

BUYER:

_____

(As to Buyer)

_____

Printed Name: _____

Date: _____

_____

(As to Buyer)

_____

Printed Name: _____

Date: _____

_____

(As to Buyer)

_____

Printed Name: _____

Date: _____

_____

(As to Buyer)

_____

Printed Name: _____

Date: _____

**EXHIBIT "A"**
RECEIPT FOR GOVERNING DOCUMENTS

The undersigned acknowledges that the documents checked below have been received.

Place a check in the column by each document received.

| **ITEM** | **RECEIVED** |
|---|---|
| 1. Public Offering Statement, including the following exhibits: | |
|    (a) Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for the Condominium and any amendments thereto | _____ |
|    (b) Articles of Incorporation of The Residences at MGM Grand – Tower A | _____ |
|    (c) Bylaws of the Condominium Association | _____ |
|    (d) Estimated Operating Budget for the Condominium Association | _____ |
|    (f) Estimated Operating Budget for Hotel Shared Costs | _____ |
|    (g) Information Statement Regarding Your Purchase of Property in a Common Interest Community | _____ |
|    (h) Nevada Revised Statutes Sections 11.202 through 11.206 and 40.600 through 40.695 and Senate Bill 241. | _____ |
| 2. Condominium Unit Purchase and Sale Agreement | _____ |
| 3. Addendum to Condominium Unit Purchase and Sale Agreement: Limited Waiver of Statute of Limitations for Warranties | _____ |
| 4. Zoning Designation Disclosure Statement | _____ |
| 5. Gaming Enterprise District Disclosure Statement | _____ |
| 6. Addendum to Gaming Enterprise District Disclosure Statement: Waiver of 24-Hour Disclosure Period | _____ |
| 7. Copies of Site Plan, Floor Plans and Building and Unit Features and Specifications | _____ |
| 8. Information Statement Regarding Your Purchase of Property in a Common-Interest Community (to be initialed separately) | _____ |

Executed this _____ day of _____, _____.


_____
Buyer


_____
Buyer