MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Email:  sm@morrislawgroup.com
Akke Levin, Bar No. 9102
Email:  al@morrislawgroup.com
Jean-Paul Hendricks, No. 10079
Email:  jph@morrislawgroup.com
300 South Fourth Street - Suite 900
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile:  (702) 474-9422

SNELL & WILMER L.L.P.
Alex Fugazzi, Bar No. 9022
Email:  afugazzi@swlaw.com
Justin Carley, Bar No. 9994
Email:  jcarley@swlaw.com
3883 Howard Hughes Parkway, #1100
Las Vegas, NV  89169
Telephone:  (702) 784-5200
Facsimile:   (702) 784-5252

Attorneys for Defendants
Turnberry/MGM Grand Towers, LLC,
MGM Grand Condominiums, LLC,
The Signature Condominiums, LLC
Turnberry/Harmon Ave., LLC and
Turnberry West Realty, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| MARY ANN SUSSEX; et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>TURNBERRY/MGM GRAND TOWERS, LLC, et al.,<br><br>    Defendants. | Case No.: 2:08-cv-00773-MMD-PAL<br><br>**MOTION FOR AN ORDER DECLARING THAT ARBITRATOR BRENDAN HARE IS DISQUALIFIED FOR HIS FAILURE TO MAKE REQUIRED DISCLOSURES UNDER NRS 38.227 THAT ESTABLISH HIS EVIDENT PARTIALITY**<br><br>**AND**<br><br>**REQUEST FOR ORAL ARGUMENT** |

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

# I.    INTRODUCTION.

## A.    The Novel Question Addressed by This Motion.

This motion presents an unprecedented question to the Court: Does the Federal Arbitration Act prohibit removal of Arbitrator Brendan Hare whose disqualifying evident partiality has been established, as a matter of law, prior to arbitration on the merits and entry of a final award? Ninth Circuit precedent suggests the answer to this question is "no." *Aerojet-General Corp. v. Am. Arbitration Ass'n*, 478 F.2d 248, 251 (a determination by the AAA deemed "final and binding" under its administrative rules may be subject to pre-award judicial review if it is not made "in accordance with a minimum standard of fair dealing" and "may cause irreparable harm to one or more of the parties"). "[T]he courts should be free to prevent a manifest injustice," *id.*, such as a second arbitration because the first arbitration went to final award, with the AAA's blessing, under an arbitrator whose evident partiality has been established pre-award as a matter of law.

It would be an injustice in this case—and contrary to due process—to support continuing the disqualified arbitrator in office to enter a final award sometime in the future that could not be confirmed because of his established bias against Turnberry/MGM Grand Towers, LLC ("Turnberry/MGM").  This would be the antithesis of the "basic purpose of arbitration [which] is the speedy disposition of disputes without the expense and delay of extended court proceedings." *Id.*  Arbitrator Brendan Hare should be removed now, so a neutral arbitrator can address the merits in one, not in the second of two arbitrations.

## B.    The Arbitrator's Bias Acknowledged in State and Federal Courts Makes This an Extreme Case Qualified for Pre-Award Judicial Review.

This is not a routine bilateral arbitration; it involves 545 claimants drawn from several state and federal court actions commenced by

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

the same lawyers.  One of the cases involves the 8 plaintiffs in this *Sussex* case.  All of the plaintiffs in all of the cases allege they were purchasers of condominiums at The Signature at MGM Grand in 2006 and 2007.  They allege they were tricked into buying by fraudulent misrepresentations of the seller, Turnberry/MGM.  They collectively make 13,080 claims against 7 corporate defendants, only one of which—Turnberry/MGM—is a party to the arbitration agreement that underlies arbitration.  The arbitrator was appointed by the AAA after this Court ordered the 8 plaintiffs in this case to arbitrate.  Recently, however, the arbitrator, over Turnberry/MGM's objections, consolidated all claims made by all plaintiffs in all courts, state and federal, bringing the total number of claimants to 545.  This mass consolidated arbitration is known as the *Sussex* arbitration.

It will take years to bring this mass arbitration to conclusion under disqualified Arbitrator Hare only to start over when his award is vacated for evident partiality that has been established as a matter of Nevada law.  There is no question, as recognized by state court Judge Mark Denton, that Arbitrator Hare failed to disclose at the time of his appointment in the *Sussex* arbitration in February 2012 and thereafter that in *2011* he "refocused his practice" to begin actively promoting a new personal plaintiffs' litigation financing business aimed at investing in mass claimant litigation, such as the 545-party *Sussex* arbitration, by financing "claimholders and their counsel" in the "advancement and resolution of claims and litigations."

Judge Denton found this undisclosed activity to be a material non-disclosure that establishes Brendan Hare's disqualifying "evident partiality" as a matter of governing Nevada law.  *Thomas v. City of North Las Vegas*, 122 Nev. 83, 127 P.3d 1057 (2006); NRS 38.241.1(b).  When presented

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

with Turnberry/MGM's motion to disqualify Arbitrator Hare in his state

court, Judge Denton asked:

> **why does it make any sense, if the failure to disclose is manifest, and if its legal effect is made clear by Nevada law, for Defendant to have to go through lengthy and expensive proceedings when, at the outset, it has raised and intends to preserve the non-disclosure issue?**

Decision and Order dated May 10, 2013 ("D & O"), Appendix[1] at TMGM 251

(emphasis added).  (The state court case before Judge Denton is comprised

of 160 plaintiffs who are also claimants in the *Sussex* arbitration.  Judge

Denton's case is referred to as the *KJH* case.)

United States District Judge James Mahan also pointed this out

during a recent status conference in the *Abraham* case before him (comprised

of 397 plaintiffs who are also claimants in the *Sussex* arbitration) when he

said the time to disqualify Arbitrator Hare is "*now, not wait until he makes an

award. . . .*" *Abraham* Tr. of May 20, 2013, status check, Dkt. No. 59, at 6:4-10,

TMGM 263 ("if I were in . . . the defendants' position . . . *the time to disqualify

the arbitrator is now, not wait until he makes an award. . . I mean when else are

you going to make a motion to disqualify?*") (emphasis added).[2]

These established facts and comments by two distinguished

judges make this an unprecedented and extreme case that warrants pre-

award equitable relief under *Aerojet-General, supra,* to prevent a resource-

wasting and useless arbitration under a disqualified arbitrator.

---

[1] The Appendix hereto has been Bates numbered TMGM 1-512.

[2] Turnberry/MGM is concurrently filing a motion in *George Abraham et al. v. Turnberry/MGM et al*, Case No. 2:11-cv-01007-JCM-NJK, asking for the relief it seeks here.  It might advance judicial economy if the Courts would hear these motions together.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101

702/474-9400 · FAX 702/474-9422

## C.     Judicial Review and Action are Warranted Now.

The Court should exercise its equitable authority to disqualify Arbitrator Hare *now*.  His evident partiality does not diminish or disappear depending on whether the plaintiffs were compelled to arbitrate by a state or a federal court.  *All* parties in arbitration that has not gotten underway should be protected from the colossal waste of time and resources that will be occasioned if the disqualified Arbitrator is permitted to proceed to a final award for some claimants that could not be confirmed because of his established violations of the disclosure requirements of NRS 38.227.  No discovery has taken place in any case or arbitration.  Only procedural orders have been entered to date by Arbitrator Hare in the *Sussex* arbitration, thus making this motion particularly timely and meritorious.  *See Metropolitan Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Co.*, 780 F. Supp. 885, 894 (D. Conn. 1991) (**if "the court grant[s] relief only after arbitration concludes . . . the parties will then have to go through the entire arbitration process all over again before a different arbitra[tor]. . . "**) (emphasis added).

To provide context for the arbitrator's disqualification and establish a full record for the "extreme case" scenario that *Aerojet-General* requires for "judicial review prior to the rendition of a final award," Turnberry/MGM provides in the next section the history that supports this motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND.

The consolidated mass arbitration that underlies this motion began as several civil actions filed in the Clark County District Court and in this federal court on behalf of purchasers of luxury residential condominiums, known as the Signature Condominiums at MGM Grand. The Signature Condominiums were developed and sold by Turnberry/MGM under a common Condominium Purchase and Sale

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

Agreement (the "PSA").  TMGM 496-508.  In a nutshell, the plaintiffs in all cases seek the same relief:  rescission of their PSAs and/or money damages for a variety of alleged "frauds" allegedly committed by Turnberry/MGM in presenting the Signature Condominiums that induced them to purchase under the PSA.

### A.     The *KJH* State Case.

The first Signature case, *KJH Investor Group, LLC, et. al. v. Turnberry/MGM Grand Towers,* Case No. A547024 ("*KJH*"), was filed on August 27, 2007, in the Clark County District Court.  TMGM 1-2.  Over the next several years, seven additional cases were filed on behalf of groups of plaintiffs, all of them by the same counsel.[3]  One of these seven cases, a putative class action by 8 parties, *Mary Ann Sussex, et al., v. Turnberry/MGM Grand Towers, LLC,* Case No. A557730 (the "*Sussex*" action), was removed to this Court in June 2008.  TMGM 5-10.

The *KJH* action in state court originally included 47 plaintiffs, all of whom were compelled to arbitrate their claims in February of 2008 by District Judge Mark Denton.  But *after* they and the plaintiffs in the six other state court cases initiated arbitration in September of 2009 (known as "the *KJH* arbitration"), their common attorneys filed a First Amended Consolidated Complaint (the *KJH* "FACC") in state *court*, on behalf of 160 plaintiffs.  *See* FACC, TMGM 36-41 (excerpt).  Of these plaintiffs, 148 were plaintiffs in the six state court cases.  Twelve of the 160, however, were not

---

[3] *Sussex v. Turnberry/MGM Grand Towers, LLC* ("Sussex"), Case No. 2:08-cv-00773-MMD-PAL; *Berkeley v. Turnberry/MGM Grand Towers, LLC,* Case No. A565873, filed on June 20, 2008; *Brown v. Turnberry/MGM Grand Towers, LLC,* Case No. A569825, filed on August 18, 2008; *Shim v. Turnberry/MGM Grand Towers, LLC,* Case No. A573280, filed on October 9, 2008; *Linares v. Turnberry/MGM Grand Towers, LLC,* Case No. A574558, filed on October 28, 2008; *Louie v. Turnberry/MGM Grand Towers, LLC,* Case No. A577034, filed on December 4, 2008; and *Sherman v. Turnberry/MGM Grand Towers, LLC,* Case No. A581851, filed on February 4, 2009.  TMGM 3-13; 17-30 (excerpts only).

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

plaintiffs in any lawsuit; they were then (and are now) claimants in the *Sussex* arbitration, discussed next.

**B.    This *Sussex* Case.**

This *Sussex* case pending before the Court consists of 8 plaintiffs who purchased 6 Signature condominiums.  *See* Amended Federal Class Action Complaint, Dkt. No. 14, TMGM 14-16 (excerpt).  The Honorable Roger L. Hunt compelled them to arbitration against Turnberry/MGM in June 2009 based on the arbitration agreement in the PSA.  TMGM 31-32.  Thereafter, the 8 *Sussex* plaintiffs together with 12 plaintiffs named in the *KJH* FACC filed a class arbitration demand in August 2009, TMGM 33-35 (excerpt only), which the Arbitrator denied and dismissed.  TMGM 43-66.

**C.    The Federal *Abraham* Case Before Judge Mahan.**

On June 21, 2011, the attorneys for the *KJH* and *Sussex* plaintiffs filed their latest lawsuit in federal court on behalf of 397 plaintiffs, *George Abraham et al. v. Turnberry/MGM et al*, Case No. 2:11-cv-01007-JCM-NJK (the "*Abraham* Action").  TMGM 73-81 (excerpt only).  (Thirty-one of these 397 plaintiffs are also named plaintiffs in the *KJH* action; 5 of those 31 were already claimants in the *Sussex* arbitration; and 2 of the remaining *Abraham* claimants were already named claimants in the *Sussex* arbitration.[4]  The

_____

[4] The 31 *Abraham* Plaintiffs who are also KJH plaintiffs are: Christina Kim; Nurham Celik; Markar Karatas; Les Krieger; Rebekah Krieger; Bernard Klouda; Benjamin Rudnitsky; Tamar Rudnitsky; Pierre Bain; Marietta Bain; Solip, LLC; Steven Guyon; Lee Pritzel; Marco Gonzalez; Jose Sanchez; Leonardo Barerra; Gloria Barerra; Myung Ya Cho; Eugene Ohta; Fouad Fegahli; Charles Lesko; Richard Feldman; LV700, LLC; Bassilios Petrakis; Sherene Tang; Juan Medina; Clarissa Medina; Ronald Perkins;  Shauna Perkins; Rafik Bakojian; and Amin Rahim.  *Compare Abraham* First Am. Compl., Dkt. No. 13 at 2-5 (caption), *with* FACC, TMGM 36-41 (excerpt) at 1-3 (Caption).  The 7 *Abraham* plaintiffs who were already among the 20 original *Sussex* claimants are Jose Sanchez, Fouad Fegahli, Bassilios Petrakis, Ronald Perkins, and Shauna Perkins (*Abraham, KJH* and *Sussex*), John Hanson, Elizabeth Hanson (*Abraham,* and *Sussex*).  *Compare Abraham* First

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101 · 702/474-9400 · FAX 702/474-9422

Honorable James Mahan compelled the *Abraham* plaintiffs to arbitrate their claims in September 2012.  Order, Dkt. No. 55, TMGM 147-48.  The *Abraham* plaintiffs, however, did not file arbitration demands.  Their attorneys named them as claimants in an amended consolidated complaint filed in the *Sussex* arbitration.  TMGM 176-89 (excerpt).

### D.   The Recently Consolidated Mass *Sussex* Arbitration.

In April 2012, after failing in their effort to arbitrate as a class, the 20 original *Sussex* claimants (the 8 *Sussex* plaintiffs plus 12 others) moved the Arbitrator to consolidate their claims with all others for a total of 545 claimants in one proceeding in order to achieve a de facto class arbitration, the *Sussex* arbitration.  *See* Motion to Consolidate Claims, TMGM 145-46 (excerpts only).  They argued then that consolidation would "advance the just, speedy and economic resolution of this matter" because of numerous purported "common issues" that could be decided against Turnberry/MGM by motion without discovery at all.  The arbitrator agreed, and on December 31, 2012, ordered the claims of the 20 *Sussex* claimants consolidated with the claims of 525 additional claimants (including the *KJH* plaintiffs before Judge Denton) for "coordinated discovery, motion practice and rulings on common issues."  Consolidation Order, TMGM 149-66.  The Arbitrator's Consolidation Order not only joined claimants on whose behalf the *KJH* and *Sussex* arbitration demands were filed, the order also joined the claims of the 397 *Abraham* plaintiffs in Judge Mahan's court who had *not* filed an arbitration demand.

Thus, the problem created by Arbitrator Hare's non-disclosures, detailed below, has been significantly compounded:  it will potentially affect not just one bi-lateral arbitration but several different arbitrations drawn

---

Am. Compl., Dkt. No. 13, *with Sussex* Arbitration Demand, TMGM 82-91 (excerpt).

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

from federal and state courts involving hundreds of claimants that have now been consolidated.

    **E.**    **The Disqualification Proceedings in the *KJH* Case.**

    On April 24, 2013, Turnberry/MGM filed a motion in the *KJH* case seeking the removal of Brendan Hare for his failure to make disclosures required by Nevada law.  In assessing the merits of the motion, Judge Denton pointed out that the 160 *KJH* plaintiffs did "not provide a persuasive argument that the Arbitrator need not have made the disclosures." D & O at 6-7, TMGM 250-51.  Their principal objection was that the district court lacked authority to disqualify the Arbitrator before a final award.  *Id*. at TMGM 253.  Although their attorneys sought to enjoin Judge Denton from entertaining the motion by filing a motion for temporary restraining order in this *Sussex* action, this Court denied their motion by order dated May 1, 2013.  TMGM 240-44.

    After holding a hearing on Turnberry/MGM's motion, Judge Denton entered a reasoned decision and order.  TMGM 245-57.  The court agreed with Turnberry/MGM that: (1) an "indirect positional conflict" due to an arbitrator's "attitudinal disposition" can be "within the ambit of evident partiality resulting from the non-disclosure itself. . . . ."; (2) the arbitrator's non-disclosure of his litigation funding business is not excused or covered by his disclosure of the types of cases he has handled; and (3) the fact that the arbitrator has not yet generated revenue from his litigation funding business does not "negate the fact that the Arbitrator has put himself in the market to generate that type of business."  D&O at 4:3-16, TMGM 248.

    Judge Denton rejected one by one the *KJH* plaintiffs' arguments against pre-award disqualification of Arbitrator Hare.  First, he pointed out that the plaintiffs have virtually conceded that the arbitrator should have

disclosed his new disqualifying plaintiffs' litigation financing business venture. *Id.* at 6:21-7:2, TMGM 250-51.

Second, he dealt with the absence of prejudice to the plaintiffs if Arbitrator Hare is replaced with an unbiased arbitrator:

> **[T]he Court discerns nothing concrete in Plaintiffs' Opposition to the effect that attending to the disqualification issue now, before an arbitrator with 'evident partiality' undertakes hearing an enormous, multi-party case, will cause actual prejudice to Plaintiffs that would outweigh Defendant's right to be assured of a neutral arbitrator going into the proceedings. [] In this regard, why does it make any sense if the failure to disclose is manifest, and if its legal effect is made clear by Nevada law, for Defendant to have to go through lengthy and expensive proceedings when, at the outset, it has raised and intends to preserve the non-disclosure issue?**

*Id.* at 7:3-16, TMGM 251(emphasis added).

Third, Judge Denton also disagreed with the *KJH* plaintiffs that a pre-award proceeding for disqualification would open flood gates of litigation. Quite the opposite: pre-award disqualification would actually *prevent* post-award litigation by a "disgruntled party seeking to invalidate an award based upon an undisclosed relationship." D & O at 8:14-28 and n. 5, TMGM 252 (internal quotations omitted).

Fourth, the district court pointed to NRS 38.222(2)(b), which invests the court with jurisdiction to impose provisional remedies for urgent matters that the arbitrator cannot address. *Id.* at 9:1-8, TMGM 253.

In the end, however, Judge Denton concluded that "there is no Nevada statutory or case law (such as *Aerojet-General*) that authorizes judicial, pre-award intervention for disqualification purposes" where the parties agreed that the AAA's decision on disqualification shall be " 'conclusive'. . . for purposes of allowing the proceedings to go forward to an award." D&O at 9:9-17, TMGM 253 (citing AAA Rule R-17(b)). But he nevertheless found the issue "to be *extremely important* and timely in view of

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

the increasing use of arbitration in resolution of commercial disputes . . . .," and entered a temporary restraining order enjoining the arbitrator for 30 days "from engaging in further arbitration proceedings" for the specific purpose of allowing Turnberry/MGM to bring this issue before "the Nevada Supreme Court."  D&O at 10:4-16, TMGM 254 (emphasis added), by way of a writ petition.

### F. The Writ Petition to the Nevada Supreme Court Prompts the 160 *KJH* Plaintiffs, Which Include 31 *Abraham* Plaintiffs and 12 *Sussex* Claimants, to Concede the Arbitrator's Disqualification.

Turnberry/MGM filed a petition for writ of mandamus on May 30, 2013.  Ten days later, the Nevada Supreme Court issued an order directing the *KJH* plaintiffs to file an answer because it appeared to the Supreme Court that "petitioner has set forth issues of arguable merit and that an answer to the petition is warranted."  Order Directing Answer and Granting Temporary Stay ("Order"), TMGM 321-24.

In response to the Order, the *KJH* plaintiffs filed two motions: (1) a Motion for Reconsideration in the district court, asking Judge Denton to lift the stay he imposed so they could submit a proposed order to the challenged arbitrator undoing the consolidation he ordered at their request in January so the *KJH* claimants could "proceed separately with their own arbitration with a new arbitrator," TMGM 328-34; and (2) an "Emergency Motion under NRAP 27(e)" in the Nevada Supreme Court, in which they "agree[d] to proceed *without* Arbitrator Hare in their proposed new arbitration so that the other plaintiffs in the federally-ordered *Sussex* AAA Arbitration ("Federal Plaintiffs"). . . can proceed with their arbitration" before the disqualified arbitrator.  Emergency Motion at 1, TMGM 343.

The Nevada Supreme Court granted the Emergency Motion and dismissed the writ petition based on the *KJH* plaintiffs' purported

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

"agreement" to jettison Arbitrator Hare for them, which, it reasoned, gave Turnberry/MGM "the relief it s[ought] in this writ petition," even though Turnberry/MGM will still have to defend against the claims of 385 remaining claimants before the disqualified Arbitrator.  Order Dismissing Petition for Writ of Mandamus, TMGM 386-90.  On July 5, 2013, Turnberry/MGM asked the Nevada Supreme Court to reconsider its decision to dismiss the writ petition.  TMGM 417-33.  A decision on rehearing is pending.

On the evening of July 1, 2013, plaintiffs' attorneys filed three separate amended complaints in arbitration with the AAA: two of them are identical, filed under the existing case number for the *Sussex* arbitration, except that one is entitled "*Sussex et al. v. Turnberry/MGM Grand Towers, LLC et al,*" and the other, "*Abraham et al v. Turnberry/MGM Grand Towers et al.*" TMGM 391-410 (excerpts only). The third was an amended *KJH* arbitration complaint to de-consolidate the 160 plaintiffs that are consolidated in the *Sussex* arbitration.  TMGM 411-16 (excerpts only).  All three complaints were filed "as per [the] Nevada Supreme Court['s] Order" dismissing Turnberry/MGM's writ petition, as if that Order directed or permitted the Plaintiffs to unilaterally de-consolidate the mass arbitration ordered by the Arbitrator, which the Order did not even address.  These new complaints have not been entertained by the AAA.

## III.   ARGUMENT.

### A.   The Court Has Jurisdiction to Review and Remove Arbitrator Hare Pre-award.

The Ninth Circuit Court of Appeals has held that in "extreme cases," a determination made by the AAA prior to the rendition of a final award may be reviewed to evaluate "whether that determination was made in accordance with a minimum standard of fair dealing." *Aerojet-General Corp. v. American Arbitration Assoc.*, 478 F.2d 248, 251 (9th Cir. 1973) ("*Aerojet-*

General"); *accord Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir. 1991) (citing *Aerojet-General*).  In *Aerojet-General*, as here, the parties had a contract providing for arbitration under the rules of the AAA.  A dispute arose and one of the parties, an Israeli company, asked for arbitration in New York.  Aerojet-General, an Ohio corporation that had its principal place of business in California, objected to the New York venue.  The AAA, however, concluded that the arbitration should be held in New York, because it was a central point between California and Israel and equally accessible to both parties.  *Aerojet-General*, 478 F.2d at 249-50 and n. 2.  Under the AAA Commercial Arbitration Rules, the AAA's decision to assign New York as the hearing locale was "final and binding." *Aerojet-General*, 478 F.2d at 250 n.1 (quoting a former version of AAA Commercial Rule R-10).  Aerojet-General, however, filed suit in the district court in California and obtained a temporary restraining order enjoining the AAA arbitration in New York.

On appeal, the Ninth Circuit discussed two points that are of significance to this motion: first, the Court of Appeals did *not* foreclose judicial scrutiny of arbitration proceedings prior to a final award.[5]  *Aerojet-General*, 478 F.2d at 251.  Second, it did *not* "feel that the language in [AAA Commercial Arbitration Rule 10] that its determination as to locale is "final and binding" precluded a limited inquiry into whether that determination

---

[5] The Seventh Circuit has held, as this Court acknowledged in its May 1, 2013, order denying plaintiffs' motion to enjoin the *KJH* court from considering the disqualification of Arbitrator Hare, that an arbitrator's bias should be challenged "when the arbitration is completed and an award rendered."  Order at 4.  The Ninth Circuit, however, has **not** so held, as *Aerojet-General* indicates.  *See also Pacific Reinsurance, supra*, 935 F.2d 1019, 1022 ("**if temporary equitable relief is to have any meaning [such as removal of a disqualified arbitrator so a neutral arbitrator can be appointed before arbitration on the merits gets underway], the relief must be enforceable at the time it is granted, not after an arbitrator's final decision on the merits**").

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

was made "in accordance with a minimum standard of fair dealing." *Id.* Such review is only foreclosed if the parties expressed a clear intention to foreclose any pre-award review, which they did not express in *Aerojet-General* **or in this** *Sussex* **case**:  "Ordinary language to the effect that the decisions of the arbitrator shall be 'final and binding' has been held *not* to preclude some judicial review." *Id*. at 252 (emphasis added).

In other words, *Aerojet-General* stands for the proposition that in an extreme case, a party aggrieved by an arbitrator's interlocutory order or determination by the AAA can seek review from the court, even if an AAA Rule provides that its determinations are "final" or an arbitration agreement provides that an arbitrator's decisions are "final." *Id*.  What could be more "extreme" than an arbitrator going into the business of financing litigation *against* corporations that appear as respondents before him, believing him to be neutral, such as Turnberry/MGM in this case?

The arbitration agreement in the Signature PSA does not foreclose pre-award review of the failure of Arbitrator Hare to disclose the facts of his evident partiality.  It merely includes the standard language that the arbitrator's award shall be "final" and specifically says that its provisions "shall *not* prevent any party from obtaining injunctive relief from a court of competent jurisdiction to enforce the obligations for which such party may obtain provisional relief pending a decision on the merits by the arbitrator." PSA, section 24.10, TMGM 503 (emphasis added).

Although AAA Commercial Rule R-17(b) says the AAA's determination as to whether an arbitrator should be disqualified is "conclusive," TMGM 461, this does *not* preclude pre-award judicial review under *Aerojet-General*, 478 F.2d at 251.  Moreover, when the AAA reconfirmed Arbitrator Hare, it did not say its determination was conclusive.  It said the opposite: **"the AAA will abide by an order issued**

**by the courts, and the parties are requested to keep us informed as to the outcome."** TMGM 190 (letter from AAA Director Baglini to counsel). The Association re-confirmed its deference to the Court on July 12, 2013 in a letter to the parties' counsel from AAA Vice President John Bishop, who said **with regard to "continued litigation regarding the appointment of the arbitrator . . . in any current or future court proceedings, the Association will abide by a court order . . . ."** Letter, TMGM 435. Because no discovery or proceedings on the merits have taken place in the *Sussex* arbitration, nothing of substance or policy prevents this Court from entertaining this motion in this extreme case of established arbitrator bias and ordering Brendan Hare's removal and replacement with a neutral arbitrator.

1.   **What Makes This an Extreme Case that Warrants Review Now.**

The AAA reaffirmed Arbitrator Hare's status without a hearing or reason in the face of substantial proof from the arbitrator himself and substantial legal authority that support his disqualification, including the AAA's own Commercial Arbitration Rules and Ethical Standards.[6]

---

[6] Last week the AAA "determined that the arbitrator shall be reaffirmed in this case." TMGM 436-37. As on previous occasions, the AAA did not give reasons for its reaffirmation of Arbitrator Hare, nor did it afford Turnberry/MGM a hearing, as it requested, on this very substantial and critical issue of the Arbitrator's disqualifying bias. Speaking for the AAA, Director Yvonne Baglini merely assured this respondent that the AAA Administrative Review Council, "after careful consideration," would do nothing, referring the parties to "Review Standards" on its website for additional information. *Id.*

The Review Standards do not illuminate the AAA's basis for the "reaffirmation" of Arbitrator Hare. At most, the Standards would permit one to imply that pre-award removal of an arbitrator requires a "direct conflict," but an indirect or positional conflict of interest, as present here, must be addressed post-award, which would ensure a second, do-over arbitration by a neutral arbitrator — the antithesis of efficient and fair arbitration. *See* Baglini e-mail, September 4, 2013, TMGM 436-37; Review Standards, TMGM 438-40; which say the AAA's decision on arbitrator

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

TMGM 190. Moreover, the Arbitrator *confirmed* his disqualifying non-disclosure to the AAA when it received Turnberry/MGM's request to disqualify him.  TMGM 173-75.

Unlike the plaintiff in *Aerojet-General*, who faced just one defendant in one case and was merely inconvenienced by having to arbitrate in New York, Turnberry/MGM will suffer irreparable harm if Arbitrator Hare is not removed.  Without prompt relief from this Court, this defendant/respondent has to bring to conclusion not just one arbitration; it must defend against the claims of hundreds of claimants consolidated before a single arbitrator whose evident partiality has been established, *before* proceedings on the merits get underway.  Arbitrating these claims to a conclusion may take years and occasion great expense.  Postponing the biased arbitrator's disqualification until he enters an award would be a colossal waste of time and resources, which arbitration is supposed to prevent.  *AT&T Mobility LLC v. Concepcion*, 563 U.S.__, 131 S. Ct. 1740, 1749 (2011) (recognizing that speedy dispute resolution is one of the goals of arbitration).

As one district court in the First Circuit pointed out persuasively, if it is clear that a party will seek to vacate an award for the arbitrator's partiality,

> **. . . it simply does not follow that the policy objective of an expeditious and just arbitration with minimal judicial interference is furthered by categorically prohibiting a court from disqualifying an arbitrator prior to arbitration . . . .  Should . . . the court. . . grant[s] relief only after arbitration concludes, [the defendant] would be entitled to vacate the award and the parties will then have to go through the entire arbitration process all over again before a different arbitration panel.**

_____

disqualification is "conclusive" but the AAA "will abide by an order issued by the courts . . . ."

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

*Metropolitan Property and Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F. Supp. 885, 894 (D. Conn. 1991) (emphasis added); *accord* D&O at 8, TMGM 251. Removing Arbitrator Hare now would make good legal and policy sense considering no discovery or merits hearings have taken place in arbitration.

> **2.    The Majority of the Original 20 *Sussex* Arbitration Claimants Have Declared Their Support for Pre-award Removal of the Arbitrator.**

When the Nevada Supreme Court ordered the *KJH* plaintiffs to file an answer to Turnberry/MGM's petition for writ of mandamus, all 160 of them—including 12 of the original 20 *Sussex* claimants—unilaterally "agreed" to de-consolidate the 545-claimant mass *Sussex* arbitration they had requested and obtained six months earlier.  They endorsed removal of Arbitrator Hare and the appointment of a new arbitrator, but just for them. Their objective was opportunistic gamesmanship: to prevent the Nevada Supreme Court from addressing the merits of Turnberry/MGM's writ petition, which the Court had deemed of "arguable merit" and to which these 160 plaintiffs had no substantive response.

The attorneys for the 160 *KJH* plaintiffs, who represent *all* the 545 claimants in the *Sussex* arbitration, cannot rationally explain why 12 of the 20 original *Sussex* claimants should proceed before another but unbiased arbitrator while 8 of them (the plaintiffs before this Court) and Turnberry/MGM remain before biased Arbitrator Hare.  The Arbitrator's own words and actions have established that he is evidently partial to the plaintiffs and biased against Turnberry/MGM.  For this reason he should not preside over *any* case in which Turnberry/MGM is a defendant and should be disqualified in all.

**B.** **The Arbitrator Failed to Disclose Material Facts that a Reasonable Person Would Consider Likely to Affect His Impartiality.**

NRS 38.227 provides, in relevant part:

**1. Before accepting appointment, an . . . arbitrator . . . shall disclose to all parties to the agreement to arbitrate and arbitral proceeding. . .** *any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the proceeding. . .*

. . .

**2. An arbitrator has** *a continuing obligation* **to disclose to all parties to the agreement to arbitrate and arbitral proceeding and to any other arbitrators any facts that the arbitrator learns after accepting appointment which a reasonable person would consider likely to affect the impartiality of the arbitrator.**

NRS 38.227(1)-(2) (emphasis added).[7]

The AAA Commercial Arbitration Rules ("AAA Rules") provide likewise: "Any person appointed . . . as an arbitrator shall disclose . . . any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence" and "[s]uch obligation shall remain in effect throughout the arbitration." AAA Rule R-16(a) (emphasis added). TMGM 460-61.

Although both NRS 38.227 and AAA Rule R-16 include examples of circumstances and relationships to be disclosed, by their terms these provisions are not limited to those relationships and circumstances

---

[7] Where, as here, the arbitration agreement provides for the application of Nevada law, the substantive law of the Nevada Uniform Arbitration Act applies. It is not preempted by the Federal Arbitration Act ("FAA") because it does not undermine the FAA's goals. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477-78 (1989)). Nevada law, including its disclosure rules in NRS 38.227, does not frustrate the FAA's policies and goals: Nevada law promotes arbitration by *neutral* arbitrators to ensure that arbitration is fair and efficient by requiring arbitrators to make relevant disclosures "at the outset." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151, 89 S. Ct. 337, 340 (1968).

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101 · 702/474-9400 · FAX 702/474-9422

and can include "*any*" fact or circumstance that a reasonable person would consider likely to affect the impartiality of the arbitrator.  These broad disclosure requirements serve important policies meant to ensure fairness and integrity in the arbitral process.  As the United States Supreme Court remarked in a seminal case, "it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award." *Commonwealth*, 393 U.S. at 151, 89 S. Ct. at 340.

The Ninth Circuit has held that evident partiality exists when "undisclosed facts show a *reasonable impression* of partiality." *Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir. 1994).  "[A]n arbitrator's nondisclosure of facts showing a potential conflict of interest creates evident partiality . . . *even when no actual bias is present*." *Id*. at 1045 (emphasis added); *accord New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007)(" 'Evident partiality' is distinct from actual bias").  Nevada law is no different:  "*In nondisclosure cases, evident partiality is established from the non-disclosure itself*, regardless of whether the undisclosed information establishes partiality or bias." *Thomas v. City of North Las Vegas*, 122 Nev. 83, 98, 127 P.3d 1057, 1068 (2006) (internal quotation marks and citation omitted, emphasis added) ("*Thomas*").

"Showing a 'reasonable impression of partiality' is sufficient in a nondisclosure case because the policy of [the FAA's] section 10(a)(2) instructs that the parties should choose their arbitrators intelligently." *Schmitz*, 20 F.3d at 1047 (quoting *Commonwealth Coatings*, 393 U.S. at 151, 89 S. Ct. at 340 (White, J., concurring)).  "The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed."

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101 · 702/474-9400 · FAX 702/474-9422

*Schmitz*, 20 F.3d at 1047.  Turnberry/MGM could not choose its arbitrator intelligently because Arbitrator Hare failed to disclose several facts known personally to him that a reasonable person would consider likely to affect his impartiality.  Under NRS 38.241(1)(b), *Thomas* and *Schmitz*, *supra*, these non-disclosures will, as a matter of law, require the Court to vacate any award he may hereafter enter.

> ### 1.  Bowdoin Street Capital—Hare's Investment Vehicle to Fund Plaintiffs' Litigation Against Corporations, such as Turnberry/MGM and its Co-defendants.

On February 16, 2011, while presiding over the *Sussex* arbitration, Arbitrator Hare founded Bowdoin Street Capital, LLC, in Delaware ("Bowdoin").  TMGM 42.[8]  The website he established for the company says: "Bowdoin Street Capital, LLC invests in *high-value*, high-probability *legal claims and litigations*" and "believe[s] that this approach will generate significant returns."  TMGM 169 (emphasis added).  Bowdoin's and the arbitrator's stated goal is to invest in the litigation of mass claims and profit from that investment by sharing in the recovery from corporate defendants, such as Turnberry/MGM and the other corporate parties named as defendants in this case.  "In addition [Arbitrator Hare says on Bowdoin's website], we assist claimholders and their counsel in the advancement and resolution of claims and litigations" such as by loans, "to be repaid only if the litigation proves successful." *Id.*

But Arbitrator Hare's Bowdoin website goes further: it touts his experience as a "neutral in many large complex commercial arbitrations with claims ranging from $20 to $200 million. . . ."  TMGM 168.  Thus, Bowdoin Street Capital and Arbitrator Hare link his services as an arbitrator in high-value multi-party commercial cases (such as this Signature arbitration) to his

---

[8] A timeline of the Arbitrator's appointment and his non-disclosures put in context of the arbitration proceedings is attached in chart form in the Appendix at TMGM 509-12.

qualifications as a principal in Bowdoin's litigation funding business. Conversely, at no time during 2011 and 2012 did Arbitrator Hare disclose to the parties in this arbitration his new personal business interest and his activities to raise money (his goal was $50 million) to invest in and profit from financing mass claimants' litigation of the same type as this 545-party multi-million dollar litigation against Turnberry/MGM.

These are facts every reasonable person or corporation being sued by hundreds of claimants for alleged securities fraud, common law fraud, and consumer fraud, such as Turnberry/MGM and its co-defendants, would like to know and by statute—NRS 38.227—are entitled to know *before* being asked to accept Brendan Hare as their "neutral" arbitrator in this multi-million dollar arbitration. Given his desire to raise money to fund and profit from plaintiffs' litigation like this, and assist plaintiff law firms like those in this case, any objective reasonable person would conclude that Mr. Hare has an incentive to *favor plaintiffs* in his "high value" arbitrations because that would further his personal business interest in establishing himself among plaintiff law firms.

### 2. Arbitrator Hare's Undisclosed Participation in Two New York Litigation Finance and Investment Seminars While Serving as a "Neutral" in the Signature Arbitration.

In April 2011, Arbitrator Hare appeared as a presenter at a "Litigation Finance & Investment Summit" held in New York City, where he and his co-presenters—all members of firms engaged in financing plaintiffs' litigation—were held out as "funds, institutional investors and other potential investors. . . ." TMGM 71. By this means Arbitrator Hare sought to build his reputation in the litigation funding community, which provided a strong and continuing incentive to favor plaintiffs in arbitrations before him, including this one.

In March 2012, Arbitrator Hare was again a presenter at a "Commercial Litigation Funding & Investment Summit" in New York, where his law firm, Hare & Associates, was touted as one of the "Industry Leaders in this Dynamic Market [of] Commercial Litigation Funding and Investment."  TMGM 137.  In his PowerPoint presentation for this seminar, Mr. Hare told his audience that the USA is "filled with potential" for litigation funding because, among other reasons, it is the most "litigious country in the . . . world," with "90% of U.S. corporations engaged in some type of litigation."  TMGM 112.  Mr. Hare told his audience that the first key to success in litigation funding is "**sourcing cases**" through

> **(1) Key professionals with experience in litigation and litigation management;**
>
> **(2) Experience concentrated in high value disputes in technology, corporate, contract, insurance, intellectual property, personal injury and class actions;**
>
> **(3) Extensive nationwide network of contacts (litigators, in-house counsel, experts, industry leaders) to access cases; and**
>
> **(4) Relationships with large firms and litigation boutiques.**

TMGM 128 (emphasis added).

Mr. Hare's own words emphasize the importance to him of building his reputation within the plaintiffs' bar in order to gain access to litigations that need funding.  In this *Sussex* arbitration, the claimants are represented by at least three different experienced law firms with offices in Nevada, California, and Florida.  Mr. Gerard and Mr. Blumenthal are both seasoned plaintiffs' and class action attorneys.  *See, e.g., Rocker v. KMPG LLP*, 122 Nev. 1185, 148 P.3d 703 (2006) (class plaintiffs represented by Mr. Gerard and Mr. Blumenthal); *Truly Nolen of America v. Superior Court*, 208 Cal. App. 4th 487, 145 Cal. Rptr. 3d 432 (2012) (Mr. Blumenthal representing plaintiffs in a class action).  It would facilitate creating a "nationwide network of contacts" among law firms experienced in plaintiffs'

and class action work if the arbitrator sides with the 545 claimants in this case.  Given Mr. Gerard and Mr. Blumenthal's extensive experience, they would be excellent sources for future business even if the Arbitrator is not funding this case and has no direct interest in its outcome.

These undisputed *facts* inescapably show that Mr. Hare has a strong, personal financial interest in developing his reputation among the very counsel for plaintiffs for whom he is now serving as a "neutral" arbitrator.  Again, these facts would give a reasonable objective person in Turnberry/MGM's position reason to doubt Arbitrator Hare's impartiality in arbitrating a dispute brought on behalf of hundreds of claimants seeking millions of dollars from Turnberry/MGM.

**C.     The Undisclosed Facts Establish Brendan Hare's Evident Partiality, as a Matter of Law.**

"In nondisclosure cases, evident partiality is established from the non-disclosure itself, regardless of whether the undisclosed information establishes partiality or bias."  *Thomas*, 122 Nev. at 98, 127 P.3d at 1068.  All that needs to be demonstrated is that the "undisclosed facts show a reasonable impression of partiality."  *Schmitz*, 20 F.3d at 1047.  Once evident partiality is established, as it has been here, there is no room for discretion: The arbitrator's award *must* be vacated.  NRS 38.241(1)(b).[9]

**1.     Evident Partiality May be Based on an Indirect Positional Conflict that Causes a Reasonable Person to Question the Arbitrator's Loyalty.**

Evident partiality is not limited to a direct relationship with one of the parties or their counsel, or to a financial interest in the outcome of the arbitration.  *See, e.g., Benjamin, Weill & Mazer v. Kors*, 125 Cal. Rptr. 3d 469,

_____

[9] Under 9 U.S.C. § 10, the federal counterpart of NRS 38.241, a court "may" vacate an award on this basis.  Again, the FAA does not preempt Nevada law on this point either because the mandate under NRS 38.241 does not frustrate the goals of arbitration; it merely ensures fairness of the arbitration.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

496 (Cal. App. 2011) (finding evident partiality based on arbitrator's failure to disclose his practice of defending lawyers and law firms in arbitration involving attorney fee dispute); *Advantage Med. Services v. Hoffman*, 72 Cal. Rptr. 3d 935, 943 (Cal. App. 2008) (finding evident partiality based on the arbitrator's failure to disclose his and his law firm's ties in unrelated cases to the insurance company of the prevailing party).

Although not binding on this Court, the opinion in *Kors* is particularly instructive here, as it was to Judge Denton in the *KJH* action. D&O at 3-4, 9-10, TMGM 247-48, 253-54.  In *Kors*, the chief arbitrator of a three-member panel presided over a billing dispute between a former client and a law firm, wearing his "neutral" arbitrator's hat.  *Kors*, 125 Cal. Rptr. 3d at 490.  He had no relationship with any of the parties or their counsel.  However, wearing his other hat as practicing lawyer, his legal practice focused on representing lawyers and large law firms in professional responsibility disputes, including fee disputes.  *Id*.  At the time he was appointed chief arbitrator, he was also representing a large law firm before the California Supreme Court in a case involving an attorney fee dispute.  *Id*. at 51, 125 Cal. Rptr. 3d at 477.  On his website, he advertised, among other things, that attorneys facing charges of misconduct "often turn to [him]" and that

> [h]is business litigation background and extensive experience with the unique issues and dynamics involved in claims against lawyers allow him to provide effective representation of his clients, which include some of the nation's largest law firms.

*Id*. at 51, 125 Cal. Rptr. 3d at 477-78 (internal quotations omitted).  He was disqualified and his award vacated for not disclosing these facts.

Similarly here, Arbitrator Hare advertises in his LinkedIn internet profile that he has "refocused his practice to concentrate on the emerging field of Litigation Finance and Funding."  TMGM 171.  His

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

Bowdoin website advertises that his company invests in "high-value, high-probability legal claims and litigations" and assists "claimholders and their law firms. . . ." TMGM 169. At the same time he is wearing a "neutral" arbitrator hat in this arbitration, he is actively seeking millions of dollars as businessman-investor Brendan Hare to invest in and profit from mass litigation of the type before him in this consolidated arbitration against corporate defendants, just like Turnberry/MGM. In doing so, he is holding out his experience as a neutral arbitrator as an asset to his litigation funding business!

Moreover, Arbitrator Hare is not one of three arbitrators, as in *Kors*; he is the sole arbitrator presiding over this consolidated mass arbitration, in which he exercised his "inherent authority" and allowed joinder of 13,080 claims of 545 claimants in a single arbitration case as a matter of "procedure" derived from his "inherent authority." TMGM 155.

### 2. A Reasonable Person Could Conclude that Arbitrator Hare's Dependence on Business From Plaintiffs' Law Firms to Further His Personal Financial Interests Would Prevent Him From Taking the Side of Turnberry/MGM.

In *Kors*, the court concluded that "a reasonable person [could] doubt whether [the arbitrator]'s dependence on business from lawyers and law firms sued by former clients would prevent him from taking the side of a client in a fee dispute with a former law firm, *because doing so might 'put at risk' his ability to secure business from the lawyers and law firms whose business he solicits*." 125 Cal. Rptr. 3d at 494 (emphasis added)(quoting from and relying on rationale of *Hoffman*, 72 Cal. Rptr. 3d at 944)).

The same can be concluded here: A reasonable person could easily and reasonably conclude that Arbitrator Hare's dependence on business from plaintiffs' lawyers and plaintiffs' law firms for his new litigation funding business would prevent him from taking the side of

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101 · 702/474-9400 · FAX 702/474-9422

Turnberry/MGM in this mammoth *Sussex*-Signature arbitration, because doing so "might 'put at risk' his ability to secure business from the lawyers and law firms whose business he solicits." *Id.* If the arbitrator ruled against the claimants in this large complex commercial arbitration, it could put at risk his ability to establish relationships with and secure business from plaintiffs' counsel and other plaintiffs' law firms. The Arbitrator's own 2012 PowerPoint presentation underscores this point. He emphasizes that an "extensive nationwide network" of contacts and relationships with litigators and law firms to "access cases" is one of the "Keys to Success in Litigation Funding." TMGM 128.

Arbitrator Hare should have disclosed in 2011 his litigation funding business, the change in the focus of his practice, and his active efforts to raise money to promote his new business at litigation fund-raising seminars. His complete failure to do so then and thereafter defeats his presumed "neutrality," as a matter of law, because a reasonable person would doubt his ability to be impartial in this *Sussex*-Signature arbitration. *Schmitz*, 20 F.3d at 1046 (evident partiality exists when "undisclosed facts show a *reasonable impression* of partiality").

## IV.   CONCLUSION

The *Sussex*-Signature arbitration presents an extreme case in which the Court can and should intervene to override the AAA's unexplained determination that Arbitrator Hare is qualified to serve as a "neutral" arbitrator for thousands of claims against Turnberry/MGM. His evident partiality has been conclusively established as a matter of law. Prolonged arbitration proceedings with him at the helm—whether he is presiding over 545 claimants or "just" 385 of them—would be wasteful because his future award must be vacated for evident partiality under NRS 38.241, which would require the parties to start over. This inevitable

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

prospect of a do-over arbitration cannot be avoided by some of the plaintiffs in arbitration—the 160 *KJH* plaintiffs—withdrawing from the *Sussex* arbitration to seek an independent neutral arbitrator while the remainder (385 claimants drawn from the 8 plaintiffs in this *Sussex* case and the 397 plaintiffs in *Abraham* case before Judge James Mahan) remain to arbitrate against Turnberry/MGM with disqualified Arbitration Hare whose bias against this defendant has been confirmed by the *KJH* plaintiffs and their common counsel.  Brendan Hare should be disqualified now, *in toto,* as 160 *KJH* plaintiffs—including the majority of the original 20 *Sussex* claimants— have already requested for themselves.

Because of the novelty of the question presented by this Motion and the unprecedented facts, oral argument would be of assistance to the Court and the parties.

MORRIS LAW GROUP


By: /s/ STEVE MORRIS
    Steve Morris, No. 1543
    Akke Levin, No. 9102
    Jean-Paul Hendricks, No. 10079
    900 Bank of America Plaza
    300 South Fourth Street
    Las Vegas, Nevada  89101

SNELL & WILMER L.L.P.
Alex Fugazzi, Bar No. 9022
Justin Carley, Bar No. 9994
3883 Howard Hughes Pkwy., #1100
Las Vegas, NV  89169

Attorneys for Defendant
Turnberry/MGM Grand Towers, LLC

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

<div align="right" style="writing-mode: vertical">

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

</div>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS LAW GROUP, and that the following documents were served via electronic service: **MOTION FOR AN ORDER DECLARING THAT ARBITRATOR BRENDAN HARE IS DISQUALIFIED FOR HIS FAILURE TO MAKE REQUIRED DISCLOSURES UNDER NRS 38.227 THAT ESTABLISH HIS EVIDENT PARTIALITY AND REQUEST FOR ORAL ARGUMENT**

**TO:**

Attorneys for Plaintiffs:

Robert B. Gerard
Ricardo R. Ehmann
Gerard & Associates
2840 South Jones Blvd.
Bldg. D, Suite 4
Las Vegas, Nevada  89146
rgerard@gerardlaw.com
Rehmann@gerardlaw.com

Norman Blumenthal
Blumenthal Nordrehaug &
Bhowmik
2255 Calle Clara
San Diego, California  92037
norm@bamlawlj.com

Burton Wiand
Wiand Guerra King, P.L.
5505 w. Gray Street
Tampa, FL  33609
bwiand@wiandlaw.com

DATED this 11th day of September, 2013.

By:   /s/ PATRICIA FERRUGIA