MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Email: sm@morrislawgroup.com
Akke Levin, Bar No. 9102
Email: al@morrislawgroup.com
Jean-Paul Hendricks, No. 10079
Email: jph@morrislawgroup.com
300 South Fourth Street - Suite 900
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

SNELL & WILMER L.L.P.
Alex Fugazzi, Bar No. 9022
Email: afugazzi@swlaw.com
Justin Carley, Bar No. 9994
Email: jcarley@swlaw.com
Charles Gianelloni, Bar No. 12747
Email: cgianelloni@swlaw.com
3883 Howard Hughes Parkway, #1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252

Attorneys for Defendant
Turnberry/MGM Grand Towers, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MARY ANN SUSSEX; et al.,<br>Plaintiffs,<br>v.<br>TURNBERRY/MGM GRAND TOWERS, LLC, et al.,<br>Defendants.<br>———<br>GEORGE ABRAHAM; et al.,<br>Plaintiffs,<br>v.<br>TURNBERRY/MGM GRAND TOWERS, LLC, et al.,<br>Defendants. | Case No.: 2:08-cv-00773-MMD-PAL<br>**CONSOLIDATED WITH:**<br>Case No.: 2:11-cv-01007-JCM-NKJ<br>**TURNBERRY/MGM GRAND TOWERS, LLC'S SUPPLEMENTAL BRIEF IN RESPONSE TO MINUTE ORDER # 129**<br>**Date: December 3, 2013**<br>**Time: 10:00 A.M.**<br>**Location: Reno Courtroom No. 5** |

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

## I. INTRODUCTION

This case presents an issue of first impression to the Court. There is no federal case involving the unique fact pattern at issue here: During the course of arbitration, as the *sole* arbitrator presiding over the claims of hundreds of claimants in a mass arbitration that he created over objection of the defendants, the arbitrator changed the focus of his career as an attorney. He started a "claimholders" litigation finance business to invest in and profit from large commercial litigations and arbitrations, just like this arbitration, at the expense of defendants. Applying the evident partiality standard applicable in the Ninth Circuit to this unprecedented set of facts, there cannot be a reasonable doubt that the arbitrator has announced his preference for plaintiffs' claims. He should be disqualified as a "neutral" arbitrator, before discovery and arbitration on the merits gets underway.

Whether the benefit to the arbitrator of his announced preference is direct or indirect, the question about his qualifications to serve as a *neutral* arbitrator is this: Do the facts *withheld* by the arbitrator, while he professes to be impartial, show that, in fact, he is *partial*? *Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir. 1994). The answer here is unequivocally yes: A reasonable person could not doubt whether the arbitrator's aggressive solicitation of investors and dependence on business from plaintiffs and plaintiffs lawyers for the success of his new career-changing litigation finance business would likely prevent him from taking the side of Turnberry/MGM in this large commercial arbitration. This is "because doing so might 'put at risk' his ability to secure business from the lawyers and law firms whose business he solicits." *Benjamin, Weill & Mazer v. Kors*, 125 Cal. Rptr. 3d 469, 496 (Cal. App. 2011).

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

An award favoring plaintiffs in this mass commercial arbitration would confer a real, albeit indirect, financial benefit on the arbitrator, because it would unmistakably demonstrate to investors and lawyers alike how lucrative litigation funding could be. This would be likely to attract investors to his company, like sugar attracts ants, and enable him to begin building the network of plaintiffs' law firms necessary to "source cases" for investment purposes.

The arbitrator's positional conflict in this case is not stale, remote, or trivial; it is real and now, a conflict *he created* mid-arbitration. It is substantial because this *Sussex* arbitration, involving 545 claimants, is precisely the type of case he seeks to invest in and profit from. Indeed, the arbitrator himself conclusively evidenced the relationship between his litigation funding business and his work as an arbitrator by touting his experience as a "neutral" arbitrator on his Bowdoin Street Capital website and in his PowerPoint presentations to prospective investors and claimants' lawyers. These facts—established by the arbitrator himself—also establish the basis for his removal *now*— before discovery gets underway and the parties waste months and years arbitrating hundreds of cases to awards that must be vacated for evident partiality that the arbitrator himself created but did not disclose to Turnberry/MGM.

## II. ARGUMENT

### A. The FAA and the Nevada Uniform Arbitration Act Apply *in Tandem.*

#### 1. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 477-78 (1989) ("Volt").*

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

2. ***Scandinavian Reins. Co. v. St. Paul Fire and Marine Ins. Co., 668 F.3d 60, 71 (2d. Cir. 2012).***

"The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt*, 489 U.S. at 477. Where, as here, the parties stipulated to be governed by Nevada law, PSA § 24.10, and Nevada law does not undermine the goals of the FAA, "enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA . . . ." *Volt*, 489 U.S. at 479; *accord Scandinavian Reins. Co. v. St. Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d. Cir. 2012) ("[T]he FAA and the New York Convention work in tandem, and they have overlapping coverage to the extent that they do not conflict") (internal quotations omitted). The Nevada Uniform Arbitration Act does not undermine but promotes the FAA's goals by setting the standards for an arbitrator's disclosure obligations (NRS 38.227) and by mandating vacatur of an award for an arbitrator's evident partiality (NRS 38.241). Thus, the Nevada Uniform Arbitration Act and the case law applying it may be properly considered by this Court in determining whether to disqualify Brendan Hare before he enters a final award.

**B. Federal and State Cases Articulating the Evident Partiality Standard.**

1. ***Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151, 89 S. Ct. 337, 340 (1968);**
2. ***Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634 (9th Cir. 2012).**
3. ***Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996);**
4. ***Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir. 1994); *Thomas v. City of North Las Vegas*, 122 Nev. 83, 98, 127 P.3d 1057, 1068 (2006).**

In the Ninth Circuit and Nevada, the standard for evident partiality in non-disclosure cases is whether the "undisclosed facts show a reasonable impression of partiality." *Schmitz v. Zilveti*, 20 F.3d 1043, 1046

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

(9th Cir. 1994); *Thomas v. City of North Las Vegas*, 122 Nev. 83, 98, 127 P.3d 1057, 1068 (2006) (adopting same standard as set forth in *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145 (1968)). "A reasonable impression of bias *sufficiently* establishes evident partiality because the integrity of the process by which arbitrators are chosen is at issue in nondisclosure cases." *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir.1996) (emphasis added). "The parties can choose their arbitrators intelligently only when facts showing *potential* partiality are *disclosed*." *Schmitz*, 20 F.3d at 1047 (emphasis added); *accord Thomas*, 122 Nev. at 98, 127 P.3d at 1068 (" 'In nondisclosure cases, evident partiality is established from the non-disclosure itself. . . .' ") (quoting *Burlington Northern Ry. Co. v. TUCO Inc.*, 960 S.W.2d 629, 636 (Tex. 1997)).

Ninth Circuit case authority makes clear that the standard for vacatur based on evident partiality in this Circuit is broader than in other circuits. *Compare Woods*, 78 F.3d at 427 ("vacatur is appropriate where the arbitrator's failure to disclose information **gives the impression of bias** in favor of one party"), *with Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (holding that evident partiality may be found only "where a reasonable person **would have to conclude that an arbitrator was partial** to one party to the arbitration") (internal citations omitted and emphasis added).

This standard was not met in *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634 (9th Cir. 2012), but the Court's opinion is nevertheless instructive. In *Lagstein* the losing party, Lloyd's, argued that "vacatur was warranted by arbitrator Whitehead's failure to disclose his and [neutral] arbitrator Springer's roles in [a highly-publicized] ethics controversy that occurred in the early 1990s." 607 F.3d at 645. However, there was no connection between the parties in arbitration and arbitrator

Whitehead's decade-old ethics controversy. And arbitrator Whitehead had disclosed that he had arbitrated many cases for Lloyd's in the past. *Id.* at 646. The Ninth Circuit declined to vacate the award merely because "an arbitrator failed to disclose a matter of some interest to a party" on the "basis of *pre-existing, publically available background information on the arbitrators* that ha[d] nothing to do with the parties to the arbitration." *Id.* (emphasis added).

Here, the facts Brendan Hare failed to disclose were *not* pre-existing or *publically available background* information on the arbitrator. Mr. Hare's refocusing of his practice to become a proponent for profit of plaintiffs' claims arose *during* this arbitration, in 2011, when he announced to prospective investors and lawyers that he had "**refocused** his practice"—those are *his* words on his personal LinkedIn page—to become an investor in "claimholders litigation." (Emphasis added.) Arbitrator Hare's active promotion of himself as a "neutral" but profit-seeking arbitrator for plaintiffs' cases would have been more than of "some interest" to Turnberry/MGM in 2011 or 2012: His promotional but undisclosed acts in "refocusing his practice" while holding himself out as a "neutral" arbitrator in this case included: (1) founding his investment vehicle, Bowdoin Street Capital; (2) creating a website to promote investing in plaintiffs' litigations; (3) lecturing and networking at litigation funding seminars; and (4) announcing his new "refocused practice" to potential litigants in need on LinkedIn (but not to the parties before him in arbitration). These are his personal but undisclosed "facts indicating that he might reasonably be thought biased against [Turnberry/MGM] and favorable to [the plaintiffs]." *Lagstein*, 607 F.3d at 646.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

### C. Federal Cases Applying Evident Partiality Standard to Facts Suggesting Indirect Benefit to Arbitrator From Award Favoring One Party.

#### 1. *New Regency Prods., Inc. v. Nippon Herald Films, Inc., 501 F.3d 1101 (9th Cir. 2007)("New Regency")*

In *New Regency*, the district court vacated arbitrator Immerman's award because he had failed to disclose that in mid-arbitration, he began working as a senior executive vice president for Yari Film Group, a company that was negotiating to finance a major motion picture with a third-party producer who was connected to New Regency, the prevailing party in arbitration. 501 F.3d at 1104. The Ninth Circuit affirmed, declaring that these facts showed "that Immerman 'ha[d] a substantial interest in a firm which [was doing] more than trivial business' closely connected to a party to the arbitration." *Id.* (quoting *Commonwealth, supra*.). This was so even though the arbitrator did not have actual knowledge of his indirect benefit and interest through his new employer, because "in the circumstances of this case . . . Immerman had a duty to investigate potential conflicts when he accepted a high-level executive position at Yari Film Group while the arbitration was ongoing." *Id.* at 1109. It was important to the Ninth Circuit that the negotiations occurred *during arbitration* and that there was more than a remote connection between the arbitrator and the prevailing party, New Regency.

*New Regency* can be easily applied by analogy to the facts here. During this arbitration, the arbitrator created Bowdoin Street Capital to finance mass-tort cases, which is what the arbitrator has made of the Signature case that began as claims on behalf of eight people who purchased six Signature condominiums. Arbitrator Hare is Bowdoin Street Capital's creator and principal. Bowdoin Street Capital is Arbitrator Hare's personal investment vehicle for soliciting investors for plaintiffs' counsel

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

and their cases in mass tort litigation. An award in favor of Claimants in this arbitration would indirectly benefit him by bolstering Bowdoin's credibility, just like the award for New Regency benefitted Yari's Film Group's business.

2. ***Thomas Kinkade Co. v. Lighthouse Galleries, LLC, 2010 WL 436604 (E.D. Mich. Jan. 27, 2010), reconsideration denied, 2010 WL 1626697 (E.D. Mich. April 21, 2010), affirmed on appeal, 711 F. 3d 719 (6th Cir. 2013).***

In *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, after arbitration had been underway for several years, the "neutral" arbitrator "Kowalsky and party-arbitrator Morganroth disclosed . . . that one of Kowalsky's law partners had been retained as a defense expert in a malpractice action pending against Morganroth and Morganroth's firm." 2010 WL 436604 * 2 (E.D. Mich. Jan. 27, 2010). Kowalsky thereafter also "disclosed that another partner in his law firm had been asked to represent [party] David White in an unrelated NASD arbitration." *Id.* Thomas Kinkade, as did Turnberry/MGM, requested the AAA to disqualify Kowalsky, the neutral arbitrator, but the AAA refused to do so as it did here. *Id.* at * 6.

Although Kowalsky had disclosed the conflicts in issue, he did not have a direct interest in the outcome of the arbitration, and he would not have received a direct benefit from the disclosed transactions, he did nothing "to separate him[self] from the financial benefits that would accompany the representation." *Id.* at * 2. Moreover, "*the timing* of the disclosures ma[de] them particularly troublesome," *id.* at * 7 (emphasis added), because, as here, the arbitrator had been appointed at the time of disclosure. The court explained:

> **Because the arbitrators must necessarily be selected *before* the arbitration begins, *mid-arbitration* business relationships**

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

> **undermine the ability of the parties to make informed decisions regarding the members of their arbitration panel. . .**
>
> Kowalsky's mid-arbitration disclosures . . . made it impossible for Plaintiffs to make an informed decision regarding Kowalsky's partiality until it was too late.
>
> **Although Plaintiffs could have unilaterally rejected Kowalsky as the neutral before arbitration began, a party that seeks to disqualify an arbitrator after commencement of the hearings faces an uphill battle. . . .**

*Id.* at * 7 (emphasis added). So would Turnberry/MGM post-award.

The *Thomas Kinkade* court vacated the arbitrators' award, additionally noting that the "neutral" arbitrator "time and again" ruled against Thomas Kinkade and in favor of the White defendants on a series of issues even though the law and the facts were against the defendants. *Id.* at * 8. In denying the defendants' motion for reconsideration of the order vacating the award, the court also rejected one of the arguments the *Sussex* plaintiffs (and the arbitrator) appear to make here: "the fact that the potential conflicts of interest . . . ultimately produced minimal income for the neutral arbitrator's firm does nothing to change the difficult position in which Plaintiffs were placed at the time of disclosure." *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, 2010 WL 1626697 (E.D. Mich. April 21, 2010) (on motion for reconsideration).[1]

[1] Thus, the arbitrator's "assurance" that Bowdoin Street Capital has not made any money (yet) and is a "dormant" entity is utterly irrelevant, as Judge Denton recognized, when observing that arbitrator Hare had nevertheless put himself in the market for this business, which affects his attitudinal position: he is biased in favor of plaintiffs and against corporations. D&O at 4:12-16, TMGM 248; TMGM 112. Even if relevant, the fact that the arbitrator's new business venture has not been successful—if true—could be cause of a separate concern, namely that he will care even more about improving his relationship with plaintiffs' counsel or alternatively that he will have greater incentive for generating fees in these arbitrations while refocusing his practice (as evident by his decision

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

Application of the *Thomas Kinkaid* rationale leads to the same result here. Moreover, unlike the arbitrator in *Thomas Kinkaid*, the single arbitrator here for 545 claimants did not voluntarily disclose *any* of the facts at issue, either in 2011 or when he was reappointed in 2012, and represented to the parties that he had nothing to disclose, *after* he had incorporated Bowdoin Street Capital, set up its website, and made presentations at litigation financing seminars for investors and plaintiffs' counsel seeking financing to litigate against corporations, such as the corporations in this arbitration. Turnberry/MGM had a "unilateral right" to reject the arbitrator in 2011 and 2012 that was destroyed by the arbitrator's indifference to conflicts and his failure to disclose his refocused practice and personal interest in supporting plaintiffs, which establishes his evident partiality. *Thomas v. City of North Las Vegas, supra*. Instead, in "mid-arbitration" Turnberry/MGM had to find out on its own that the arbitrator had withheld this highly relevant, critical information while he was considering Turnberry/MGM's dispositive motions and opposition to mass consolidation, every one of which he denied by disregarding the law applicable to the motions.

There is no question that the arbitrator would receive an indirect benefit from an award in the plaintiffs' favor in this arbitration: (1) it would attract plaintiffs' counsel and investors to Bowdoin Street Capital; and (2) it would give meaning to, *in the arbitrator's own words*, that to succeed in the litigation funding business, one needs a good network of

---

consolidating hundreds of new claimants before him and denying a motion to dismiss any claims if it would not resolve the entire arbitration). *See Pitta v. Hotel Ass'n of New York*, 806 F.2d 419, 423-24 (2d Cir.1986) (ordering the arbitrator to be disqualified for an "impermissible self-interest" where the "arbitrable grievance directly concerned the arbitrator's own employment for what may be an extended period of time").

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

contacts—law firms that specialize in group or mass tort class action, as plaintiffs' attorneys in this mass tort case do. Moreover, the arbitrator may well have received an indirect benefit already, because he surely can tout to prospective investors/clients of his litigation funding business an understanding of issues affecting the value of such litigation, including, for example, consolidation orders such as the one he entered in this case.

The evident partiality of the arbitrator is illustrated by his conduct and rulings entered after Turnberry/MGM sought his disqualification, as in *Thomas Kinkade.*[2] As the Sixth Circuit observed on appeal of the arbitrator's disqualification,". . . years into an arbitration, those disclosures were little better than no disclosure at all." *Thomas Kinkade Co. v. White*, 711 F. 3d 719, 724 (6th Cir. 2013). Arbitrator Hare's after-the-fact confirmation in February 2013 that he failed to make a disclosure at the time of his re-appointment in 2012 came also a year too late for Turnberry/MGM; it "obviously would have rejected [Brendan Hare] out of hand" if it had known he was seeking to exploit for profit-making purposes litigation against corporate defendants in 2011 or 2012. *Id.*

### 3. *Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds, 748 F.2d 79, 81 (2d Cir. 1984) ("Morelite")*

[2] For example (only), the arbitrator questioned whether he should apply Nevada or federal statutes of limitations and refused to apply either because doing so would not dispose of all claims and all claimants. He has also ignored three Nevada cases directly on point that, if applied, would dispose of Plaintiffs' securities claims altogether.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

### 4. *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S., 492 F.3d 132, 137 (2d Cir. 2007)("AIM Corp")*

*Morelite* and *AIM Corp* are both "indirect benefit" cases in which the courts vacated the awards for evident partiality under the more stringent standard for vacatur in the Second Circuit. They are of interest here. *See Morelite Const. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 81 (2d Cir. 1984)(vacating an award because the arbitrator's son was vice president of the parent union of a party in the arbitration); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132 (2d Cir. 2007) (vacating an award where the subsidiary of the arbitrator's company was doing business with a subsidiary of the parent company of a party in the arbitration, even though the arbitrator claimed lack of involvement in the negotiations). Although the facts of these cases are distinguishable from ours, "[i]n assessing a given relationship, courts must remain cognizant of peculiar commercial practices and factual variances" of each case. *Morelite*, 748 F.2d at 84. The fact that this *Sussex* case does not fit squarely into the facts of another case does not diminish or trivialize Brendan Hare's indirect conflict and the effect of his failure to disclose it.

### D. State Cases Applying Evident Partiality Standard to Facts Suggesting Indirect Benefit to Arbitrator From Award Favoring One Party.

As discussed above, the Court may properly consider the Nevada Uniform Arbitration Act and the cases applying the Act's evident partiality standard, because the parties' arbitration agreement specifies Nevada law as governing the PSA and any dispute between them. The Nevada Supreme Court, in turn, often looks to California law when it comes to matters of arbitration. *See, e.g., Gonski v. Second Judicial Dist. Court*, 245 P.3d 1164, 1169 (Nev. 2010) (relying on and citing a number of

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

seminal California cases in deciding a motion to compel arbitration); *D.R. Horton, Inc. v. Green*, 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004) (same). Thus California law may properly be considered as persuasive law—as Judge Denton did when he recognized the arbitrator's indirect conflict, and stayed the case to permit Turnberry/MGM to present to the Nevada Supreme Court the issue of whether he could be removed now rather than at the end of an expensive and time-consuming mass arbitration. *See* D&O at 3-4, 9-10, TMGM 247-48, 253-54 (relying on and discussing *Benjamin, Weill & Mazer v. Kors*, 125 Cal. Rptr. 3d 469, 496 (Cal. App. 2011).

**1. *Benjamin, Weill & Mazer v. Kors*, 125 Cal. Rptr. 3d 469, 496 (Cal. App. 2011)("*Kors*").**

*Kors* is very similar to the facts of this case.[3] Like the arbitrator in this case, the *Kors* arbitrator had no direct relationship with any of the parties or counsel and received no direct benefit from the outcome of the arbitration. But he focused his law practice on defending law firms against legal malpractice claims and was representing a law firm in a fee dispute on appeal, while at the same time presiding over a similar fee dispute in arbitration. As the District Court for the Northern District of California explained, the conflict in *Kors* warranted vacatur of the award, because "(1) the conflicting [legal malpractice] case was occurring *concurrently* with the arbitration, and (2) the subject matter was *directly* related." *Oshidary v. Purpura-Andriola*, 2012 WL 2135375 (N.D. Cal. June 12, 2012) (emphasis added).

[3] A detailed discussion and analysis of *Kors* is already set out on pages 23 to 26 of Turnberry/MGM's Motion to Disqualify (# 114) and will not be repeated here. Turnberry/MGM has also highlighted the relevant portions of the case for the Court's guidance in the appendix of cases, attached to this Supplement.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

The same result must follow here. Much like the arbitrator in *Kors*, arbitrator Hare refocused his practice during this arbitration to promote investing in large plaintiffs' litigations, and he has been actively promoting that goal by setting up a personal investment company and lecturing on the subject to solicit investors. At the same time he has been presiding over this arbitration, touting to his audience/investors that his services as a "neutral" arbitrator would benefit them and him in pursuit of profit from plaintiffs' litigations. If the arbitrator ruled against the claimants in this arbitration, it could foreclose his ability to establish relationships with and secure business from plaintiffs' counsel and other plaintiffs' law firms.

**2. *Advantage Med. Services v. Hoffman*, 72 Cal. Rptr. 3d 935, 943 (Cal. App. 2008) ("*Hoffman*").**

*Hoffman* is equally on point and is discussed with approval in *Kors*. In *Hoffman*, the arbitrator permitted a representative of Advantage Medical Services's ("AMS") insurer to attend the hearing without disclosing her identity. She told the parties she was "coverage counsel for Lloyd's of London." After the arbitrator issued an interim award in favor of AMS, the defendants learned that: (1) the arbitrator and his firm represented "major marine insurers" and that the arbitrator was "extremely involved" in the maritime/insurance defense aspects of his law firm's practice; and (2) the arbitrator had indirect ties to Lloyd's as "correspondent counsel" for P&I [protection and indemnity] Clubs, which were tied to Lloyd's through "maritime syndicates providing the bulk of the insurance and reinsurance for shipowners around the world." *Hoffman*, 160 Cal. App. 4th at p. 812, 72 Cal. Rptr. 3d 935.

Neither the arbitrator nor his firm had represented a syndicate at Lloyds. But because of the arbitrator and his firm's "significant

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

commercial and public relationships" with the P&I Clubs, "[i]t would be *incompatible* for anyone approved as [their] "correspondent". . . to take actions contrary to other participants; to do so would most certainly put at risk their status as approved "correspondent" counsel or otherwise." *Id.* at 819, 72 Cal. Rptr. 3d 935 (quoting expert report) (emphasis added). The appellate court then affirmed the trial court's order vacating the award because the undisclosed facts "could cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial."

As in *Hoffman*, it would equally be "incompatible" in this case for the arbitrator to rule against the hundreds of *Sussex* claimants when he is concurrently seeking business from plaintiffs just like them and their counsel to further his refocused practice and interest in financing litigation, just like this arbitration. A ruling against the plaintiffs in this case—the poster child for his new litigation finance business—would greatly diminish, if not eliminate, his ability to generate a network of contacts with the plaintiffs' bar that in his New York seminars he touted as one of his essential attributes to attract new business.

### 3. *KJH et al. v. Turnberry/ MGM Grand Towers et al.*, Decision and Order dated May 10, 2013 ("*KJH*").

Judge Denton recognized the significance of *Kors* and its rationale, and added these persuasive points:

(1) an "indirect positional conflict" due to an arbitrator's "attitudinal disposition" can be "within the ambit of evident partiality resulting from the non-disclosure itself. . . . ." D&O at 4:3-7, TMGM 248;

(2) the arbitrator's non-disclosure of his litigation funding business is not excused or rendered inconsequential by his disclosure of the types of cases he has handled D&O at 4:8-12, TMGM 248; and

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

(3) the fact that the arbitrator has not yet generated revenue from his litigation funding business does not "negate the fact that the Arbitrator has put himself in the market to generate that type of business." D&O at 4:12-16, TMGM 248.

## III. CONCLUSION

As this case and the cases discussed above demonstrate, an indirect benefit from an award favoring a plaintiff or group of plaintiffs can come in many shapes and forms. It just so happens that this case presents a combination of disqualifying non-disclosures that are unprecedented. But the novelty of these facts does not detract from their significance and case precedents that conclude that arbitration awards may be vacated for evident partiality. If allowed to go unchecked to final award(s), Arbitrator Hare's demonstrated evident partiality will not only generate fees for him for many months to come, but it will establish his credentials as a plaintiffs' arbitrator who can be relied on by investors to evaluate ("source") cases

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

and support them to conclusion and profits for all, just like a final award here would yield to the plaintiffs and their counsel.

MORRIS LAW GROUP

By: [signature]
Steve Morris, No. 1543
Akke Levin, No. 9102
Jean-Paul Hendricks, No. 10079
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

SNELL & WILMER L.L.P.
Alex Fugazzi, Bar No. 9022
Justin Carley, Bar No. 9994
Charles Gianelloni, Bar No. 12747
3883 Howard Hughes Parkway, #1100
Las Vegas, NV 89169

Attorneys for Defendant
Turnberry/MGM Grand Towers, LLC

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS LAW GROUP, and that the following documents were served via electronic service: **TURNBERRY/MGM GRAND TOWERS, LLC'S SUPPLEMENTAL BRIEF IN RESPONSE TO MINUTE ORDER # 129**

TO:

Robert B. Gerard
Ricardo R. Ehmann
Gerard & Associates
2840 So. Jones Blvd. - Bldg. D, Ste 4
Las Vegas, Nevada 89146
*rgerard@gerardlaw.com*
*rehmann@gerardlaw.com*

Norman B. Blumenthal
Kyle Nordrehaug
Donald Scott Macrae
Blumenthal Nordrehaug & Bhowmik
2255 Calle Clara
La Jolla, California 92037
*norm@bamlawlj.com*
*kyle@bamlawlj.com*
*smacrae#bamlawlj.com*

Attorneys for Plaintiffs

Burton Wiand
Wiand Guerra King
3000 Bayport Drive - Suite 600
Tampa, Florida 33607
*bwiand@wiandlaw.com*

Daniel Marks
Law Offices of Daniel Marks
302 East Carson Avenue, Ste. 702
Las Vegas, Nevada 89101
*office@danielmarks.net*

Attorneys for Plaintiffs

DATED this 21st day of November, 2013.

By: [signature]